Ethan Preston (263295)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Movant Robert Nock*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT NOCK, an individual,<br><br>            Movant,<br><br>      v.<br><br>TWILIO INC., a Delaware corporation,<br><br>          Respondent. | No. 3:25-mc-80322<br><br>**APPENDIX SUPPORTING MOVANT ROBERT NOCK'S MOTION TO COMPEL NON-PARTY TWILIO INC.**<br><br>Underlying Case: *Nock v. Palmco Admin., LLC*, No. 1:24-cv-00662 (D. Md.)<br><br>Judge:         Not yet set<br>Date:           Not yet set<br>Courtroom:   Not yet set |

Movant Robert Nock ("Nock") hereby submits the appendix supporting his Motion to Compel. For each document in the appendix, the index below lists: (A) its number in the attached declaration; (B) a brief description; (C) its exhibit number (if any) from Nock's other cases; and (D) its page number in the pagination applied to the appendix ("Nock App'x").

| (A) | (B) | (C) | (D) |
|---|---|---|---|
| 1. | 2019 Email from Synegence, LLC to Mohsin Abdul Jabbar with Indra Login Credentials | - | 1 |
| 2. | 2020 Email from Mohsin Abdul Jabbar Listing (215) 914-9702 Telephone Number | - | 2 |
| 3. | Mohsin Abdul Jabbar's LinkedIn Webpage Listing (215) 914-9702 Telephone Number | 43 | 4 |
| 4. | Indra's June 2021 Email About Pakistan GPS Coordinates in Enrollment Data | 14 | 6 |
| 5. | Excerpt of TextNow, Inc.'s Call Records for (215) 914-9702 | 46 | 8 |
| 6. | List of TPV.com's Telephone Numbers Used by Sales Agents | 154 | 16 |

---

| (A) | (B) | (C) | (D) |
|---|---|---|---|
| 7. | Excerpt of TPV.com's Rule 30(b)(6) Deposition Transcript (Gary Pudles) | - | 17 |
| 8. | Copy of *Nock v. AnswerNet, Inc.*, No. 25-26, 2025 WL 2911147 (E.D. Pa. July 1, 2025) | - | 49 |
| 9. | Order, *Lawson v. Twilio, Inc.*, No. 3:24-mc-80129 (N.D. Cal. Dec. 2, 2024) ECF No. 13 | - | 51 |
| 10. | Joint Discovery Letter, *Lathrop v. Uber Techs., Inc.*, No. 4:14-cv-05678 (N.D. Cal. Dec 23, 2015) ECF No. 100 | - | 53 |
| 11. | Plaintiff's Rule 56(d) Motion, *Glauser v. GroupMe, Inc.*, No. 4:11-cv-02584 (N.D. Cal. July 28, 2014) ECF No. 112 | - | 57 |
| 12. | Joint Discovery Letter, *Bauman v. V Theater Group, LLC*, No. 3:15-mc-80102-JSC (N.D. Cal. May 6, 2015) ECF No. 10 | - | 58 |
| 13. | Nock's Subpoena to Twilio, Inc. and September 9, 2025 Proof of Service | - | 67 |
| 14. | Email Chain Between Counsel for Nock and Twilio Between September 19 and October 10, 2025 | - | 86 |
| 15. | Twilio's October 10, 2025 Response to Nock's Subpoena | - | 92 |
| 16. | Email Chain Between Counsel for Nock and Twilio on October 10, 2025 | - | 105 |

Dated: October 16, 2025   By: _____ s/Ethan Preston

Ethan Preston (263295)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Movant Robert Nock*

From: "Erick Johnson" <erick@synegenceenterprise.com> [10.255.90.16]
To: ajsolutions1122@gmail.com
CC: "Sherrie Edwards" <sherrie@synegenceenterprise.com>
Date: 12/11/2019 2:11:25 PM
Subject: INDRA LOGIN CREDENTIALS

---

**Hi Team**

**here is the login credentials for INDRA:**

**Sub Account Name: Synergence LiveOp Telesales- AJ & Company**
**Sub Account Number: 95162**
**DNIS: 585-433-3469**
**Alternate DNIS: 585-433-3735**

**Username: INDRA_SYN_AJ_MAN**
**Password:** █████████

**Username: INDRA_SYN_AJ_AGE**
**Password:** █████████

**This the portal where u need to upload your recordings:**

**Site: https://columbia1350.exavault.com/users**
**Username: AJ_Co**
**Password:** █████████

**I'll send you your data once i receive.**



Erick Johnson, President
Synegence LLC
Erick@synegenceenterprise.com

From: "Mohsin Abdul jabbar" <ajsolutions1122@gmail.com> [192.168.10.7]
To: "Sherrie Edwards" <sherrie@synegenceenterprise.com>
Date: 7/28/2020 8:43:40 AM
Subject: Re: Add to Gap

Owner name
Talaha Ali Jabbar
Adress::  Main Street Satellite town sargodha pakistan
Phone no:: 2159149702

> On 28-Jul-2020, at 9:14 AM, Sherrie Edwards <sherrie@synegenceenterprise.com> wrote:

> I need your name owner
> address
> phone number

> i cant remember as getting so many emails.

> <Outlook-0adnlm1x.png>

> Sherrie Bryant Edwards, CEO & Chairman
> Synegence, LLC
> A Parent Company of Synergence Compliance Partners
> Sherrie@synegenceenterprise.com
> Office:    813-831-6200
> Mobile:   813-734-4232

**From:** Sherrie Edwards <sherrie@synegenceenterprise.com>
**Sent:** Monday, July 27, 2020 1:14 PM
**To:** ajsolutions1122@gmail.com <ajsolutions1122@gmail.com>
**Cc:** Erick Johnson <erick@synegenceenterprise.com>
**Subject:** Fw: Add to Gap

Please wait for the remaining docs to begin campaign Monday.

| Office Name |
|---|
| AJ Solutions |
| Username: gap362 |
| Password: e7z80E27 |

| First Name | Last Name | Username | Password |
|---|---|---|---|
| Bryan | Walker | gapa3621001 | 6D1oN0l3 |
| Adam | Smith | gapa3621002 | IJ31QK6C |
| Dave | Smith | gapa3621003 | h6kkwYt0 |

Nock App'x 2

| Steven | Polack | gapa3621004 | 8aG42lg2 |
| Harry | Smith | gapa3621005 | 5hb8r32d |
| Mike | Louis | gapa3621006 | P13g49gJ |
| Anthony | Hood | gapa3621007 | Ld3Xi6YL |
| Christian | Daniel | gapa3621008 | 8eQE0k28 |
| Mark | Wilson | gapa3621009 | fNJ70o5x |
| Scott | James | gapa3621010 | 5sk638eq |

<pastedImagebase640.png>

Sherrie Bryant Edwards, CEO & Chairman
Synegence, LLC
A Parent Company of Synergence Compliance Partners
Sherrie@synegenceenterprise.com
Office:    813-831-6200
Mobile:   813-734-4232

Nock App'x 3



**Mohsin Abdul Jabbar**
Director Of Finance and Operations at AJ and Company

Message

**All activity**

Posts · Comments · Videos · Reactions

**Mohsin Abdul Jabbar** · Following
Director of Finance and Operations at AJ and Company
1yr · 🌐

I'm happy to share that I've been promoted to Director of Finance And Operations at **AJ and Company!**



Starting a New Position

👍 1

👍 Like     💬 Comment     ↻ Repost     ➤ Send

**Mohsin Abdul Jabbar** · Following
Director of Finance and Operations at AJ and Company
2yr · 🌐

Hope you all are doing fine; we are helping businesses with back-office services to help them manage tasks remotely at a cost-effective per-hour rate.

Our staff is highly qualified and fluent in the English language.

We can help you in the following:

1. Chat & Email Support

2. Virtual Assistance

✓ Link copied to clipboard. **View post**

EXHIBIT 43

Nock App'x 4

5. LinkedIn Marketing

6. Data Entry

7. Web Designing & Development

8. E-Commerce Business Solutions

9. Graphic Designing

10. Content Creation

11. Social Media Platform Management

13. Customer services

14. Sales

Thanks & Regards

Mohsin Abdul Jabbar
2159149702
https://lnkd.in/dw793va

👏❤️ 2

Like          Comment          Repost          Send

---

**Mohsin Abdul Jabbar** • Following
Director Of Finance and Operations at AJ and Company
4yr • 🌐

Who's open to work from home? 💁 Referral agents needed!!
Paid Weekly, Direct Deposit ⬅️
Comment "AGENT"



0:01          1x

👏🌿 2                                    1 comment

Like          Comment          Repost          Send

---

**Mohsin Abdul Jabbar** • Following
Director Of Finance and Operations at AJ and Company
5yr • 🌐

Looking for energy deregulation campaigns for Residential.
#energy #campaigns #residential #deregulation #US #dm #telesales

👍 3                                      2 comments

---

✅ Link copied to clipboard. View post

Nock App'x 5

From: Jonathan Cleckley
To: nslneilstlouis@gmail.com
CC: "Franklin Jackson" <fjackson@indraenergy.com>
Date: 6/9/2021 10:04:47 AM
Subject: Joshua Valles NSL2004
Attachments: Attach 1

Neil

Please outline why you have a sale that is GPS tracking at 7,000 miles away??

Our quality control will be conducting an investigation and we will get back to you after that occurs. In the meantime I will be deactivating this agent.

Tel. # 3015677923
Sale Date: 6-7-2021

Agent is in Pakistan.
Distance 7,165.34 miles.
D2D sale. GPS shows the agent to be in Pakistan.
Agent location tracked to Pakistan. 32.094500930864314,72.69109335397042
ekata shows phone link.
Contract shows just one name. for the customer and agent.
signatures appear to have been signed by the same person.



EXHIBIT

14

**Jonathan Cleckley**
Manager of D2D & Retail Sales
**C: 832-622-2352**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
www.IndraEnergy.com



Nock App'x 7

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, Andrea Casad attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by **TextNow, Inc.,** and my title is Project Support Specialist. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records disclosed on are true duplicates of the original records in the custody of TextNow, Inc.

I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of TextNow, Inc., and they were made by TextNow, Inc. as a regular practice; and

b.     such records were generated by TextNow, Inc.'s electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of TextNow, Inc. in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by TextNow, Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                                      Signature

Nock App'x 8

EXHIBIT

46

| | |
|---|---|
| **Subject:** | Re: TextNow Subpoena Received |
| **From:** | "TextNow Support" <support@enflickhub.zendesk.com> |
| **Date:** | 03/27/2024, 2:59 PM |
| **Attachments:** | 📦 159729-#2159149702-subscriber-1549602000-1710475199_created-1711567120.zip (647 bytes), 📦 159729-#2159149702-messages-1549602000-1710475199_created-1711567120.zip (24.4 KB), 📦 159729-#2159149702-calls-1549602000-1710475199_created-1711567120.zip (67.0 KB) |
| **To:** | "ep" <ep@eplaw.us> |

# Please type your reply above this line #

---

**Nina** (TextNow Support)

Mar 27, 2024, 3:59 PM EDT

Hi ep,

I would like to confirm that your data package is complete. The requested records associated to the following telephone number(s) have been attached to this email:

(215) 914-9702

Please note that you will have to use an encryption key to open the files. The password is: **BF1ED1F5ABBC8709**

The data package includes the following:
· Subscriber data
· Call logs
· Message logs
· IP addresses

All logs are provided in UTC.

It is important to note that the subscriber information is inputted by the user and TextNow does not verify or authenticate first and last name or email addresses.

Please let us know if you have any questions.


Best Regards,
Nina
Manager, Privacy and Compliance

[PPMPN1-2YWN1]

Attachments:

| | |
|---|---|
| 159729-#2159149702-subscriber-1549602000-1710475199_created-1711567120.zip | 647 bytes |
| 159729-#2159149702-messages-1549602000-1710475199_created-1711567120.zip | 24.4 KB |
| 159729-#2159149702-calls-1549602000-1710475199_created-1711567120.zip | 67.0 KB |

| Call Start Time | Call End Time | Duration | Caller | Called Number | MDN |
|---|---|---|---|---|---|
| 2019-02-08 17:43:31 +0000 | 2019-02-08 17:43:53 +0000 | 22 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-08 17:54:42 +0000 | 2019-02-08 17:55:13 +0000 | 31 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-08 22:57:01 +0000 | 2019-02-08 22:57:39 +0000 | 38 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-08 22:57:05 +0000 | 2019-02-08 22:57:05 +0000 | 0 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-08 23:12:42 +0000 | 2019-02-08 23:12:42 +0000 | 0 | tel:+13125253418 | tel:+12159149702 | |
| 2019-02-08 23:12:59 +0000 | 2019-02-08 23:28:09 +0000 | 910 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-11 17:34:54 +0000 | 2019-02-11 17:35:19 +0000 | 25 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-11 21:34:28 +0000 | 2019-02-11 21:34:28 +0000 | 0 | tel:+13125253418 | tel:+12159149702 | |
| 2019-02-11 21:35:46 +0000 | 2019-02-11 21:36:17 +0000 | 31 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-11 21:38:20 +0000 | 2019-02-11 21:38:51 +0000 | 31 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-11 21:45:35 +0000 | 2019-02-11 21:46:08 +0000 | 33 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-11 22:01:35 +0000 | 2019-02-11 22:04:32 +0000 | 177 | tel:+13125253418 | tel:+12159149702 | |
| 2019-02-12 19:47:50 +0000 | 2019-02-12 19:48:29 +0000 | 39 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-12 21:10:37 +0000 | 2019-02-12 21:11:08 +0000 | 31 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-12 21:29:42 +0000 | 2019-02-12 21:30:13 +0000 | 31 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-12 21:39:49 +0000 | 2019-02-12 21:41:38 +0000 | 109 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-14 16:27:58 +0000 | 2019-02-14 16:30:35 +0000 | 157 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-14 18:27:08 +0000 | 2019-02-14 18:29:38 +0000 | 150 | tel:+12159149702 | tel:+12038719339 | |
| 2019-02-14 18:32:05 +0000 | 2019-02-14 18:34:02 +0000 | 117 | tel:+12159149702 | tel:+12038719339 | |
| 2019-02-15 16:29:12 +0000 | 2019-02-15 16:30:27 +0000 | 75 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-16 01:24:02 +0000 | 2019-02-16 01:24:02 +0000 | 0 | tel:+17204220582 | tel:+12159149702 | |
| 2019-02-16 01:47:47 +0000 | 2019-02-16 01:48:07 +0000 | 20 | tel:+12159149702 | tel:+17204220582 | |
| 2019-02-16 01:49:31 +0000 | 2019-02-16 01:49:51 +0000 | 20 | tel:+12159149702 | tel:+17204220582 | |
| 2019-02-19 15:39:41 +0000 | 2019-02-19 15:40:02 +0000 | 21 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-19 15:41:27 +0000 | 2019-02-19 15:42:30 +0000 | 63 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-19 15:42:39 +0000 | 2019-02-19 15:43:09 +0000 | 30 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-20 15:40:46 +0000 | 2019-02-20 15:46:46 +0000 | 360 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-21 23:15:58 +0000 | 2019-02-21 23:16:26 +0000 | 28 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-21 23:19:22 +0000 | 2019-02-21 23:19:42 +0000 | 20 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-21 23:58:41 +0000 | 2019-02-21 23:58:54 +0000 | 13 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-22 00:06:25 +0000 | 2019-02-22 00:06:55 +0000 | 30 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-22 15:44:43 +0000 | 2019-02-22 15:45:12 +0000 | 29 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-22 16:42:37 +0000 | 2019-02-22 16:43:08 +0000 | 31 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-22 20:11:00 +0000 | 2019-02-22 20:11:33 +0000 | 33 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-23 00:00:50 +0000 | 2019-02-23 00:01:20 +0000 | 30 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-23 00:21:13 +0000 | 2019-02-23 00:21:41 +0000 | 28 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-23 00:22:04 +0000 | 2019-02-23 00:23:34 +0000 | 90 | tel:+12159149702 | tel:+17085466610 | |
| 2019-02-23 01:11:01 +0000 | 2019-02-23 01:15:04 +0000 | 243 | tel:+13125253418 | tel:+12159149702 | |
| 2019-02-27 00:24:47 +0000 | 2019-02-27 00:24:47 +0000 | 0 | tel:+12159149702 | tel:+17085466610 | |
| 2019-02-27 00:25:37 +0000 | 2019-02-27 00:25:45 +0000 | 8 | tel:+12159149702 | tel:+17085466610 | |
| 2019-02-27 00:26:20 +0000 | 2019-02-27 00:26:20 +0000 | 0 | tel:+12159149702 | tel:+17085466610 | |
| 2019-02-27 00:26:29 +0000 | 2019-02-27 00:26:55 +0000 | 26 | tel:+12159149702 | tel:+13125253418 | |
| 2019-02-27 15:39:12 +0000 | 2019-02-27 15:47:29 +0000 | 497 | tel:+12159149702 | tel:+13125253418 | |

Nock App'x 11

| | | | | | |
|---|---|---|---|---|---|
| 683 | 2021-03-23 19:46:47 +0000 | 2021-03-23 19:47:27 +0000 | 40 | tel:+12159149702 | tel:+18335137075 |
| 684 | 2021-03-24 16:12:07 +0000 | 2021-03-24 16:12:55 +0000 | 48 | tel:+12159149702 | tel:+18335137075 |
| 685 | 2021-03-26 15:35:59 +0000 | 2021-03-26 16:04:40 +0000 | 1721 | tel:+12159149702 | tel:+14086503123 |
| 686 | 2021-03-27 16:22:07 +0000 | 2021-03-27 16:23:26 +0000 | 79 | tel:+12159149702 | tel:+18335137075 |
| 687 | 2021-03-29 22:56:25 +0000 | 2021-03-29 22:56:33 +0000 | 8 | tel:+12159149702 | tel:+18444161174 |
| 688 | 2021-04-09 21:58:28 +0000 | 2021-04-09 21:58:44 +0000 | 16 | tel:+12159762525 | tel:+12159149702 |
| 689 | 2021-04-15 22:01:28 +0000 | 2021-04-15 22:01:52 +0000 | 24 | tel:+12159149702 | tel:+18002132870 |
| 690 | 2021-04-15 22:02:21 +0000 | 2021-04-15 22:03:17 +0000 | 56 | tel:+12159149702 | tel:+18007435000 |
| 691 | 2021-04-15 22:03:27 +0000 | 2021-04-15 22:05:16 +0000 | 109 | tel:+12159149702 | tel:+18007435000 |
| 692 | 2021-04-15 22:05:25 +0000 | 2021-04-15 22:06:35 +0000 | 70 | tel:+12159149702 | tel:+18007435000 |
| 693 | 2021-04-15 22:06:43 +0000 | 2021-04-15 22:09:14 +0000 | 151 | tel:+12159149702 | tel:+18007435000 |
| 694 | 2021-04-15 22:09:27 +0000 | 2021-04-15 22:12:09 +0000 | 162 | tel:+12159149702 | tel:+18007435000 |
| 695 | 2021-04-15 22:12:26 +0000 | 2021-04-15 22:17:17 +0000 | 291 | tel:+12159149702 | tel:+18667436589 |
| 696 | 2021-04-15 22:23:30 +0000 | 2021-04-15 22:26:42 +0000 | 192 | tel:+12159149702 | tel:+18667436589 |
| 697 | 2021-04-15 23:20:35 +0000 | 2021-04-15 23:23:42 +0000 | 187 | tel:+12159149702 | tel:+18667436589 |
| 698 | 2021-04-15 23:24:16 +0000 | 2021-04-15 23:27:37 +0000 | 201 | tel:+12159149702 | tel:+18667436589 |
| 699 | 2021-04-16 19:34:28 +0000 | 2021-04-16 19:38:59 +0000 | 271 | tel:+12159149702 | tel:+18667436589 |
| 700 | 2021-04-19 15:33:59 +0000 | 2021-04-19 15:34:08 +0000 | 9 | tel:+12159149702 | tel:+17085466610 |
| 701 | 2021-04-19 15:34:02 +0000 | 2021-04-19 15:34:11 +0000 | 9 | tel:+12159149702 | tel:+17085466610 |
| 702 | 2021-04-19 22:15:46 +0000 | 2021-04-19 22:17:08 +0000 | 82 | tel:+12159149702 | tel:+18335137075 |
| 703 | 2021-04-19 23:37:37 +0000 | 2021-04-19 23:37:37 +0000 | 0 | tel:+12159149702 | tel:+928444161174 |
| 704 | 2021-04-19 23:38:07 +0000 | 2021-04-19 23:38:15 +0000 | 8 | tel:+12159149702 | tel:+18444161174 |
| 705 | 2021-04-20 23:38:25 +0000 | 2021-04-20 23:38:25 +0000 | 0 | tel:+17473001524 | tel:+12159149702 |
| 706 | 2021-04-21 17:21:49 +0000 | 2021-04-21 17:22:55 +0000 | 66 | tel:+12159149702 | tel:+18335137075 |
| 707 | 2021-04-21 22:04:58 +0000 | 2021-04-21 22:06:41 +0000 | 103 | tel:+12159149702 | tel:+18335137075 |
| 708 | 2021-04-22 21:25:15 +0000 | 2021-04-22 21:26:02 +0000 | 47 | tel:+12159149702 | tel:+19733660940 |
| 709 | 2021-04-22 21:27:09 +0000 | 2021-04-22 21:27:13 +0000 | 4 | tel:+12159149702 | tel:+19733660940 |
| 710 | 2021-04-22 21:32:55 +0000 | 2021-04-22 21:33:05 +0000 | 10 | tel:+12159149702 | tel:+14437666356 |
| 711 | 2021-04-22 21:33:37 +0000 | 2021-04-22 21:34:46 +0000 | 69 | tel:+12159149702 | tel:+14437666356 |
| 712 | 2021-04-22 21:35:39 +0000 | 2021-04-22 21:35:44 +0000 | 5 | tel:+12159149702 | tel:+14437666356 |
| 713 | 2021-04-22 21:38:17 +0000 | 2021-04-22 21:38:47 +0000 | 30 | tel:+12159149702 | tel:+14437666356 |
| 714 | 2021-04-22 21:48:04 +0000 | 2021-04-22 21:51:26 +0000 | 202 | tel:+12159149702 | tel:+17326675721 |
| 715 | 2021-04-22 21:57:49 +0000 | 2021-04-22 21:59:11 +0000 | 82 | tel:+12159149702 | tel:+14437666356 |
| 716 | 2021-04-22 22:24:53 +0000 | 2021-04-22 22:27:47 +0000 | 174 | tel:+12159149702 | tel:+17327415369 |
| 717 | 2021-04-22 22:53:41 +0000 | 2021-04-22 22:55:10 +0000 | 89 | tel:+12159149702 | tel:+19082734922 |
| 718 | 2021-04-22 23:56:30 +0000 | 2021-04-22 23:58:33 +0000 | 123 | tel:+12159149702 | tel:+16096554130 |
| 719 | 2021-04-23 00:06:12 +0000 | 2021-04-23 00:07:23 +0000 | 71 | tel:+12159149702 | tel:+18335137075 |
| 720 | 2021-04-23 17:36:30 +0000 | 2021-04-23 17:37:33 +0000 | 63 | tel:+12159149702 | tel:+14109478253 |
| 721 | 2021-04-23 17:43:27 +0000 | 2021-04-23 17:45:08 +0000 | 101 | tel:+12159149702 | tel:+12403025244 |
| 722 | 2021-04-23 17:43:30 +0000 | 2021-04-23 17:45:11 +0000 | 101 | tel:+12159149702 | tel:+12403025244 |
| 723 | 2021-04-24 15:37:50 +0000 | 2021-04-24 15:37:50 +0000 | 0 | tel:+12159149702 | tel:+17327478259 |
| 724 | 2021-04-24 15:38:23 +0000 | 2021-04-24 15:38:34 +0000 | 11 | tel:+12159149702 | tel:+17327478259 |
| | 2021-04-24 15:39:50 +0000 | 2021-04-24 15:40:08 +0000 | 18 | tel:+12159149702 | tel:+17327478259 |

| 736 | 2021-04-27 18:35:18 +0000 | 2021-04-27 18:38:59 +0000 | 221 | tel:+18449432767 | tel:+12159149702 | |
| 737 | 2021-04-27 18:39:47 +0000 | 2021-04-27 18:40:56 +0000 | 69 | tel:+12159149702 | tel:+13018083711 | |
| 738 | 2021-04-27 18:58:34 +0000 | 2021-04-27 18:58:52 +0000 | 18 | tel:+12159149702 | tel:+19739927559 | |
| 739 | 2021-04-27 18:59:59 +0000 | 2021-04-27 18:59:59 +0000 | 0 | tel:+12159149702 | tel:+19739927559 | |
| 740 | 2021-04-27 19:01:52 +0000 | 2021-04-27 19:01:52 +0000 | 0 | tel:+12159149702 | tel:+19739927559 | |
| 741 | 2021-04-27 20:51:46 +0000 | 2021-04-27 20:51:57 +0000 | 11 | tel:+12155251833 | tel:+12159149702 | |
| 742 | 2021-04-28 00:00:41 +0000 | 2021-04-28 00:03:18 +0000 | 157 | tel:+12159149702 | tel:+18565414513 | |
| 743 | 2021-04-28 00:03:34 +0000 | 2021-04-28 00:05:42 +0000 | 128 | tel:+12159149702 | tel:+18565414513 | |
| 744 | 2021-04-28 00:05:51 +0000 | 2021-04-28 00:12:52 +0000 | 421 | tel:+12159149702 | tel:+18565414513 | |
| 745 | 2021-04-28 00:19:51 +0000 | 2021-04-28 00:22:26 +0000 | 155 | tel:+12159149702 | tel:+18565414513 | |
| 746 | 2021-04-28 13:16:34 +0000 | 2021-04-28 13:19:58 +0000 | 204 | tel:+18883556205 | tel:+12159149702 | |
| 747 | 2021-04-28 22:00:36 +0000 | 2021-04-28 22:00:43 +0000 | 7 | tel:+12159149702 | tel:+13013222893 | |
| 748 | 2021-04-28 22:01:21 +0000 | 2021-04-28 22:01:46 +0000 | 25 | tel:+12159149702 | tel:+13013222893 | |
| 749 | 2021-04-28 22:02:15 +0000 | 2021-04-28 22:02:22 +0000 | 7 | tel:+12159149702 | tel:+13013222893 | |
| 750 | 2021-04-28 22:02:51 +0000 | 2021-04-28 22:02:57 +0000 | 6 | tel:+12159149702 | tel:+13013222893 | |
| 751 | 2021-04-28 22:15:13 +0000 | 2021-04-28 22:16:24 +0000 | 71 | tel:+12159149702 | tel:+18449432767 | |
| 752 | 2021-04-29 14:18:11 +0000 | 2021-04-29 14:20:34 +0000 | 143 | tel:+12159149702 | tel:+18883556205 | |
| 753 | 2021-04-29 14:21:26 +0000 | 2021-04-29 14:22:22 +0000 | 56 | tel:+12159149702 | tel:+18328977232 | |
| 754 | 2021-04-29 15:25:05 +0000 | 2021-04-29 15:29:00 +0000 | 235 | tel:+18328977232 | tel:+12159149702 | |
| 755 | 2021-04-29 16:20:15 +0000 | 2021-04-29 16:20:36 +0000 | 21 | tel:+12159149702 | tel:+19739230589 | |
| 756 | 2021-04-29 16:20:57 +0000 | 2021-04-29 16:21:25 +0000 | 28 | tel:+12159149702 | tel:+19739230589 | |
| 757 | 2021-04-29 16:25:03 +0000 | 2021-04-29 16:26:28 +0000 | 85 | tel:+12159149702 | tel:+19739230589 | |
| 758 | 2021-04-29 17:42:11 +0000 | 2021-04-29 17:43:38 +0000 | 87 | tel:+12134521505 | tel:+12159149702 | |
| 759 | 2021-04-29 18:26:53 +0000 | 2021-04-29 18:26:55 +0000 | 2 | tel:+12159147181 | tel:+12159149702 | |
| 760 | 2021-04-29 21:40:13 +0000 | 2021-04-29 21:41:40 +0000 | 87 | tel:+12159149702 | tel:+18335137075 | |
| 761 | 2021-04-29 23:00:06 +0000 | 2021-04-29 23:01:35 +0000 | 89 | tel:+12159149702 | tel:+18449432767 | |
| 762 | 2021-04-29 23:53:07 +0000 | 2021-04-29 23:53:18 +0000 | 11 | tel:+12159149702 | tel:+18335137075 | |
| 763 | 2021-04-29 23:53:44 +0000 | 2021-04-29 23:55:07 +0000 | 83 | tel:+12159149702 | tel:+18335137075 | |
| 764 | 2021-04-29 23:53:47 +0000 | 2021-04-29 23:55:10 +0000 | 83 | tel:+12159149702 | tel:+18335137075 | |
| 765 | 2021-04-30 20:34:03 +0000 | 2021-04-30 20:35:30 +0000 | 87 | tel:+12159149702 | tel:+14109236620 | |
| 766 | 2021-04-30 21:09:40 +0000 | 2021-04-30 21:11:24 +0000 | 104 | tel:+12159149702 | tel:+13015876519 | |
| 767 | 2021-04-30 21:24:40 +0000 | 2021-04-30 21:26:49 +0000 | 129 | tel:+12159149702 | tel:+18449432767 | |
| 768 | 2021-04-30 23:44:23 +0000 | 2021-04-30 23:44:32 +0000 | 9 | tel:+12159149702 | tel:+14104882739 | |
| 769 | 2021-04-30 23:44:52 +0000 | 2021-04-30 23:45:40 +0000 | 48 | tel:+12159149702 | tel:+14104882739 | |
| 770 | 2021-05-01 00:03:49 +0000 | 2021-05-01 00:05:30 +0000 | 101 | tel:+12159149702 | tel:+14105839508 | |
| 771 | 2021-05-03 16:23:31 +0000 | 2021-05-03 16:25:09 +0000 | 98 | tel:+12159149702 | tel:+14104882739 | |
| 772 | 2021-05-03 17:13:03 +0000 | 2021-05-03 17:17:20 +0000 | 257 | tel:+12159149702 | tel:+18328977232 | |
| 773 | 2021-05-03 17:28:48 +0000 | 2021-05-03 17:33:30 +0000 | 282 | tel:+12159149702 | tel:+14104300518 | |
| 774 | 2021-05-03 17:42:20 +0000 | 2021-05-03 17:43:37 +0000 | 77 | tel:+12159149702 | tel:+18449432767 | |
| 775 | 2021-05-03 17:44:26 +0000 | 2021-05-03 17:44:34 +0000 | 8 | tel:+12159149702 | tel:+13014984735 | |
| 776 | 2021-05-03 17:44:40 +0000 | 2021-05-03 17:44:40 +0000 | 0 | tel:+12159149702 | tel:+13014984735 | |
| 777 | 2021-05-03 17:44:58 +0000 | 2021-05-03 17:46:15 +0000 | 77 | tel:+12159149702 | tel:+13014984735 | |
| 778 | 2021-05-03 18:07:56 +0000 | 2021-05-03 18:09:08 +0000 | 72 | tel:+12159149702 | tel:+18449432767 | |
| 779 | 2021-05-03 18:33:54 +0000 | 2021-05-03 18:35:45 +0000 | 111 | tel:+12159149702 | tel:+13014640930 | |

| | | | | | |
|---|---|---|---|---|---|
| 782 | 2021-05-03 22:22:55 +0000 | 2021-05-03 22:23:03 +0000 | 8 | tel:+12159149702 | tel:+17323565387 |
| 783 | 2021-05-03 23:13:25 +0000 | 2021-05-03 23:14:03 +0000 | 38 | tel:+12159149702 | tel:+18335137075 |
| 784 | 2021-05-03 23:14:15 +0000 | 2021-05-03 23:15:22 +0000 | 67 | tel:+12159149702 | tel:+18335137075 |
| 785 | 2021-05-03 23:40:26 +0000 | 2021-05-03 23:42:08 +0000 | 102 | tel:+12159149702 | tel:+18335137075 |
| 786 | 2021-05-03 23:40:29 +0000 | 2021-05-03 23:42:11 +0000 | 102 | tel:+12159149702 | tel:+18335137075 |
| 787 | 2021-05-04 14:31:59 +0000 | 2021-05-04 14:31:59 +0000 | 0 | tel:+16572464014 | tel:+12159149702 |
| 788 | 2021-05-04 14:42:48 +0000 | 2021-05-04 14:43:03 +0000 | 15 | tel:+12159149702 | tel:+16572464014 |
| 789 | 2021-05-05 14:58:36 +0000 | 2021-05-05 14:58:49 +0000 | 13 | tel:+12159149702 | tel:+18328977232 |
| 790 | 2021-05-05 14:59:29 +0000 | 2021-05-05 15:01:01 +0000 | 92 | tel:+18328977232 | tel:+12159149702 |
| 791 | 2021-05-05 19:30:13 +0000 | 2021-05-05 19:31:36 +0000 | 83 | tel:+12159149702 | tel:+18335137075 |
| 792 | 2021-05-05 19:39:40 +0000 | 2021-05-05 19:40:58 +0000 | 78 | tel:+12159149702 | tel:+18335137075 |
| 793 | 2021-05-06 15:35:02 +0000 | 2021-05-06 15:35:12 +0000 | 10 | tel:+15025195184 | tel:+12159149702 |
| 794 | 2021-05-06 17:59:01 +0000 | 2021-05-06 18:00:07 +0000 | 66 | tel:+12159149702 | tel:+18339701303 |
| 795 | 2021-05-06 17:59:04 +0000 | 2021-05-06 18:00:10 +0000 | 66 | tel:+12159149702 | tel:+18339701303 |
| 796 | 2021-05-07 14:43:32 +0000 | 2021-05-07 14:43:42 +0000 | 10 | tel:+18886452604 | tel:+12159149702 |
| 797 | 2021-05-07 14:43:50 +0000 | 2021-05-07 14:44:38 +0000 | 48 | tel:+12159149702 | tel:+18886452604 |
| 798 | 2021-05-07 16:53:47 +0000 | 2021-05-07 16:53:47 +0000 | 0 | tel:+12159149702 | tel:+13018563571 |
| 799 | 2021-05-07 16:54:59 +0000 | 2021-05-07 16:54:59 +0000 | 0 | tel:+12159149702 | tel:+13018563571 |
| 800 | 2021-05-07 17:45:32 +0000 | 2021-05-07 17:45:45 +0000 | 13 | tel:+12159149702 | tel:+14106542222 |
| 801 | 2021-05-07 17:45:52 +0000 | 2021-05-07 17:46:21 +0000 | 29 | tel:+12159149702 | tel:+14106542222 |
| 802 | 2021-05-07 17:46:32 +0000 | 2021-05-07 17:47:36 +0000 | 64 | tel:+12159149702 | tel:+14106542222 |
| 803 | 2021-05-10 19:12:10 +0000 | 2021-05-10 19:17:31 +0000 | 321 | tel:+12159149702 | tel:+18328977232 |
| 804 | 2021-05-10 21:04:19 +0000 | 2021-05-10 21:05:11 +0000 | 52 | tel:+12159149702 | tel:+13017626328 |
| 805 | 2021-05-11 18:29:02 +0000 | 2021-05-11 18:30:19 +0000 | 77 | tel:+12159149702 | tel:+18449432767 |
| 806 | 2021-05-11 23:48:09 +0000 | 2021-05-11 23:49:11 +0000 | 62 | tel:+12159149702 | tel:+18335137075 |
| 807 | 2021-05-12 18:02:40 +0000 | 2021-05-12 18:02:44 +0000 | 4 | tel:+12159149702 | tel:+18335137075 |
| 808 | 2021-05-12 18:02:53 +0000 | 2021-05-12 18:04:15 +0000 | 82 | tel:+12159149702 | tel:+18335137075 |
| 809 | 2021-05-14 18:36:00 +0000 | 2021-05-14 18:36:30 +0000 | 30 | tel:+12159149702 | tel:+18335137075 |
| 810 | 2021-05-17 15:15:12 +0000 | 2021-05-17 15:15:43 +0000 | 31 | tel:+17323502888 | tel:+12159149702 |
| 811 | 2021-05-17 17:52:32 +0000 | 2021-05-17 17:52:42 +0000 | 10 | tel:+12158144278 | tel:+12159149702 |
| 812 | 2021-05-17 18:24:23 +0000 | 2021-05-17 18:25:34 +0000 | 71 | tel:+12159149702 | tel:+18335137075 |

| | | | | | |
|---|---|---|---|---|---|
| 835 | 2021-05-18 18:07:49 +0000 | 2021-05-18 18:09:00 +0000 | 71 | tel:+12159149702 | tel:+18335137075 |
| 836 | 2021-05-18 18:09:57 +0000 | 2021-05-18 18:10:22 +0000 | 25 | tel:+12159149702 | tel:+16096554262 |
| 837 | 2021-05-18 18:10:38 +0000 | 2021-05-18 18:13:34 +0000 | 176 | tel:+12159149702 | tel:+16096554262 |
| 838 | 2021-05-18 18:39:40 +0000 | 2021-05-18 18:39:40 +0000 | 0 | tel:+12159149702 | tel:+12019390392 |
| 839 | 2021-05-18 18:40:22 +0000 | 2021-05-18 18:44:34 +0000 | 252 | tel:+12159149702 | tel:+16098719034 |
| 840 | 2021-05-18 20:34:13 +0000 | 2021-05-18 20:40:44 +0000 | 391 | tel:+12159149702 | tel:+15137718393 |
| 841 | 2021-05-18 20:57:38 +0000 | 2021-05-18 20:59:08 +0000 | 90 | tel:+12159149702 | tel:+15137718393 |
| 842 | 2021-05-18 20:57:40 +0000 | 2021-05-18 20:59:10 +0000 | 90 | tel:+12159149702 | tel:+15137718393 |
| 843 | 2021-05-18 21:05:49 +0000 | 2021-05-18 21:07:39 +0000 | 110 | tel:+12159149702 | tel:+12012827334 |
| 844 | 2021-05-18 22:26:59 +0000 | 2021-05-18 22:31:30 +0000 | 271 | tel:+12159149702 | tel:+15136925528 |
| 845 | 2021-05-18 22:32:48 +0000 | 2021-05-18 22:32:52 +0000 | 4 | tel:+12159149702 | tel:+13302341333 |
| 846 | 2021-05-18 22:33:17 +0000 | 2021-05-18 22:33:18 +0000 | 1 | tel:+12159149702 | tel:+13302341333 |
| 847 | 2021-05-18 22:33:42 +0000 | 2021-05-18 22:34:50 +0000 | 68 | tel:+12159149702 | tel:+13302341333 |
| 848 | 2021-05-18 22:37:51 +0000 | 2021-05-18 22:40:58 +0000 | 187 | tel:+12159149702 | tel:+16098719034 |
| 849 | 2021-05-18 22:41:14 +0000 | 2021-05-18 22:50:44 +0000 | 570 | tel:+12159149702 | tel:+16098719034 |
| 850 | 2021-05-18 23:16:29 +0000 | 2021-05-18 23:17:29 +0000 | 60 | tel:+12159149702 | tel:+18335137075 |
| 851 | 2021-05-19 18:23:42 +0000 | 2021-05-19 18:23:49 +0000 | 7 | tel:+12159149702 | tel:+16096542587 |
| 852 | 2021-05-19 18:24:30 +0000 | 2021-05-19 18:24:30 +0000 | 0 | tel:+12159149702 | tel:+16096542587 |
| 853 | 2021-05-19 18:26:09 +0000 | 2021-05-19 18:45:33 +0000 | 1164 | tel:+12159149702 | tel:+19086852047 |
| 854 | 2021-05-19 18:59:11 +0000 | 2021-05-19 18:59:35 +0000 | 24 | tel:+12159149702 | tel:+19086852047 |
| 855 | 2021-05-19 19:00:04 +0000 | 2021-05-19 19:07:47 +0000 | 463 | tel:+12159149702 | tel:+19086852047 |
| 856 | 2021-05-19 19:16:28 +0000 | 2021-05-19 19:21:36 +0000 | 308 | tel:+12159149702 | tel:+19086852047 |
| 857 | 2021-05-19 19:34:30 +0000 | 2021-05-19 19:34:42 +0000 | 12 | tel:+12159149702 | tel:+19086852047 |
| 858 | 2021-05-19 19:34:51 +0000 | 2021-05-19 19:35:21 +0000 | 30 | tel:+12159149702 | tel:+19086852047 |
| 859 | 2021-05-19 20:33:27 +0000 | 2021-05-19 20:37:39 +0000 | 252 | tel:+12159149702 | tel:+19739230589 |
| 860 | 2021-05-19 20:39:03 +0000 | 2021-05-19 20:40:55 +0000 | 112 | tel:+12159149702 | tel:+19733341404 |
| 861 | 2021-05-19 21:19:08 +0000 | 2021-05-19 21:21:13 +0000 | 125 | tel:+12159149702 | tel:+13302341333 |
| 862 | 2021-05-19 21:28:11 +0000 | 2021-05-19 21:30:31 +0000 | 140 | tel:+12159149702 | tel:+19088520882 |
| 863 | 2021-05-19 21:32:26 +0000 | 2021-05-19 21:32:41 +0000 | 15 | tel:+12159149702 | tel:+19733341404 |
| 864 | 2021-05-19 21:33:06 +0000 | 2021-05-19 21:33:19 +0000 | 13 | tel:+12159149702 | tel:+19733341404 |
| 865 | 2021-05-19 21:37:10 +0000 | 2021-05-19 21:37:17 +0000 | 7 | tel:+12159149702 | tel:+19084644352 |
| 866 | 2021-05-19 21:37:53 +0000 | 2021-05-19 21:37:58 +0000 | 5 | tel:+12159149702 | tel:+19084644352 |
| 867 | 2021-05-19 21:39:04 +0000 | 2021-05-19 21:40:18 +0000 | 74 | tel:+12159149702 | tel:+18335137075 |
| 868 | 2021-05-19 21:43:37 +0000 | 2021-05-19 22:04:30 +0000 | 1253 | tel:+12159149702 | tel:+19088520882 |
| 869 | 2021-05-19 23:49:38 +0000 | 2021-05-19 23:50:35 +0000 | 57 | tel:+12159149702 | tel:+18335137075 |
| 870 | 2021-05-20 00:00:28 +0000 | 2021-05-20 00:00:35 +0000 | 7 | tel:+12159149702 | tel:+19737854288 |
| 871 | 2021-05-20 00:01:08 +0000 | 2021-05-20 00:01:14 +0000 | 6 | tel:+12159149702 | tel:+19737854288 |
| 872 | 2021-05-20 00:01:47 +0000 | 2021-05-20 00:01:53 +0000 | 6 | tel:+12159149702 | tel:+19737854288 |
| 873 | 2021-05-20 20:34:53 +0000 | 2021-05-20 20:34:53 +0000 | 0 | tel:+12159149702 | tel:+12016412882 |
| 874 | 2021-05-20 20:35:01 +0000 | 2021-05-20 20:35:01 +0000 | 0 | tel:+12159149702 | tel:+12016412882 |
| 875 | 2021-05-20 20:35:10 +0000 | 2021-05-20 20:35:10 +0000 | 0 | tel:+12159149702 | tel:+12016412882 |
| 876 | 2021-05-20 20:45:59 +0000 | 2021-05-20 20:47:13 +0000 | 74 | tel:+12159149702 | tel:+16092671832 |
| 877 | 2021-05-20 20:52:36 +0000 | 2021-05-20 20:54:28 +0000 | 112 | tel:+12159149702 | tel:+18335137075 |
| 878 | 2021-05-20 20:59:28 +0000 | 2021-05-20 20:59:36 +0000 | 8 | tel:+12159149702 | tel:+19734164147 |

(833) 513-7075                agents.twilio.tpvhub.com
(844) 416-1174                docs.tpvhub.com
(844) 943-2767                dash.tpvhub.com
                             cvapi.tpvhub.com
                             clients.demo.tpvhub.com
                             agents.deploy.tpvhub.com
                             mgmt.deploy.tpvhub.com
                             downloads.tpvhub.com
                             hub.tpvhub.com
                             releases.tpvhub.com
                             agents.staging.tpvhub.com
                             api.staging.tpvhub.com
                             clients.staging.tpvhub.com
                             mgmt.staging.tpvhub.com

Exhibit                                              No. 1:23-cv-01042

**EXHIBIT**

**154**

Nock App'x 16

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3      _____

4    ROBERT NOCK, an individual, on

5    his own behalf and on behalf of

6    all others similarly situated,

7            Plaintiff,

8        v.                          Civil Action No.

9    SPRING ENERGY RRH, LLC d/b/a        1:23-cv-01042-

10   SPRING POWER & GAS; RRH ENERGY      JHR

11   SERVICES, LLC d/b/a RICHMOND ROAD

12   HOLDINGS, LLC; and RICHMOND ROAD

13   HOLDINGS, LLC, Delaware limited

14   liability companies,

15            Defendants.

16     _____

17       VIDEOCONFERENCE DEPOSITION OF GARY PUDLES

18   DATE:        Monday, August 26, 2024

19   TIME:        10:03 a.m.

20   LOCATION:    Remote Proceeding

21                AnswerNet

22                3930 Commerce Avenue

23                Willow Grove, PA 19090

24   REPORTED BY:  James Bekman

25   JOB NO.:      6872872

                                      Page 1

Nock App'x 17

| | |
|---|---|
| 1    A P P E A R A N C E S | 1    I N D E X |
| 2  ON BEHALF OF PLAINTIFF ROBERT NOCK: | 2  EXAMINATION:                    PAGE |
| 3    ETHAN PRESTON, ESQUIRE (by videoconference) | 3    By Mr. Preston            9 |
| 4    Preston Law Offices | 4 |
| 5    4054 McKinney Avenue, Suite 310 | 5      E X H I B I T S |
| 6    Dallas, TX 75209 | 6  NO.        DESCRIPTION            PAGE |
| 7    ep@eplaw.us | 7  Exhibit 20    Email Dated 5/11/21    55 |
| 8    (972) 842-4666 | 8  Exhibit 21    Endurance Enrollment GPS Data 92 |
| 9 | 9  Exhibit 23    Endurance Enrollment GPS Data 93 |
| 10    JEREMY WILSON, ESQUIRE (by videoconference) | 10  Exhibit 46    TextNow US Certification    91 |
| 11    Biles Wilson | 11  Exhibit 68    Spring Power Signature Page  70 |
| 12    457 Laurence Drive, Suite 195 | 12  Exhibit 105  TPV.com Data        104 |
| 13    Heath, TX 75032 | 13  Exhibit 107  Parties and Witnesses    29 |
| 14    jeremy@bileswilson.com | 14  Exhibit 113  TPV.com Services Agreement  34 |
| 15    (214) 662-8456 | 15  Exhibit 149  Spring Power Response    44 |
| 16 | 16  Exhibit 150  AnswerNet Amended Subpoena  15 |
| 17 | 17  Exhibit 151  AnswerNet Response Letter  25 |
| 18 | 18  Exhibit 152  Cerida Subpoena      27 |
| 19 | 19  Exhibit 153  Email Dated 3/26/21      76 |
| 20 | 20  Exhibit 154  Servers            88 |
| 21 | 21  Exhibit 155  Audio Recording        100 |
| 22 | 22  Exhibit 156  Audio Exhibit    106 |
| 23 | 23  Exhibit 157  Audio Exhibit    110 |
| 24 | 24  Exhibit 158  Audio Exhibit    113 |
| 25                        Page 2 | 25  Exhibit 159  Audio Exhibit    113 |
| | 25                        Page 4 |

| | |
|---|---|
| 1      A P P E A R A N C E S (cont'd) | 1      D O C U M E N T S   R E Q U E S T E D |
| 2  ON BEHALF OF DEFENDANTS SPRING ENERGY RRH, LLC D/B/A | 2  NO.        DESCRIPTION        PAGE |
| 3  SPRING POWER & GAS, RRH ENERGY SERVICES LLC D/B/A | 3  1        URL Tpvhub.com Record    74 |
| 4  RICHMOND ROAD HOLDINGS, LLC, AND RICHMOND ROAD | 4 |
| 5  HOLDINGS, LLC, DELAWARE LIMITED LIABILITY COMPANIES: | 5      I N F O R M A T I O N   R E Q U E S T E D |
| 6    ELLIOT A. HALLAK, ESQUIRE (by videoconference) | 6  NO.        DESCRIPTION        PAGE |
| 7    Harris Beach PLLC | 7  1        TPV.com Hiatus Date      38 |
| 8    677 Broadway, Suite 1101 | 8 |
| 9    Albany, NY 12207 | 9      QUESTIONS INSTRUCTED NOT TO ANSWER |
| 10    ehallak@harrisbeach.com | 10        PAGE    LINE |
| 11    (518) 427-9700 | 11          65      6 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25                        Page 3 | 25                        Page 5 |

2 (Pages 2 - 5)

Nock App'x 18

G. Pudles

1            G. Pudles
2      THE REPORTER: Good morning. My name
3 is James Bekman. I'm the reporter
4 assigned by Veritext to take the record of
5 this proceeding. We are now on the record
6 at 10:03 a.m.
7      This is the deposition of Gary Pudles
8 taken in the matter of Robert Nock, an
9 individual on his own behalf and on behalf
10 of all others similarly situated v. Spring
11 Energy RRH, LLC doing business as Spring
12 Power & Gas, RRH Energy Services, LLC
13 doing business as Richmond Road Holdings,
14 LLC, and Richmond Road Holdings, LLC,
15 Delaware Limited Liability Companies on
16 Monday, August 26, 2024, at 390 Commerce
17 Avenue, Willow Grove, Pennsylvania 19090.
18      I'm a notary authorized to take
19 acknowledgements and administer oaths in
20 New York. Parties agree I will swear in
21 the witness remotely.
22      Absent an objection on the record
23 before the witness is sworn, all parties
24 and the witness understand and agree that
25 any certified transcript produced from the

Page 6

G. Pudles

1            G. Pudles
2 recording of this proceeding:
3      - is intended for all uses
4        permitted under
5        applicable procedural
6        and evidentiary rules
7        and laws in the same
8        manner as a deposition
9        recorded by stenographic
10        means; and
11      - shall constitute written
12        stipulation of such.
13      Now, at this time, will everybody in
14 attendance please identify themselves for
15 the record?
16      It looks like Counsel Wilson is
17 joining us now. So before I swear in the
18 witness, I will let him in and let him
19 know we're at appearances. I'll take a
20 quick pause here.
21      Counsel Wilson, we're about to do
22 appearances if you're -- could hear us;
23 okay? So feel free to join.
24      MR. WILSON: I can. Okay, thank you.
25      THE REPORTER: Okay, thank you.

Page 7

G. Pudles

1            G. Pudles
2 Okay. So at this time, could everybody in
3 attendance please identify themselves for
4 the record?
5      MR. PRESTON: My name is
6 Ethan Preston. I'm appearing on behalf of
7 Plaintiff Robert Nock.
8      MR. WILSON: Jeremy Wilson on behalf
9 of Plaintiff Robert Nock.
10      MR. HALLAK: Elliot Hallak from the
11 law firm of Harris Beach here for the
12 defendants.
13      MR. MURDZA: David Murdza, general
14 counsel for AnswerNet appearing for
15 AnswerNet witness Gary Pudles.
16      THE REPORTER: And if the witness
17 could just state his first and last name.
18      MR. PUDLES: My name is Gary Pudles.
19      THE REPORTER: Thank you.
20      MR. PUDLES: P-U-D-L-E-S.
21      THE REPORTER: Thank you. Okay.
22 Hearing no objection, I will now swear in
23 the witness.
24      If you could please raise your right
25 hand. Thank you.

Page 8

G. Pudles

1            G. Pudles
2 WHEREUPON,
3        GARY PUDLES,
4 called as a witness and having been first
5 duly sworn to tell the truth, the whole
6 truth, and nothing but the truth, was
7 examined and testified as follows:
8      THE REPORTER: Okay. Counsel, please
9     proceed.
10        EXAMINATION
11 BY MR. PRESTON:
12    Q   Good morning, Mr. Pudles. I
13 just want to make sure, are you impaired,
14 or ill, or taking medication and it would
15 cause you not to be able to give truthful
16 testimony today?
17    A   No.
18    Q   Have you been -- had your
19 deposition taken before?
20    A   Yes.
21    Q   Okay. So I'm going to remind
22 you and go over some of the ground rules.
23 Court reporter can't see gestures. It's
24 really a transcribed interview. And so
25 everything -- all your answers have to be

Page 9

3 (Pages 6 - 9)

Nock App'x 19

G. Pudles

1 verbal. We can't talk over each other.
2 And you should ask me if you can't --
3 don't hear or understand a question. Does
4 that -- do those rules sound amenable to
5 you?
6 A   Yes.
7 Q   Okay. So this is a deposition -
8 - a Rule 30(b)(6) deposition of AnswerNet
9 and some affiliates to get their side of
10 the story on some events that are relevant
11 to the underlying lawsuit. I wanted to
12 ask before we go, what function does
13 AnswerNet or its affiliates play in the
14 third party verification processes of the
15 defendants?
16 A   For -- we -- we provide third
17 party verification. We provide that
18 service.
19 Q   Okay. And what does that
20 involve?
21 A   That involves either with an
22 electronic or a live script where we
23 confirm with the consumer that they know
24 what they're buying and that they -- that

Page 10

G. Pudles

1 selling in, we will capture coordinates
2 related to the seller. Related to the
3 sales --
4 Q   Okay. Do you --
5 A   I'm sorry. Related to the sales
6 agent. I apologize.
7 Q   Thank you. Do you capture any
8 other information?
9 A   Certainly. We record the
10 entirety generally of the transaction and
11 all of the data being requested in the
12 particular script by a client. We capture
13 all of that data either electronically or
14 -- either electronically or by an agent
15 collecting that data and putting it into a
16 database.
17 Q   Okay. And what is your personal
18 involvement? This is a case that's going
19 to focus on TPV.com. Do you know who I'm
20 talking about when I say TPV.com?
21 A   I'm sorry. I do know who
22 TPV.com is, yes.
23 Q   Okay. What information does
24 TPV.com capture about door-to-door sales

Page 12

G. Pudles

1 they want to make the purchase.
2 Q   Okay. So that's the
3 verification call --
4 A   Correct.
5 Q   -- that is made in the course of
6 the third party verification? One of the
7 critical features that AnswerNet and its
8 affiliates play in this litigation is the
9 collection of GPS data. Does that change
10 your answer at all in terms of what
11 services AnswerNet provides?
12 A   No, it doesn't change my answer
13 at all.
14 Q   Okay. So you guys -- does the
15 AnswerNet and its affiliates collect GPS
16 coordinates for the sales agent?
17 A   For -- sorry, I interrupted.
18 You want to finish your question?
19 Q   For the sales agents that were
20 working on behalf of the defendants.
21 A   Well, first of all, we don't
22 work on behalf of the sales agents. We
23 work on behalf of the seller. And
24 depending on what channel the seller is

Page 11

G. Pudles

1 agents?
2 A   They capture the -- the details
3 of a transaction. It really depends on
4 the client, and each client has their own
5 scripts and their own data that they
6 determine that we should capture for them.
7 So, you know, we do capture, you know,
8 transaction information, consumer
9 information, the terms of the -- of the
10 offer and the acceptance, and as you
11 pointed out, the GPS coordinates at
12 certain parts of the transaction.
13 Q   Okay. Do you capture anything
14 else like IP addresses, or user agents, or
15 other data that's transmitted over an HTTP
16 protocol?
17 A   Yes. I -- I would -- it depends
18 on the client. Or if you have one of our
19 reports, you can show it to me and I'm
20 happy to point out what the -- what those
21 data points are.
22 Q   Okay. Do you understand that
23 there's a court case involving the
24 defendants and my client?

Page 13

4 (Pages 10 - 13)

Nock App'x 20

G. Pudles

1  
2      A   I understand that there's, if
3  I'm not mistaken, a TCPA action between
4  your client and my client.
5      Q   Okay.  And when did you come to
6  that understanding?
7      A   I have no idea.  Well, sometime
8  -- one -- most likely at a meeting after
9  you reached out or after the client
10  reached out to my general counsel who's
11  very diligent in making sure I know
12  things.
13     Q   Okay.  I'm going to upload
14  another exhibit to the drive.  You should
15  have access to a Google Drive.
16     A   Well, I do, but I -- I would
17  prefer if you would share documents,
18  because I would rather make sure that I'm
19  not searching for something and we're not
20  talking about the same thing.  So if you
21  don't mind bringing up and sharing the
22  document, that would be appreciated,
23  because I don't want to -- I -- I want to
24  make sure that I'm looking at the right
25  document at the right time.

Page 14

G. Pudles

1  
2      Q   Okay.  We might not always be
3  able to do that, but I will try.
4          MR. PRESTON:  Mr. Bekman, can we --
5  I'm going to try to share the screen.
6          THE REPORTER:  Yes.  You're -- you're
7  set up, Counsel.  Oh, I'm just trying to --
8  this is the same Google Drive from
9  previous?
10         MR. PRESTON:  Yeah.  Yeah.  It's a
11  little bit different.  Actually, it might
12  -- the URL might be different.
13         THE REPORTER:  Okay.
14         MR. HALLAK:  Ethan, can you just let
15  us know what exhibit you're referring to
16  when you bring up documents --
17         MR. PRESTON:  This is Exhibit 150.
18         (Exhibit 150 was marked for
19         identification.)
20         MR. HALLAK:  Okay.  Thank you.
21  BY MR. PRESTON:
22     Q   All right.  So this is a
23  subpoena.  It is a subpoena for a Rule
24  30(b)6 deposition of AnswerNet and some
25  affiliated companies.  There we go.  Do

Page 15

G. Pudles

1  
2  you see AnswerNet, TPV, LLC, Sales
3  Verification, and Cerida Investment
4  Corp --
5      A   I do.
6      Q   -- Mr. Pudles?
7      A   I do.
8      Q   Okay.  And have you seen this
9  document before?
10     A   I have not.
11     Q   You have not seen this document
12  before?
13     A   No.
14     Q   Okay.  Did you prepare for a
15  deposition?  Did you prepare for this
16  deposition?
17     A   I did.
18     Q   Okay.  How did you prepare?
19     A   With counsel and with -- with
20  counsel and a couple of other people, but
21  mostly with counsel.
22     Q   Okay.  Without involving
23  discussions with your counsel, who did you
24  speak with?
25     A   I spoke with Eduardo Flores who

Page 16

G. Pudles

1  
2  is our Vice President of TPV,
3  Lauren Hinote, who is our -- who is our
4  salesperson, and counsel.
5      Q   Okay.  And how long has
6  Mr. Flores been at TPV.com?
7      A   I don't know how long he's been
8  at TPV.com, but he -- he's been with
9  TPV.com since I acquired that company --
10  or since Cerida Investment Corp acquired
11  the LLC.
12     Q   Okay.  Did he have a position
13  TPV.com prior to that acquisition?
14     A   He did.  He did.
15     Q   Okay.  And when did that
16  acquisition take place, if you don't mind
17  my asking?
18     A   I believe it was 2021.
19     Q   Okay.  What did you speak with
20  Mr. Flores about?
21     A   About making sure that I knew
22  the things I thought you would ask about.
23     Q   Okay.  How did you do that
24  without looking at the deposition notice?
25     A   Because it -- the -- the prep

Page 17

5 (Pages 14 - 17)

Nock App'x 21

G. Pudles

1  work was prepped by my attorneys.
2      Q    Okay.
3      A    So -- so anything I needed to
4  see was prepared for me by my attorneys.
5      Q    Okay.  And what specifically did
6  you discuss with Mr. Flores?
7      A    What did I specifically discuss
8  with Mr. Flores?  Well, with the group and
9  -- and there was no private conversation,
10  so I'm not really sure where the attorney
11  privilege lies, but we went over the -- a
12  couple of sheets that you had sent over, a
13  couple of reports from ours to make sure
14  that I was correctly identifying those.
15  And we talked about -- about what we
16  thought you might ask and -- and how we
17  might answer that -- how I might answer
18  that.  And my attorneys gave me advice as
19  to, you know, as to some of the ways I was
20  going to answer or not answer depending on
21  the nature of the question.
22      Q    Okay.  And there was another
23  person, Laura [sic] Hinote?  Did I --
24      A    Correct.

Page 18

G. Pudles

1      Q    Okay.  Are there any other
2  employees who would have more information
3  about what you assumed we were going to
4  ask about in the deposition?
5      A    No.
6      Q    Okay.  How do you know that?
7      A    Well, because I just do.  I
8  mean, I'm not sure how to even answer
9  that, so I'll just say that nobody would
10  know more than Lauren and Eduardo.
11      Q    Okay.  Very good.  What happened
12  after the acquisition of TPV.com and I
13  think there's another entity that's sort
14  of involved in this called TrustedTPV --
15  does that sound like an affiliate --
16      A    It is.
17      Q    -- of AnswerNet?
18      A    We -- we -- yes.  TrustedTPV was
19  a business whose assets we acquired.
20      Q    Okay.  What happened to TPV.com
21  and TrustedTPV?  Are those entities -- do
22  they still exist?
23      A    TPV.com, LLC exists.  Trusted --
24  Trusted may exist.  I've never bought -- I

Page 20

G. Pudles

1      Q    Okay.  And what's her position?
2      A    She's in sales.
3      Q    Which entity?
4      A    She sells for the TPV companies.
5  She works -- she works -- I -- I'm not
6  sure which company she actually works for.
7  I have a few.  But she's --
8      Q    Yeah.
9      A    -- she's the salesperson
10  dedicated to the TPV business.  She also
11  came from TPV.com and was very
12  knowledgeable about the focus platform,
13  which I believe you're going to ask about.
14      Q    I am going to ask about that.
15  That is -- I'm grateful that we're on the
16  same page about that.  Is there any
17  information that you sought in preparation
18  for your deposition that you were not able
19  to obtain?
20      A    Not that I can think of.
21      Q    Okay.
22      A    No.  In fact, I know there
23  was -- I got everything I -- I needed --
24  at least what we thought we needed.

Page 19

G. Pudles

1  didn't buy the entity -- I only bought the
2  assets.
3      Q    Okay.  Who's the most senior
4  employee at Cerida Investment?
5      A    Me.
6      Q    Okay.  Who's the most senior
7  employee at AnswerNet?
8      A    Well, AnswerNet, Inc. is me, but
9  AnswerNet is a brand, it's not an -- it's
10  not a corporation.
11      Q    Okay.  What's the relationship
12  between AnswerNet, Inc. and AnswerNet the
13  brand?
14      A    AnswerNet the brand covers a
15  number of corporations.  AnswerNet, Inc.
16  was the first company created that -- that
17  is now part of AnswerNet.
18      Q    Okay.  And so TPV.com, those --
19  the verification records that were created
20  during the course of defendant's business
21  with TPV.com, who owns those assets?  Who
22  operates that business?
23      A    Well, TPV.com, LLC is owned by
24  Cerida Investment Corp.

Page 21

Nock App'x 22

G. Pudles

1
2    Q   Okay.
3    A   Cerida Investment Corp is owned
4  by me.
5    Q   Okay.  Who's the most senior
6  person at TPV.com?
7    A   Well, if it's not me, it's
8  Eduardo Flores.
9    Q   Okay.
10   A   Actually -- actually, yeah -- or
11  it -- it would be Cori Bartlett, who is my
12  COO.
13   Q   Okay.  Okay.  And what about
14  TrustedTPV?
15   A   Well, the assets of TrustedTPV
16  were folded into -- I believe folded into
17  TPV.com.
18   Q   Okay.  Okay.  So TrustedTPV sort
19  of merged into what used to be TPV.com,
20  but that's really now AnswerNet.  Is that
21  -- do I have that right?
22       MR. MURDZA:  Objection.  Doesn't
23       classify his testimony accurately, but you
24       can answer.
25       THE WITNESS:  All right.  So

Page 22

G. Pudles

1
2  they maintain -- sorry.  What are the
3  steps that they take to maintain that
4  separation?
5        MR. MURDZA:  Objection on the grounds
6    of relevance.  Are we going to talk about
7    Focus and TPV?
8        MR. PRESTON:  We are.  I just -- but
9    who's running focus, Mr. Murdza?  It's
10   not --
11       MR. MURDZA:  I'm not here to answer
12   questions.
13       MR. PRESTON:  -- clear.
14       THE WITNESS:  Well, so going back to
15   your -- could you reread the open
16   question, please?
17  BY MR. PRESTON:
18   Q   Sure.  What steps does AnswerNet
19  take to maintain the separation between
20  different affiliates?
21   A   And if you're asking me what we
22  do to keep our companies different --
23  separated, they have separate payrolls,
24  they have separate bank accounts.  They
25  have -- they have separate, you know --

Page 24

G. Pudles

1
2  AnswerNet is brand.  So to the extent that
3  all of these brands are now part of
4  AnswerNet and operate under the brand
5  AnswerNet TPV, we bought the member
6  interests of -- of TPV.com, LLC.  So
7  Cerida owns a 100 percent of the member
8  interests.  And Cerida also bought the
9  operating assets of Sales Verification,
10  LLC, which, you know, as Trusted.
11  BY MR. PRESTON:
12   Q   TrustedTPV?
13   A   Correct.
14   Q   Okay.
15   A   So they're operated -- they're
16  operated as one business under the
17  AnswerNet brand.
18   Q   How then does AnswerNet
19  distinguish between the different
20  affiliates?
21   A   Wow, I'm not really sure.  We --
22  we work very hard to keep our various
23  affiliates separate, so I'm not really
24  sure what you are trying to ask.
25   Q   Well, what are the steps that

Page 23

G. Pudles

1
2  you know, they have separate existences.
3  We have separate, you know, registrations
4  in separate states.
5    Q   Okay.  Okay.  See if I can get
6  this in front of me.  So I'm going to
7  upload another exhibit.  I'm going to try
8  to share it again with y'all.  Share
9  another one.  All right.  So this is a
10  letter I received from Ashly McGarity.
11       (Exhibit 151 was marked for
12       identification.)
13       Have you ever seen this letter
14  before?
15   A   No.
16   Q   Okay.  So there's a -- I'm going
17  to highlight a paragraph.
18   A   Mm-hmm.
19   Q   Is this a correct statement?
20  This --
21   A   It is.
22   Q   Okay.  So by way of background,
23  on June 18, 2021, Cerida acquired the
24  member interest of TPV.com, a transaction
25  which did not involve AnswerNet.  All

Page 25

Veritext Legal Solutions
800-336-4000

Nock App'x 23

G. Pudles

1 right.
2    A    Which did not involve AnswerNet,
3 Inc.
4    Q    Right.  Okay.  Do you know how
5 TPV.com's procedures changed after this
6 acquisition?
7    A    Wow.  Which procedures
8 specifically are you talking about?
9    Q    Fair enough.  Their verification
10 of enrollments for defendants and their
11 communication policies with respect to
12 communications with the defendants.
13    A    They did not change.  They did
14 not change.
15    Q    Okay.  We're going to roll out
16 of that.  Does Ms. McGarity have any
17 technical background?
18    A    I wouldn't know --
19         MR. MURDZA:  Objection, relevance,
20 but you can answer.
21 BY MR. PRESTON:
22    Q    Let me rephrase that.  Does she
23 have any involvement in the technical or
24 database side of AnswerNet?

G. Pudles

1 was not clear.  Which entity -- which
2 AnswerNet affiliate controls the documents
3 responsive to requests five and six in
4 Exhibit 152.  Is that Cerida or TPV, LLC?
5    A    I would say that that's TPV.  I
6 would say that's TPV.  TPV controls the --
7 the documents.  They might get support
8 from some of the other entities, but the
9 control of the documents -- would be in
10 TPV.
11    Q    Okay.
12    A    But to be very clear, 'cause I
13 don't want to be unclear, I believe
14 that -- I -- I believe you would say that
15 much of -- many of the documents are --
16 are -- the infrastructure for holding
17 those documents are not -- are not
18 controlled by TPV.  So we have an
19 infrastructure -- an internal
20 infrastructure that stuff -- but the
21 documents themselves and the knowledge in
22 them would be controlled by TPV.
23    Q    So when you say TPV in your
24 answer, you're referring to TPV.com, the

G. Pudles

1    A    No.
2    Q    Or any of the affiliates?
3    A    No.
4    Q    Okay.  Add another.  I'm going
5 to add another exhibit.  Going to save
6 that with y'all.  Try to get it up on the
7 screen.  All right.  So this is a subpoena
8 duces tecum that was served on TPV, LLC
9 and Cerida Investment.
10         (Exhibit 152 was marked for
11         identification.)
12         I want to scroll down to
13 requests one, five, and six.  One involves
14 documents concerning Nock, and I don't
15 want to belabor that point, but five and
16 six involve communications with defendants
17 during the class period and communications
18 with sales agents who enrolled consumers
19 with the defendants during the class
20 period.  And I want to ask who controls
21 these documents?
22    A    I believe you've been working
23 with our attorneys.
24    Q    No, no.  Sorry.  That question

G. Pudles

1 TPV, LLC entity --
2    A    Correct.
3    Q    -- becuase TPV is an acronym
4 that you guys use in your industry;
5 correct?
6    A    TPV is an acronym stands for
7 third party verification.
8    Q    Right.  And your prior answer
9 just now concerning who controls things,
10 what you're really talking about is
11 TPV.com, which is a specific LLC?
12    A    Correct.
13    Q    Correct?  Okay.  So I'm going to
14 upload another document, and this is
15 Exhibit 107.  Get rid of that.
16         (Exhibit 107 was marked for
17         identification.)
18         All right.  Mr. Pudles, you
19 should have -- you should be able to see
20 another exhibit that we've prepared and it
21 lists the full names of some of the
22 defendants.  Do you see that?
23    A    I do.
24    Q    Okay.  And this is Exhibit 107.

8 (Pages 26 - 29)

Nock App'x 24

G. Pudles

1  G. Pudles
2  And I want to ask, do you know who these
3  companies are?
4     A   I do.
5     Q   Okay.  And how do you
6  distinguish between these three companies?
7     A   How do I distinguish between
8  those three companies?  I'm not sure what
9  you mean.
10    Q   Well, there are three different
11 companies somewhat similar to AnswerNet's
12 different affiliates.  I'd like to
13 understand, you know, from AnswerNet's
14 perspective how these three companies are
15 different.
16       MR. HALLAK:  Objection to the form of
17    the question.
18    A   The -- I don't know the legal
19 underpinnings of RRH.  What I know is that
20 when they sign up for a particular service
21 in a particular state -- when they sign up
22 for TPV service in a particular state or
23 in a particular -- with a particular
24 product, they will tell us the legal
25 entity that operates that product in that

Page 30

G. Pudles

1  G. Pudles
2  an objection.
3     Q   Sure.  But he's not being
4  deposed.  You are.
5        MR. HALLAK:  So, Ethan, as long as
6     that's just how you're referring to them
7     for purposes of this deposition, that's
8     fine.
9  BY MR. PRESTON:
10    Q   Okay.  We'll take that under
11 advisement.  Get rid of that exhibit.  And
12 do you recognize -- sorry.  I got rid of
13 that too soon.  Do you recognize this?
14 Can you still see that last exhibit -- the
15 107?
16    A   I -- I'm looking at the list of
17 names where the first three names are,
18 Spring Energy RRH, RRH Energy Services,
19 and Richmond Road Holdings.
20    Q   All right.  And I also want to
21 ask, do you recognize some of the other
22 names that I've just highlighted?
23 Endurance Sales, Lone Star Marketing --
24    A   I can't -- I can't see anything
25 other than the line up to Retail Energy

Page 32

G. Pudles

1  G. Pudles
2  state.  And that's all we need to know.
3     Q   Okay.
4     A   For me -- for me, it's -- for
5  me, it's one guy.  And when that guy
6  calls, I jump.
7     Q   Okay.  And who is that guy?
8     A   Greg Hasiak.
9     Q   Okay.  Okay.  And so as far as
10 you're concerned, Mr. Hasiak, when he's
11 calling you, he's calling -- it could be
12 on behalf of any of those entities?
13    A   Or any other entity that he
14 might have an interest in.
15    Q   Okay.  And your relationship
16 with him would be sort of defined at the
17 level of whatever contractor arrangement
18 you are operating under at that time?
19    A   Correct.
20    Q   Okay.  Go back.  So can I talk
21 about these defendants as a group?  Can I
22 just refer to them as RRH or as
23 defendants?  Would that be okay with you?
24    A   I'm -- I'm here for you.  I
25 guess that would be Mr. Hallak, if he had

Page 31

G. Pudles

1  G. Pudles
2  Solutions.
3     Q   Okay.  I'm going to restart it.
4  How about now?
5     A   I recognize the name Endurance
6  Sales and Marketing, and I don't recognize
7  any of the other names.
8     Q   Okay.  And what about these
9  names?  NSL Marketing, Neil St. Louis?
10 No?
11    A   No.  Don't know those either.
12    Q   Okay.  What do you know about
13 Endurance Sales?
14    A   They -- they were a seller for
15 RRH and RRH has sued them because RRH
16 believes that -- well, whatever is in the
17 lawsuit.  I -- what I know is that they
18 were a seller for RRH and that they are
19 now engaged in a lawsuit that RRH has
20 initiated.
21    Q   Okay.  Going to upload some more
22 exhibits, make sure that you have
23 everything.  All right.  So this is a
24 contract between TPV and the defendants.
25 //

Page 33

9 (Pages 30 - 33)

Nock App'x 25



1          G. Pudles
2      (Exhibit 113 was marked for
3      identification.)
4      Can you see this, Mr. Pudles --
5  this exhibit --
6      A   I can.

10          MR. HALLAK:  Objection to form.

                                    Page 34

1          G. Pudles
2  trucking, and I'll stop singing The
3  Grateful Dead.
4      Q   Yeah, that's great.  All right.
5  So when did TPV.com start collecting GPS
6  data for the defendant's enrollments?
7      A    Sometime prior to my ownership.
8      Q   Okay.  And do you know -- did
9  that not come up with Mr. Flores or
10  Ms. Hinote?
11      A   No, I -- it -- it is my
12  understanding that that's been a part of
13  the system since the TPV.com system was
14  launched prior to my ownership.
15      Q   Okay.
16      A   I know that it was done prior,
17  because when we acquired it, it was
18  already being done.
19      Q   Okay.  How does the defendant's
20  business compare to other AnswerNet
21  customers who are in the retail energy
22  space?
23          MR. MURDZA:  Objection to form --
24      A   I'm not -- I'm not sure what you
25  mean, but other than --

                                    Page 36

1          G. Pudles

18  BY MR. PRESTON:
19      Q   Okay.  And we're getting into
20  closer to the heartland of this
21  deposition.  I don't know if you guys want
22  to take a break.  We've been going for
23  40 minutes.  You want want to keep
24  trucking?
25      A   Trucking, yeah.  Let's keep

                                    Page 35

1          G. Pudles
2      Q   Is there anything --
3          THE REPORTER:  Counsel, that --
4  Counsel Hallak, that was an objection as
5  well to form?
6          MR. HALLAK:  Yeah, yeah.  Same
7  objection to form.
8          THE REPORTER:  Yeah, it was just --
9  just garbled.  Thank you.
10  BY MR. PRESTON:
11      Q   Is there anything unusual or
12  distinctive about their business, or is it
13  pretty much consistent with other retail
14  energy suppliers?
15      A   It's pretty much consistent --
16          THE REPORTER:  Counsel Hallak, you
17  broke up again.  That was objection to the
18  form of the question?
19          MR. HALLAK:  Objection to the form of
20  the question.  Yes.  Thank you.
21          THE REPORTER:  Thank -- thank you,
22  Counsel.
23          THE WITNESS:  And the -- the work
24  that we do is pretty much consistent
25  across our TPV customer base.

                                    Page 37

10 (Pages 34 - 37)

Nock App'x 26

G. Pudles

1　　　　　G. Pudles
2　BY MR. PRESTON:
3　　　Q　Okay.  Does TPV.com still
4　provide services to defendants today?
5　　　A　I believe we -- we may have a
6　little, but I -- I also -- part of me
7　believes that they may be on hiatus right
8　now.  I believe they are on hiatus.
9　　　Q　Okay.  And --
10　　　A　And so I don't believe -- I
11　don't believe they're currently selling.
12　　　Q　Okay.  Do you know when they
13　went on the hiatus?
14　　　A　I don't.  I don't, but if it's
15　relevant or important, I'm certain I can
16　get that back to you.
17　　　Q　Okay.  I think it would -- it
18　probably might be useful.  So in your
19　business --
20　　　A　Sorry -- David make a note,
21　please.
22　　　　MR. MURDZA:  I'm doing that now.
23　　　　THE WITNESS:  Okay.
24　BY MR. PRESTON:
25　　　Q　Has AnswerNet communicated with

Page 38

1　　　　　G. Pudles
2　counsel and with some folks, and I don't
3　remember who over at -- other than I know
4　Greg wasn't on the call, and I think it
5　was all lawyers and maybe somebody
6　internally about the lawsuit generally.
7　BY MR. PRESTON:
8　　　Q　Okay.  And what was the content
9　of that conversation?
10　　　　MR. MURDZA:  Objection, privilege.
11　　　　MR. PRESTON:  Sorry.  You say
12　privilege, but I'm confused.  I'm talking
13　about communications between AnswerNet,
14　and the affiliates, and the defendants,
15　and so I'm not sure how that would be
16　privileged.
17　　　　MR. MURDZA:  I'm not sure what type
18　of conversations you're asking --
19　　　　THE WITNESS:  I'm talking about the
20　one conversation we had as a group, you,
21　me, and some folks over there.  I don't
22　remember who was on it from their side.
23　We had one conversation.
24　　　　MR. MURDZA:  I don't remember who --
25　if any defendants were involved in that.

Page 40

1　　　　　G. Pudles
2　the defendants about this subpoena?
3　　　　MR. MURDZA:  Objection.
4　BY MR. PRESTON:
5　　　Q　About this case?
6　　　　MR. MURDZA:  Objection, privilege.
7　There's been lots of communications by
8　answering that, Counsel, with yourself and
9　other counsel, including calls that you
10　were on relative to this matter.  So he
11　can answer as to AnswerNet the operating
12　entity, but I do want to be clear that
13　when it involves discussions with myself
14　or Ashly McGarity, of which there's been
15　several, those are privileged.
16　　　　MR. PRESTON:  Sure.  But I'm talking
17　about communications between AnswerNet or
18　its affiliates and defendants.
19　　　　THE WITNESS:  I can only speak to my
20　conversations.  I know there have been
21　conversations between the attorneys.
22　Nobody else in the company would talk to
23　anybody at RRH to my knowledge about
24　anything with the lawsuit.  I had one
25　conversation regarding the lawsuit with my

Page 39

1　　　　　G. Pudles
2　BY MR. PRESTON:
3　　　Q　Is there a joint defense
4　agreement between AnswerNet and the
5　defendants?
6　　　A　There is not.  Not to my
7　knowledge.
8　　　Q　Okay.  Okay.  So, and this gets
9　back to our -- kind of core of this
10　deposition.  Your business involves
11　verifying enrollments of door-to-door
12　salespeople; correct?
13　　　A　That's part of it, yes.
14　　　Q　Do you have a sense of how much
15　travel -- let me rephrase.  How much does
16　the average door-to-door salesperson
17　travel in a typical day?
18　　　A　I wouldn't know.  I'm not in
19　a -- I'm not a -- in the door-to-door
20　business.
21　　　Q　But you're measuring in --
22　you're verifying their enrollments and
23　you're taking their GPS data as part of
24　that verification.
25　　　A　Okay.

Page 41

11 (Pages 38 - 41)

G. Pudles

1  G. Pudles
2  Q   So you would have some data
3  about how much they're traveling from
4  enrollment to enrollment; correct?
5  A   The system -- that data would
6  live on the system, yes.
7  Q   Okay.  And does AnswerNet ever
8  look at that GPS data to assess, you know,
9  how much travel a typical door-to-door
10  salesperson would do in a typical day?
11  A   No.
12  Q   Okay.  So there's no baseline --
13  AnswerNet does not have any baseline to
14  evaluate whether or not a door-to-door
15  salesperson has traveled an unusual
16  distance and to evaluate their
17  enrollments?  Does that -- so if the
18  typical door-to-door salesperson travels
19  five miles in a day and one particular
20  door-to-door salesperson travels a hundred
21  miles in a day, that would not create any
22  red flags over at AnswerNet or TPV.com?
23      MR. MURDZA:  Objection to form --
24      MR. HALLAK:  -- form the question.
25  A   Correct.

Page 42

1  G. Pudles
2  Q   Okay.  Is that not part of the
3  job for AnswerNet or TPV.com?
4  A   No.  It is not part of the job
5  unless the client asks us to make it part
6  of the job.
7  Q   Okay.  And do you have any sense
8  of how long a typical door-to-door
9  enrollment takes?
10      MR. HALLAK:  Objection to the form of
11  the question.
12  A   Yeah.  I -- I don't particularly
13  have a sense of how long an enrollment
14  takes -- the average enrollment takes --
15  not one that I could give across multiple
16  -- not one that I could give across the
17  business as a whole.  I can tell you maybe
18  how long an average TPV might take, but
19  not the enrollment itself.  We're not
20  involved -- we're -- we're generally only
21  involved in part of the enrollment
22  process, and that's the part that drives
23  the TPV.
24  Q   Okay.  So I'm going to share
25  another document.  This is also uploaded,

Page 43

1  G. Pudles
2  this is Exhibit, shoot, 149.  Yeah.
3  Exhibit 149.  All right.  Have you ever
4  seen this document before?
5      (Exhibit 149 was marked for
6      identification.)
7  A   Nope.
8  Q   Okay.  So this is an
9  interrogatory answer that defendants
10  served on plaintiffs.  I'm going to read
11  the last sentence here.  "Defendants state
12  that the GPS coordinates contained in
13  defendant's enrollment records were
14  obtained through a platform created by
15  TPV.com that utilized Google Location
16  Services to attempt to capture the GPS
17  coordinates of sales agents, customers,
18  and service addresses."  Is that -- I'm
19  going to state that defendants have
20  indicated that they rely on TPV.com to
21  collect GPS data; is that correct?
22  A   Yes.
23  Q   Okay.  And that TPV.com used
24  Google Location Services; is that correct?
25  A   Yes.

Page 44

1  G. Pudles
2  Q   Okay.  And is it fair for
3  plaintiff or anyone else in this case to
4  rely on Google Maps data to review the GPS
5  coordinates from the defendant's
6  enrollment records?  Is that a valid way
7  of analyzing those records?
8      MR. MURDZA:  Objection.  Calls for
9  speculation.
10      MR. HALLAK:  Objection to the
11  question as well.
12      THE WITNESS:  So if you're asking
13  we're using Google data, so is it fair to
14  say that you can use Google Data to look
15  up things on Google -- on Google Maps?  I
16  would say that would seem to make sense to
17  me.
18  BY MR. PRESTON:
19  Q   Right.  And so another way of
20  perhaps asking the same question that
21  won't draw an objection is would you
22  expect AnswerNet's GPS coordinates to
23  generally be consistent with Google Maps?
24  A   Yes.
25  Q   Okay.  When did TPV.com start --

Page 45

12 (Pages 42 - 45)

Nock App'x 28

G. Pudles

1 I've answered this already. Was
2 collecting GPS coordinates for TPV --
3 sorry, excuse me. Did defendants require
4 TPV.com to collect GPS coordinates of
5 these sales enrollments as part of the
6 contract between TPV.com and Richmond Road
7 Holdings?
8    A   Yes.
9    Q   Okay.
10    A   Well, let me just say we did it,
11 I'm assuming it's part of the contract,
12 but the contract itself would speak for
13 itself.
14    Q   Okay.
15    A   I don't -- I don't want to speak
16 to the contract, because I certainly
17 haven't reviewed it and I certainly don't
18 have it memorized.
19    Q   Okay. So I'm going to scroll
20 down in the same contract and there's a
21 document called Focus Location Services
22 overview. Do you recognize this document?
23    A   I do.
24    Q   Okay. Whose document is this?

*Page 46*

G. Pudles

1    A   Yep. Yes, it is.
2    Q   Is the past tense correct?
3    A   It is.
4    Q   Okay. So what does the Focus
5 platform use now?
6    A   I believe it still uses Google
7 Location Services.
8    Q   Okay. And this would've been
9 correct in 2021?
10    A   I believe so, yes.
11    Q   Okay. How does the Focus
12 platform collect Google Location Services
13 GPS coordinates?
14    A   Generally, by, you know, using
15 the GPS data from the mobile device as it
16 says in the next part.
17    Q   Okay. And so how are those GPS
18 coordinates transmitted to TPV.com?
19    A   So when the Focus application is
20 open on the mobile device from different
21 parts of the workflow of focus, it will
22 grab the coordinates from the mobile
23 device.
24    Q   So is there a separate mobile

*Page 48*

G. Pudles

1 Is this defendant's document, or
2 AnswerNet's document, or TPV.com's
3 document?
4    A   This is an Answer -- so I'm
5 going call it -- AnswerNet is the brand
6 upon which TPV.com operates.
7    Q   Sure.
8    A   So asking if it's an AnswerNet
9 document or TPV.com, it is an AnswerNet
10 document that -- that was created outside
11 of the time period of this lawsuit.
12    Q   Well, it says created
13 July 13, 2023 --
14    A   Correct.
15    Q   -- which is while this lawsuit
16 was pending. Do you see that?
17    A   I do.
18    Q   Okay. And so I want to ask,
19 there's a line here that I hope you can
20 see, the Focus platform utilized Google
21 Location Services to capture GPS
22 coordinates?
23    A   Correct.
24    Q   Is that correct? Okay.

*Page 47*

G. Pudles

1 application called Focus, or is this done
2 via HTTP?
3    A   Focus is a SaaS platform. And
4 so it's not a -- it's a native mobile, but
5 it's not a mobile platform and in terms of
6 the way you're describing it. So what it
7 is is it's a SaaS platform that looks on
8 the device that it's been launched on to
9 find the GPS coordinates that are showing
10 on the device. Those coordinates are then
11 -- are then converted some way I guess to
12 -- to -- through the Google Location
13 Services. So the Google Location Services
14 are part of the -- are part of the SaaS
15 platform, and it triggers a look up into
16 the coordinates being shown on the device
17 at the time of the workflow in which we
18 are checking for those coordinates.
19    Q   Okay. It -- I guess I'm a
20 little bit confused. You say it's a SaaS
21 platform. Is that Software as a Service?
22    A   It is.
23    Q   Okay. And then, how is the
24 Software as a Service accessed?

*Page 49*

13 (Pages 46 - 49)

Nock App'x 29

G. Pudles

1
2    A    The agent would bring it up
3  either on their mobile device or on their
4  computer depending on which channel
5  they're working in.
6    Q    Okay.  So they bring it up on
7  their computer.  What application would
8  they use to bring it up and access the
9  Focus platform?
10    A    They would bring up Focus like
11  they would bring up any SaaS platform like
12  Facebook, or Yahoo, or any other, you
13  know, web-based platform.
14    Q    So they would be using some kind
15  of browser to interact with Focus?
16    A    Correct.
17    Q    Okay.  And the GPS coordinates
18  would be transmitted via Google -- or
19  sorry, excuse me.  The GPS coordinates
20  would be transmitted via the browser?
21    A    Yes.
22    Q    Okay.  Do you know how the
23  browser collects the GPS coordinates?
24        MR. MURDZA:  Objection, calls for
25      speculation.

Page 50

---

G. Pudles

1
2    Q    Okay.
3    A    -- it will make the data on --
4  it'll make it appear that the data on the
5  phone is correct when it's not.
6    Q    Okay.  Is the -- at what points
7  in the transaction are GPS coordinates
8  collected?
9    A    Generally, they're collected at
10  the start of the enrollment, at the -- at
11  the end of the enrollment, you know,
12  during the signature.  I believe those
13  are, you know, the -- and it may also be
14  at the beginning of the enrollment.  So at
15  the beginning of the enrollment, then it's
16  the -- I know it's the beginning of the --
17  the contract, and then it's at the signing
18  of the contract process.
19    Q    Okay.
20    A    To the extent they're using
21  Focus for -- for the contract.
22    Q    How long have you --
23    A    Go ahead.
24    Q    How long have you known that GPS
25  coordinates could be spoofed?

Page 52

---

G. Pudles

1
2        THE WITNESS:  I don't -- I'm not a
3      technician, so I don't know the technical
4      aspects of -- of grabbing the GPS.
5  BY MR. PRESTON:
6    Q    Okay.  It's, so you don't know
7  if it's like a JavaScript function or some
8  other internal --
9    A    I believe the -- I believe
10  that's what we use Google -- Google
11  Location Services to do.
12    Q    Okay.
13    A    So I believe Google Location
14  Services will grab that data and -- and
15  bring it into the program.
16    Q    Do you know if that data can be
17  falsified?
18    A    I do.
19    Q    Can it?
20    A    Yes.
21    Q    Okay.  And do you know how it
22  can be falsified?
23    A    There are a number of programs
24  which -- which will provide what's called
25  GPS -- GPS spoofing.  So it will --

Page 51

---

G. Pudles

1
2    A    How long have I known?  Since
3  approximately 1985 -- I'm sorry, 1995.
4    Q    Okay.  Okay.  Was this a
5  well-known vulnerability in GPF -- excuse
6  me -- in GPS authentication?
7    A    It's become a well-known -- it's
8  become a well-known vulnerability.  It
9  wasn't back then.
10    Q    How did you come to be aware of
11  it?
12    A    Because I was part of a team
13  that won a pioneer preference from the FCC
14  to build one of the first all digital
15  wireless networks in the United States.
16    Q    Okay.
17    A    I was -- I was in the
18  engineering department of that effort.
19    Q    Okay.  Why -- when did it become
20  well known that GPS spoofing was a
21  vulnerability of GPS authentication
22  systems?
23    A    I can't answer that, because I
24  left wireless -- you know, I left wireless
25  in 1996.  No, I left wireless in -- yeah,

Page 53

14 (Pages 50 - 53)

Nock App'x 30

G. Pudles

1
2  1996, and so I couldn't tell you that.
3  But I can tell you that when I got into
4  the -- when I acquired TPV.com, it was
5  something that -- that was known and -- it
6  was something that was known.
7      Q    Okay.  I'm going to scroll down
8  a little bit more.  In Exhibit 149, you
9  can see a sentence, "The GPS location for
10 a customer is captured after accepting our
11 terms and privacy on the landing page of
12 our digital link."  And a little bit
13 further, "Additionally, we capture
14 customer GPS location for signature
15 capture.  All GPS locations are captured
16 and displayed on the event", and the event
17 is capitalized.  Can you tell me what an
18 event is?
19     A    Yes.  An event is the signature
20 capture.  The event is the -- the
21 beginning, you know, whatever the event --
22 event is defined as one of the parts of
23 the workflow --
24     Q    Okay.
25     A    -- that requires the GPS

Page 54

G. Pudles

1
2  customer did complete a verification call,
3  but when contacted with a follow-up call
4  indicated that he did not recall a recent
5  door-to-door visit, but did recall a phone
6  call.  This is only one customer claim and
7  we understand it may not provide us a full
8  picture, but with the information
9  provided, it seems clear that at least
10 some of this agent's door-to-door activity
11 is not being conducted at the customer
12 residence.  And as a result, his badge is
13 now deactivated."  Do you see all that?
14     A    I see it.
15     Q    Okay.  So I'd like to ask, what
16 is AnswerNet's understanding of what
17 happened with respect to those enrollments
18 by that agent?
19     A    Well, what this shows me is how
20 -- how integrity filled are -- Richmond
21 Holdings is, because it appears that they
22 made a determination that something may
23 not have been right and they took solid
24 action.  That's what I read here.  But I
25 -- I have no opinion, because this is not

Page 56

G. Pudles

1
2  location to be captured.
3      Q    Okay.  So I'm going to get
4  another document in front of you.  So this
5  is a document called Exhibit 20.  It's an
6  email chain between defendants and
7  Endurance.  I want to ask, we provided
8  this document before your deposition.
9  Have you looked at this document
10 previously?
11         (Exhibit 20 was marked for
12         identification.)
13     A    No.
14     Q    Okay.  I want to scroll down,
15 and I'm going to highlight a few sentences
16 from this document.  "Our quality
17 assurance team has escalated this agent,
18 Neil St. Louis.  After review of recent
19 sales activities, the agent has been
20 deactivated.  Two different customers have
21 TPV entries, which showed GPS locational
22 tracking, placing the agent in a city in
23 Pakistan.  Customer Cecil Jerome was
24 enrolled yesterday, similarly, showed the
25 agent in a different country.  The

Page 55

G. Pudles

1
2  -- this is not having anything to do with
3  AnswerNet, and I -- my opinion is
4  irrelevant to the -- to this matter.
5      Q    Well, but defendant's action is
6  based on GPS coordinates that AnswerNet
7  collected.
8      A    Okay.
9      Q    Isn't that right?
10        MR. HALLAK:  Objection to form.
11     A    It would -- it would appear they
12 got this information from -- from our TPV
13 platform.  So that's what, you know --
14 that's what this letter says.  I have no
15 independent understanding of any of it
16 other than the letter says that they did
17 what I would consider to be the right
18 thing.
19     Q    Okay.  So in -- sorry.
20 AnswerNet made this verification call to
21 Cecil Jerome.  Is that -- do you see where
22 it says that?
23     A    I do.
24     Q    Okay.
25     A    Well, hold -- hold on one

Page 57

15 (Pages 54 - 57)

Nock App'x 31

G. Pudles

1  G. Pudles
2  second.  Let me -- let me -- it doesn't --
3  it -- it -- but it doesn't say that
4  AnswerNet did the follow-up call.  So I
5  don't --
6    Q   No.  I don't think -- did the
7  follow-up call.
8    A   We -- we completed the
9  verification call, but it doesn't say that
10  we completed the follow-up call.  So I
11  want to be very careful about -- about my
12  testimony, which is that I -- I believe
13  that I know through counsel that we did do
14  the -- the verification call that you --
15  that you are referencing, but I don't
16  believe -- I don't know whether we did the
17  follow-up call.  So I want to be very
18  careful not to say we did, because I don't
19  know -- I don't know that.
20    Q   I'm going to represent to you --
21    A   I'm -- I'm confused.  Why are we
22  talking door-to-door for a TCPA claim?
23  But that's I guess none of my business.
24  That doesn't make any sense at all.  And
25  by the way, that's -- that still doesn't

Page 58

1  G. Pudles
2  make any sense, but let's keep going.
3    Q   Well, the claim is that these
4  people were making telemarketing calls and
5  then convincing consumers to say that
6  somebody met with them in person when in
7  fact that was not the case.
8    A   Okay.  Okay I guess.  Okay, now
9  I'll stop, because I'm a -- I go -- go
10  ahead.  It still doesn't make sense.  But
11  it -- but go ahead.
12    Q   Do -- has this situation where
13  the customer -- the sales agent is not
14  present with the customer ever happened
15  previously?
16    A   Yes.
17    Q   Okay.
18    A   Yes.
19    Q   Does it happen a lot?
20    A   Does it happen a lot?
21    MR. MURDZA:  Objection to form.  Who
22  are you talking --
23    THE WITNESS:  Yeah, I -- I mean, it
24  is a problem.  It is a known problem in
25  the industry that the industry is now all

Page 59

1  G. Pudles
2  working on locking down.
3  BY MR. PRESTON:
4    Q   When did it become a known
5  problem?
6    A   It -- it's been a known problem
7  since I was introduced to the industry a
8  couple years ago.
9    Q   By 2021?
10    A   I first learned about the bigger
11  problem at one of the conferences that I
12  attended, and somebody got up and talked
13  about the issues, and that's when it was
14  brought to my attention.
15    Q   2022?
16    A   I would say sometime in '22.
17    Q   Okay.  Does AnswerNet do
18  anything to detect or prevent these
19  situations?
20    A   We have -- we recently deployed
21  a couple of things to -- to hopes -- to --
22  to try and put a stop to it.
23    Q   You mentioned a bigger problem
24  that was discussed at a conference you
25  attended.  Can you explain what that

Page 60

1  G. Pudles
2  bigger problem is?
3    A   Well, GPS spoofing as a whole is
4  a -- has been a problem for the
5  industry -- has been a problem for the
6  industry.
7    Q   Okay.  Do you have a sense of
8  how long it's been a problem for the
9  industry?
10    A   No, I don't.
11    Q   Okay.  And so you indicated that
12  you were -- AnswerNet had recently created
13  procedures to stop this kind of problem.
14  Can you tell me exactly what they're
15  trying to stop?
16    MR. MURDZA:  Objection, misstates his
17  testimony, but you can answer.
18    THE WITNESS:  We're trying to stop
19  the ability of people to -- people to use
20  spoof coordinates as part of the TPV
21  process.
22  BY MR. PRESTON:
23    Q   Okay.  And how are you trying to
24  stop it?
25    A   That's confidential business

Page 61

16 (Pages 58 - 61)

Nock App'x 32

G. Pudles

1  information. I'm not going to reply to
2  that. We're using technology in different
3  forms of technology to stop that, but
4  that's confidential to our business,
5  because what we're about to --
6  Q   Okay.
7  A   -- what -- what we're about to
8  launch is going to be revolutionary.
9  Q   Okay. So these are procedures
10  that are not yet on the market?
11  A   Some are and some are not.
12  Q   When the procedures -- let's
13  just talk about the procedures that are
14  now on the market. I don't think I need
15  to inquire into your, you know, future
16  business plans. But stuff that's already
17  on the market, when did it go on the
18  market?
19  A   For us it was earlier this year.
20  I don't remember exactly.
21  Q   Okay. Okay. Was AnswerNet
22  involved in any quality assurance process
23  with defendants with respect to any of the
24  customers identified in this email at

Page 62

G. Pudles

1  call, that's something that would be
2  relayed to the client?
3  MR. MURDZA: Objection to form.
4  MR. HALLAK: Same.
5  A   In this case, we weren't asked
6  to do this. Spring Energy never asked us
7  to do this. So the answer to that is we
8  didn't do it for this client.
9  Q   Okay. Is that something that
10  AnswerNet ever does?
11  MR. MURDZA: Objection. Relevance.
12  We're here to talk about Spring Energy.
13  A   Yeah, I -- I'm -- unless I'm an
14  -- I'm being asked to be an expert in TPV,
15  you know, again, I'm --
16  Q   Well --
17  A   -- I didn't want to be here for
18  the entire three hours. As you know, I
19  really didn't want to be here at all. So
20  let's -- let's stick to the facts that I
21  can give you and about the system, but I'm
22  not here --
23  A   Sure.
24  A   -- TPV police.

Page 64

G. Pudles

1  Exhibit 20?
2  A   No.
3  Q   Does AnswerNet ever get involved
4  in quality assurance processes with its
5  clients?
6  A   Some clients have us do some
7  analysis, but generally that -- they do it
8  themselves, because this is obviously an
9  important issue to our clients. They hire
10  us because they want to be compliant and
11  they want to get the best information.
12  And so most of them will take that data
13  themselves and -- and react the way you
14  saw this client react, which is when
15  brought -- somehow when -- when --
16  whatever -- however they figured it out,
17  they took immediate and very decisive
18  action.
19  Q   Okay. And so if AnswerNet
20  discovered in a verification call that a
21  customer -- sorry. If AnswerNet
22  discovered in a verification call that the
23  sales agent was not physically present
24  with the customer, but said it was a phone

Page 63

G. Pudles

1  Q   I understand. It goes to what
2  options and countermeasures were available
3  to the defendants at the time of these
4  events?
5  MR. MURDZA: Objection to relevance.
6  I mean, there's other TPV vendors, so the
7  whole universe is what's available to
8  Spring Energy. We'll talk about --
9  MR. PRESTON: Are you instructing him
10  not to answer?
11  MR. MURDZA: I am.
12  MR. PRESTON: On relevance?
13  MR. MURDZA: On relevance.
14  BY MR. PRESTON:
15  Q   Okay. Outside of collecting
16  enrollment data, was AnswerNet involved in
17  hiring, vetting, or monitoring any of
18  defendant's sales agents?
19  A   No.
20  Q   Okay. Does AnswerNet make a
21  verification call for every enrollment?
22  A   That we wouldn't -- I couldn't
23  tell you, because we only make
24  verification calls on enrollments that

Page 65

17 (Pages 62 - 65)

Nock App'x 33

G. Pudles

1   G. Pudles
2   come through our system or that are
3   presented to us.
4       Q   Sure. Let me rephrase that.
5   Does AnswerNet make verification calls for
6   every enrollment that is made through the
7   TPV.com process?
8       A   No.
9       Q   When do they not make calls?
10      A   When the call comes into us.
11      Q   Oh. Okay. Okay. Is there a
12  script that AnswerNet uses for these
13  calls?
14      A   When it -- when it requires an
15  agent, there is a script, yes.
16      Q   Okay. And who provides those
17  scripts?
18      A   In general terms, they're
19  jointly created between the customer and
20  our client solutions team.
21      Q   Okay. So AnswerNet does make
22  calls -- outgoing verification -- excuse
23  me. AnswerNet does make outgoing
24  verification calls to potential enrollees;
25  correct?

Page 66

1   G. Pudles
2       A   Yes.
3       Q   What is that reason?
4       A   If -- it depends on what -- what
5   platform you're using at the time. Again,
6   I'm not going to sit here and explain my
7   business. If you want to talk about the
8   platform that was in use at the time of
9   your complaint, I'm happy to talk -- and
10  -- and what we use for -- for the time in
11  your complaint. But -- but seriously, we
12  -- we're an hour twenty into this and now
13  you're asking me to teach you about my
14  business, which is really not my purpose
15  here, please.
16      Q   Sure. During the time of the
17  events in the complaint, what platforms
18  were used?
19      A   By -- by the TPV.com group, it
20  was the Twilio platform.
21      Q   Okay, perfect. Thank you. Did
22  AnswerNet do anything to detect or prevent
23  enrollments which are made by telephone
24  but where the sales agent coached the
25  customer to say they met the salesperson

Page 68

1   G. Pudles
2       A   Correct.
3       Q   Okay. Do you know the caller ID
4   that is used for those calls?
5       A   Caller ID that is used in those?
6   No. I don't actually.
7       Q   Let me ask another question that
8   might be a little bit more to the point --
9       A   But I believe it's our -- it's
10  our caller ID, not the clients.
11      Q   Okay. Does AnswerNet use Twilio
12  to make those calls?
13      A   Sometimes.
14      Q   Okay. Is there -- are there any
15  other platforms that are used to make
16  verification calls?
17      A   Yes.
18      Q   What are those platforms?
19      A   The other platform we use is
20  called VCC, Virtual Call Center.
21  Sometimes we make calls on that platform
22  as well.
23      Q   Is there a reason why you would
24  make a call on one platform versus the
25  other?

Page 67

1   G. Pudles
2   in person?
3           MR. MURDZA: Objection to form.
4           MR. HALLAK: Objection to the form of
5       the question.
6           THE REPORTER: A double? Two
7       objections, Counsel? Thank you.
8           THE WITNESS: Stereo objections. So,
9       I'm sorry, could you ask the question
10      again with understanding there -- both --
11      both counsel object?
12  BY MR. PRESTON:
13      Q   Sure. Yeah, yeah, yeah. Does
14  AnswerNet -- excuse me, let me back up.
15  Did AnswerNet do anything to detect or
16  prevent enrollments, which were -- were
17  made over the telephone, but where the
18  sales agent coached the customer to say
19  that they met with the sales agent in
20  person?
21          MR. HALLAK: I'll renew that
22      objection to the form of the question.
23      A   And that's -- that's a question
24  that is -- that -- that assumes -- that
25  assumes something that I can't testify to.

Page 69

18 (Pages 66 - 69)

Nock App'x 34



G. Pudles

1    G. Pudles
2 So I'm going to say this, there are
3 certain, there were at the time certain
4 things that -- that the system looks for
5 certainly that would create alerts, and I
6 believe you have the alerts.  So -- so
7 there are things that created alerts, but
8 in terms of what was done and how that was
9 done, our job was to collect data and
10 deliver it to the client.  It was the
11 client -- and it -- and that was the
12 extent of what we were hired to do.
13  Q   Okay.  I think I have -- I
14 understand the position and what was done.
15 Make sure.  68.  So I'm going to put an
16 exhibit in front of you.  All right.  So
17 I'm putting an exhibit in front of you.
18 Do you recognize the form of this exhibit?
19   (Exhibit 68 was marked for
20   identification.)
21  A   No.
22

Page 70

Page 72

1    G. Pudles
2  MR. MURDZA:  Take a minute to --
3  THE WITNESS:  Well --

Page 71

1    G. Pudles

Page 73

Veritext Legal Solutions
800-336-4000

Nock App'x 35

G. Pudles

1
2 ████████████████████████
██████ ██ ████████
████████

6     A    Well, I'm -- I'm -- if you will
7 email it to counsel, I will double check
8 for that.  I can't look it up myself right
9 now, but I'm -- I'm going to ask before I
10 agree to do that, you know, A, who's
11 paying for my time to do that?  And B, you
12 have a document.  If there's a -- a
13 purpose for me to -- to say yes or no that
14 it's there -- that it's still somewhere
15 you have it, and if you have it, then it
16 was given to you by counsel.  So the
17 answer is I'm not going to go chasing
18 around.
19         I, you know -- I -- I agreed to
20 three hours, and we've already -- we've
21 already over -- overspent time.  So the
22 answer is I could see it, but I'm not
23 going to offer to do that unless you're
24 going to offer to pay my team for my time
25 to do that.

Page 74

G. Pudles

1
2     Q    Can you tell me what kind of
3 servers were in place in 2021?
4     A    No.  Other than just say
5 cloud-based servers likely in AWS.  That's
6 all I can tell you.
7     Q    Okay.  All right.  So I've
8 uploaded another document.  And I'll share
9 it.  So this is a -- it's an email, but it
10 has attached a bunch of garbage of how
11 that happened.
12         (Exhibit 153 was marked for
13         identification.)
14         But get to the relevant point
15 very quickly.  So this is the Spring
16 door-to-door easy TPV user guide.  Do you
17 recognize this document?
18     A    I do.
19     Q    Okay.  Did AnswerNet have any
20 involvement in creating this document?
21     A    Depends on what the date of this
22 document is.
23     Q    Well, it would be in 2021.  So I
24 guess my question is probably better
25 framed as did TPV.com have any role in

Page 76

G. Pudles

1
2     Q    Okay.  I mean, the issue of
3 payment is still open, and I've sent the
4 URL around, but you know -- what kind of
5 server is that client.tpvhub.com?
6     A    What kind of server is that
7 today?  Quite frankly --
8     Q    For your business --
9     A    -- but I would say it's an AWS
10 server.  But -- but quite frankly, I'm
11 getting really tired.  I really am.  I'm
12 getting really tired of you showing me
13 things, 'cause I looked at the date of
14 this and that date -- that date is after
15 the time -- it's maybe inside of the
16 lawsuit, but it's outside of the time of
17 your complaint.  We're going round and
18 round on a TCPA question that has nothing
19 to do with door-to-door.
20     Q    Sir, you're --
21     A    I'm -- I'm really -- I -- I have
22 to tell you I'm -- I'm getting frustrated.
23 So the answer is -- the answer is it's --
24 today we have servers that were different
25 than then, and let's move on.

Page 75

G. Pudles

1
2 creating this document?
3     A    I would believe that TPV --
4 again, not knowing what -- not knowing
5 when it was created, it is likely -- it --
6 it appears to be a TPV.com document.
7     Q    Okay.  This sentence, it says,
8 "Yes, it is optimized for your mobile
9 device.  What does optimized mean here?
10     A    Optimized means that when you
11 use the right technology, it will show up
12 on a mobile device properly so that it is
13 readable on a mobile device, it is usable
14 on a mobile device.  So if you don't use
15 the right technology, then when you bring
16 it up on a mobile device, it will have bad
17 margins, the pictures might not render
18 properly, et cetera.  It was always
19 contemplated that this would be mobile and
20 mobile optimized.
21     Q    Okay.  So what do you mean by
22 the right technology?
23     A    There are many ways to build
24 websites and -- and sites visible on the
25 web with data, pictures, et cetera.  And

Page 77

20 (Pages 74 - 77)

Nock App'x 36

G. Pudles

1    some of those technologies allow you to --
2    do not -- do not render well on a mobile
3    device, and some of them do allow you to
4    render well on a mobile device. So for
5    example, traditional HTML doesn't always
6    come out well on a mobile device, but if
7    you use a framework like Ruby on Rails or
8    certain higher end HTML type platforms,
9    you're able to -- you're able to grab
10   that, and when somebody opens it on a
11   mobile device, it renders properly so the
12   information can be read, you can go from
13   page to page, and -- and the -- the kinds
14   of features that well running websites
15   have, will be -- will be available to you
16   on the mobile device.
17   Q    And I think I know the answer,
18   but you know, it's a deposition, I got to
19   get the record right. Why is it important
20   that it renders well on a mobile device?
21   A    So that it makes it easier for
22   both the sales agent and the consumer to
23   see what they're doing, what they're
24   signing, what they're agreeing to, to make
25

Page 78

G. Pudles

1    be placed to the customer to complete
2    verbal confirmation with a live agent
3    confirming enrollment. Upon successful
4    completion of a live TPV call, the
5    customer will receive a copy of their
6    digital contract and transcript of their
7    digital form via email or text." How
8    often was this post verification call,
9    text, or email sent by TPV.com?
10   MR. MURDZA: Objection, form.
11   A    During the -- to my knowledge,
12   every time a successful TPV call was
13   completed, it was sent.
14   Q    Okay.
15   A    We got -- we got consent of the
16   consumer to send it, and we sent it.
17   Q    Okay. And did you keep records
18   of what kind of consent was given?
19   Because -- well, let me back up. So when
20   the consumer gets a text, the text has a
21   link to where they're supposed to sign; is
22   that correct?
23   A    If you want me to talk about
24   specifically the -- the issue -- you know,
25

Page 80

G. Pudles

1    sure that things can't be hidden because
2    of the way the -- the way the -- the
3    platform operates on the mobile device.
4    Q    All right. Because it's
5    essential that they're looking at -- it's
6    likely that the sales agent is looking at
7    it via a mobile device, and it's important
8    that if the customer is that they can see
9    everything; is that accurate?
10   MR. MURDZA: Objection. Objection,
11   form.
12   MR. HALLAK: Same objection.
13   A    Yes.
14   Q    So is there a dashboard for
15   enrollments -- enrollment records on
16   tpvhub.com?
17   A    There is a portal where
18   enrollment records can be accessed during
19   the time that this lawsuit -- the
20   activities of this lawsuit are around,
21   yes.
22   Q    Okay. Let's scroll down.
23   Customer summary. So there's -- you'll
24   see I'm highlighting a "outbound call will
25

Page 79

G. Pudles

1    the -- the transactions at issue, I'm
2    happy to, but --
3    Q    Yes.
4    A    -- what I'll tell you is that
5    sometimes, you know, that -- that -- the
6    -- they would get a text or we would make
7    an outbound call to run through what they
8    had. By the time we ran -- we made the
9    outbound call, they would have generally
10   already signed the enrollment.
11   Q    Oh, okay. That's an important
12   distinction that I didn't understand. How
13   were those signatures collected during
14   this time period?
15   A    By the sales rep in the Focus
16   application.
17   Q    So the sales rep would hand them
18   the document and they would sign -- hand
19   them the mobile device and they would
20   sign?
21   A    Or -- if they were -- or if
22   they were telemarketing, they would've
23   sent them a link.
24   Q    Okay. So this -- the link in
25

Page 81

21 (Pages 78 - 81)

Nock App'x 37

G. Pudles

1  the email is really for telemarketing, not
2  for door-to-door sales?
3      MR. MURDZA: No --
4      MR. HALLAK: Objection, form.
5      THE WITNESS: Sorry.
6      MR. PRESTON: Okay.
7      THE WITNESS: Did you -- you get the
8  objection, Mr. Court Reporter?
9      MR. PRESTON: Always --
10     THE REPORTER: Thank you. I was
11  going to interrupt after. I appreciate
12  that. That -- was that both?
13     MR. MURDZA: Yes.
14     THE REPORTER: Thank you. Two
15  objections.
16     MR. MURDZA: Yeah.
17     THE REPORTER:
18     THE WITNESS: Stereo -- stereo
19  objections, and it's both. It's -- it's
20  both. The transaction always happens -- in a
21  way, the transaction always happens over
22  the web.
23  BY MR. PRESTON:
24     Q   Okay.

G. Pudles

1      Q   Okay. So there is some
2  screening that AnswerNet does to avoid
3  fraud; correct?
4      A   There are some screening that
5  AnswerNet does that does -- yes, that is
6  correct.
7      Q   Okay. So what data is screened
8  to detect fraud by AnswerNet during this
9  time -- during, you know, spring of 2021?
10     A   Without -- without having
11  something in front of me, I know that we
12  do VoIP numbers. I -- I know that -- I
13  know that there's a few, and I -- and I
14  can't tell you -- I don't have the
15  entirety of the process memorized, but
16  there were things that -- that the client
17  will say, if this is -- so, for example,
18  one of the things that we would do for a
19  door-to-door person is if they -- and --
20  and I don't know the numbers -- but if we
21  saw a door-to-door sales agent making
22  sales -- sales too rapidly, that would
23  lead you to believe that they're
24  potentially a problem. And -- these

G. Pudles

1      A   The transaction's always
2  happening over the web, because it's a
3  SaaS application that's capturing the data
4  and do -- and managing the workflow.
5      Q   Okay. Is there a situation
6  where a door-to-door sales agent would be
7  using a desktop computer to do either the
8  enrollment or any of the follow-up work
9  that's involved in the process?
10     MR. MURDZA: I'm going to object,
11  because it calls for speculation. He's
12  already testified that AnswerNet doesn't
13  employ or direct the door-to-door sales --
14     A   Yeah. We're not in the door to todo
15  business, Counsel. And again, I can
16  testify to what -- what I know and what I
17  believe, but, you know, I'm --
18     Q   Okay. Does AnswerNet screen for
19  non-fixed VoIP numbers that are used in
20  the enrollment process?
21     A   Yes.
22     Q   Okay. And why does it do that?
23     A   Because the use of a VoIP number
24  can often indicate fraud.

G. Pudles

1  are the things on the -- what you have on
2  the -- on the alerts.
3      So if you look on the alerts and
4  if you -- if you'd like -- if you'd like
5  to bring up the alert page that I know you
6  have or a document about the alerts, I'm
7  happy to go through them, and tell -- and
8  -- and testify as to the alerts.
9      Q   Okay. I'm going to tell you I'm
10  not sure exactly which alerts you're
11  talking to, but -- talking about rather,
12  but my next question is does TPV.com
13  screen for VPNs?
14     A   Yes, we do. We didn't then. We
15  do now.
16     Q   Okay. When did it start
17  screening for VPNs?
18     A   Earlier this year.
19     Q   I see. Was there a reason why
20  AnswerNet did not screen for VPN use prior
21  to 2024?
22     A   Yes.
23     Q   What was that reason?
24     A   Wasn't part of our technology

Nock App'x 38

G. Pudles

1    stack.
2    Q   Okay.  Can sales agents access
3    Easy TPV in the desktop mode?
4    A   Yes.
5    Q   I mean, is that a possibility?
6    They can?
7    A   Yes.
8    Q   Okay.  Can door-to-door sales
9    agents access Easy TPV in the desktop
10   mode?
11   A   I couldn't tell you, because I
12   don't know about door -- you know, where
13   -- how door-to-door agents access and what
14   they use to access.
15   Q   Okay.  Does AnswerNet keep track
16   of the user agent that's transmitted over
17   HTTP?
18   A   I have no idea what you just
19   said.
20   Q   So part of what's collected over
21   HTTP can be a set of data that's generally
22   referred to as user agent, which involves
23   the kind of browser and then some
24   information about the -- you know, maybe

Page 86

G. Pudles

1    BY MR. PRESTON:
2    Q   I think you indicated -- you
3    referred me to a different document,
4    Mr. Pudles, and I appreciate that and
5    we'll probably get to that document a
6    little bit later.  But I wanted to ask
7    whether or not sitting here as you are
8    today, do you know if AnswerNet collected
9    that information in 2021?
10   A   Not without seeing the documents
11   that I referenced earlier.
12   Q   Okay.  So I've placed another
13   exhibit online, and I'm displaying it,
14   it's Exhibit 154.  There's a list of
15   telephone numbers that I've highlighted.
16   Do you see those telephone numbers?
17       (Exhibit 154 was marked for
18        identification.)
19   A   I do.
20   Q   What are these telephone numbers
21   used for?
22   A   I -- I believe they are -- I
23   don't know every telephone number we use
24   for TPV, so I -- I would have to see

Page 88

G. Pudles

1    the computer that they're using, and it
2    might also include whether or not it's a
3    desktop or a mobile.  And so my question
4    is, does AnswerNet collect that kind of
5    information regarding door-to-door sales
6    agents?
7    A   You have a -- a report that you
8    actually I believe attached to -- I was
9    told, I did not see it -- that you
10   attached to the -- some -- some legal
11   document that shows you what we collect --
12   or what we collected during that period.
13   If you want to bring that document up, we
14   can go through what the -- what the
15   columns mean, if that's -- if that's
16   helpful to you.
17   Q   Okay.  Let's --
18       MR. PRESTON:  Mr. Bekman, can you
19   read that last question back?
20       THE REPORTER:  Oh, yes, Counsel.
21   Counsel, give me one second.
22       (The reporter repeated the
23        record as requested.)
24   //

Page 87

G. Pudles

1    something else.  I believe they are phone
2    numbers that we use for doing TPV, but you
3    know, without seeing something else, we
4    have -- we have literally tens of
5    thousands of phone numbers that we operate
6    across all my companies, and I don't have
7    personal knowledge of any one of them.
8    Q   Sure.  Are there telephone
9    numbers that sales agents use to call
10   TPV.com?
11   A   Yeah, during the time there were
12   certainly telephone numbers that sales
13   agents used to call TPV.com.
14   Q   Okay.  And what were those
15   telephone numbers -- what did they call
16   about?  What was the purpose of those
17   telephone numbers?
18   A   Generally, for a TPV or --
19   generally, they were either a TPV or they
20   were to -- to start a conference call to
21   bring the -- the consumer in.  So there
22   are -- there are a number of things that
23   we do, but you know, either they were for
24   a sales agent to call in and then we would

Page 89

23 (Pages 86 - 89)

Nock App'x 39

G. Pudles

dial out to the consumer and bring them into a call or -- or something like that throughout the process.

Q So they were used for enrollment purposes?

A They were used for TPV purposes.

Q Sorry. They were used to initiate a verification call?

A Correct.

Q Okay. Are those calls recorded?

A Yes.

Q Do you know roughly how long those calls -- recorded calls are kept?

A I don't.

Q Okay. I'm going to add another document. So document 46 -- Exhibit 46 is a certificate of authenticity, and it's essentially the response to a subpoena that we served on TextNow for call records associated with one of the sales agents involved in this case. And if you'll scroll down, you can see there's calls to some of these TPV numbers in May, also in March. And there's a -- in fact an

G. Pudles

outgoing call from AnswerNet or TPV.com to this telephone number that was used by the sales agent here. Is it possible to get these documents -- these recordings?

(Exhibit 46 was marked for identification.)

A First of all, I don't know who TextNow is.

Q Sure.

A And -- and again, any documents or recordings that we had were turned over to Spring, and they would've delivered -- if they exist, they would've delivered them to you, because this document doesn't look like anything I've seen. It's also prior to when I purchased the company, and it -- which, yeah. So on almost every level, I can't testify to this document or the authenticity of any part of it.

Q Okay. I understand that. But it does show calls from a sales agent to AnswerNet, and that's my question is --

MR. MURDZA: Objection --

A No. No, it -- no, it doesn't.

G. Pudles

It shows a -- a series of numbers. I don't know what it shows. And this was -- again, this was prior to the time of AnswerNet acquiring TPV.com, LLC. So it doesn't show any calls to AnswerNet. It shows calls to tpvllc.com -- TPV.com, LLC before AnswerNet acquired the company. And I don't even know what they are, because quite frankly, I don't know who TextNow is.

Q Okay. So prior to this deposition, we served some exhibits on your counsel. There was an Exhibit 21 and exhibit 23. Did you look at any of those documents?

A I looked at some documents prior to this deposition, yes.

Q Okay. All right. Is this one of the documents you looked at?

(Exhibit 21 was marked for identification.)

[redacted]

G. Pudles

[redacted]

G. Pudles

1  form of the question and any
2  characterization of the defendants within
3  the question you had.
4      MR. PRESTON:  Okay.  I mean, I guess
5  we can go back to Exhibit 50.  I think
6  what I'd like to do is go off the record
7  for about five minutes to give Mr. Pudles
8  some time to look through two other
9  exhibits which are uploaded to the Google
10  Drive.  Those are Exhibits 104 and in
11  particular Exhibit 105.  And I think those
12  are the distance reports that you've been
13  referencing.  And if you could, you know,
14  take a look at those spreadsheets and
15  confirm to yourself that the distances
16  involved and the other GPS data is
17  truthful and a correct representation of
18  what's in -- that Exhibits 21 and 23 are a
19  truthful representation of the GPS data
20  that's in Exhibits 105.  Does that sound
21  fair?
22      MR. MURDZA:  Well, I'm going to --
23  no, I want to object.  We're not going to
24  go off the record.  If there's going to be

Page 94

G. Pudles

1  here, because again, none of this has
2  anything to do with a TCPA claim.  Okay.
3  Now, to the extent that what you want me
4  to testify to is that there's -- there is
5  7,145 miles between the customer and --
6  and an activity done by the sales agent, I
7  -- so far that I know of, Mr. Preston, you
8  haven't lied to me yet, so if you tell me
9  that that document -- I can't testify to
10  it.  If you tell me that document
11  represents a summary of the raw data and
12  you want me to see that there's a 7,100
13  distance, I can tell you that if that's
14  what I see on that record, and if it was
15  based on records out of Focus, it's
16  probably correct.
17  BY MR. PRESTON:
18      Q   Okay.  I'm going to ask you to
19  turn to Exhibit 79 that's in the Google
20  Drive.
21      MR. MURDZA:  Are you able to share
22  this exhibit, or can someone -- so we're
23  all looking at the same part of the
24  exhibit, please?

Page 96

G. Pudles

1  questions about the documents, we can put
2  them in front of Mr. Pudles and he can
3  answer questions, but we're not going to
4  endeavor to do some sort of work
5  reconciling the raw data to these reports.
6  And again, I want to represent at least
7  this report, the one you currently have on
8  the screen has creation dates prior to
9  Cerida's purchase of TPV.com.
10      So again, the records speak for
11  themselves.  We can talk to the records if
12  they're up on the screen, but we're not
13  going to undertake a process whereby he
14  goes off the record and performs work to
15  reconcile the numbers here.  And
16  furthermore, we're two hours in to the
17  three hour deposition.  We have a hard
18  stop at 1.  So I just want to point that
19  out as well.
20      MR. PRESTON:  And you're taking time
21  with these objections, so, but go on.
22      THE WITNESS:  I -- I -- okay.  I --
23  I'm going to -- I -- I -- I'm really --
24  I'm -- I'm really trying to be patient

Page 95

G. Pudles

1      MR. PRESTON:  I can.
2      THE WITNESS:  And -- and let me say
3  three hours is three hours.  I -- I, you
4  know -- and I'm going to need a -- a
5  nature break.  Three hours is three hours.
6  Objections are a natural part of a
7  deposition.  So please keep that in mind
8  as you consider the -- the remaining hour
9  and at least the 10 minutes I'm going to
10  need --
11  BY MR. PRESTON:
12      Q   I'm grateful for -- but let's
13  focus on this exhibit.  As you point out
14  time is of the essence.  All right.

Page 97

25 (Pages 94 - 97)

Nock App'x 41



Page 98

1                    G. Pudles

---

Page 100

1                    G. Pudles
2    some more documents.  So I'm going to
3    start -- I'm going to upload a audio file.
4    It's a verification call recording,
5    Exhibit 155, and we're going to play it.
6    And I'm going to ask some questions about
7    TPV.com's verification processes.  They're
8    pretty short.
9            (Exhibit 155 was marked for
10           identification.)
11           (Audio played.)

---

Page 99

1                    G. Pudles
2    BY MR. PRESTON:
3        Q   Okay.  So given that answer, do
4    you have a sense of whether or not the
5    data is accurate?
6        A   If you're asking me my opinion,
7    my opinion is irrelevant.  I'm not an
8    expert.  I can tell you the data is the
9    data.  I have faith that the data
10   collected was -- was collected by the
11   system.  My job's not to give you an
12   opinion or -- of -- of the data that we --
13   that -- that the -- that my client has
14   provided you from our system.
15       Q   Okay.  If the data is accurate,
16   how did these sales agents appear at these
17   two different sales addresses in such
18   short period of time?
19           MR. MURDZA:  Objection.  If you know,
20       you can answer, but --
21           THE WITNESS:  I wouldn't -- I
22       wouldn't know.
23   BY MR. PRESTON:
24       Q   Okay.  I have just a few more
25   questions.  I'm going to start producing

---

Page 101

1                    G. Pudles

---

Veritext Legal Solutions
800-336-4000

Nock App'x 42



Veritext Legal Solutions
800-336-4000

Nock App'x 43



1                    G. Pudles

3        Q    Okay.  Going to play another
4    recording, and we're actually almost,
5    almost done.  This is another recording
6    from that time period.  Play this as well.
7        (Exhibit 156 was marked for
8        identification.)
9        (Audio played.)

Page 106

1                    G. Pudles

Page 108

1                    G. Pudles

20        Q    Okay.  That's all fair.  I have
21    one more.  Should that have triggered an
22    investigation by defendants?
23        MR. HALLAK:  Objection to form.
24        MR. MURDZA:  Objection to relevance,
25    your konwledge.

Page 107

1                    G. Pudles

8        Q    Because, and I think your point
9    is this, that defendants would not enroll
10    anybody unless there was a recorded call
11    in which the customer said, no, they met
12    me in person; isn't that right?
13        A    That's right.
14        Q    Okay.  And so they're waiting
15    for that call to ascertain whether or not
16    that they can enroll that person -- they
17    need the recorded call before they enroll
18    any of their customers; correct?
19        MR. HALLAK:  Objection to form.
20        MR. MURDZA:  Objection to form.
21        A    And -- and you're asking me to
22    make a legal opinion about what they need
23    versus what -- what I can tell you is that
24    in the examples that you gave me -- the --
25    where the consumer indicated that they

Page 109

28 (Pages 106 - 109)

Nock App'x 44

G. Pudles

1    didn't meet with somebody, that by rules
2    set by Spring Energy, they didn't accept
3    the enrollment from the sales agent,
4    because they don't want -- they're not
5    dancing on the lines.  They're being an
6    integrity filled provider of -- of energy
7    services.
8    Q   Okay, I understand.  I think
9    there's another recording that I'd like to
10   listen to.
11   A   Okay.
12   Q   So this is -- I'm going to mark
13   this as Exhibit 157.
14       (Exhibit 157 was marked for
15       identification.)
16       (Audio played.)
17       I just want to pause there for a
18   second.  He's talking about ████████
19   ████████  correct?  That's the name that
20   he's discussing with --
21   A   That's the name -- that's the
22   name he said, but I don't know who he is.
23   Q   Fair enough.
24       (Audio played.)

Page 110

G. Pudles

1    ask any questions outside of the script
2    that's provided by the defendants?
3    A   That's approved by the
4    defendants, yes.
5    Q   Okay.
6       (Audio played.)
7       So it sounds to me like he
8    instructed her not to tell the truth
9    during the verification and to state that
10   she had met with the sales agent at her
11   door.  Did you hear that?
12   A   I heard the same recording you
13   did, and that's what it sounded like, yes.
14   Q   Okay.
15   A   But my -- but my reading or
16   hearing of that means nothing.
17   Q   And it says he already has her
18   information put into the electronic
19   authorization portal.  Did you hear that?
20   A   I did.
21   Q   Okay.  I would presume that that
22   is TPV.com's electric authorization
23   portal?  This person was enrolled later on
24   by the defendants?

Page 112

G. Pudles

1        So he's talking about getting a
2    verification call; is that correct?
3    A   That's what it sounded like.
4       (Audio played.)
5    Q   So I want to pause there again.
6    He directed her to state during the
7    verification call that they met in person.
8    Did you hear that?
9       MR. MURDZA:  Objection, form.  Speaks
10   for itself.  You can answer.
11   A   -- right?  I mean, the thing
12   speaks for itself.  He said what he said.
13   Q   That's not actually an objection
14   in a deposition.  Can you answer whether
15   or not he --
16   A   Well, I -- I said I -- the --
17   the call speaks for itself, that you heard
18   what he said.  I heard him say what you --
19   you repeated in different words what he
20   said.
21   Q   Okay.
22       (Audio played.)
23       So I want to pause there.  Is it
24   true that the verifiers are not allowed to

Page 111

G. Pudles

1    A   Again, I'm just going to simply
2    say that he said what he said.  I don't
3    know what he was talking about, and I'm
4    not going to guess.  That's not my --
5    Q   Sure.
6    A   -- my job isn't to guess, but my
7    job is to testify as to the -- the
8    details, and I don't have any details
9    about what he was meaning.
10   Q   All right.  I have one -- two
11   more things, and we are almost out of
12   here.
13   A   You made that promise before.
14   Q   That's true.  That's true.
15   You've got me.  Hold on.  Let me find
16   this.  All right.  So there's Exhibit 158
17   that I'm introducing.  It's another
18   recording from a little bit later in time.
19   Oh, not that one.  Yeah.  Excuse me.
20   Ignore Exhibit 158 for the moment.  We're
21   going to -- I'm introducing a new exhibit,
22   Exhibit 159.
23       (Exhibit 158 and Exhibit 159
24       were marked for identification.)

Page 113

29 (Pages 110 - 113)

Nock App'x 45

G. Pudles

1  G. Pudles
2  (Audio played.)



Page 114

1  G. Pudles
2  BY MR. PRESTON:
3  Q   So was there any communication
4  from AnswerNet to the defendants outside
5  of what's shown in, you know, the distance
6  reports at Exhibit 104 and 105?
7  A   There are alert reports which
8  that -- which the -- I believe there are
9  alerts that go to clients, but I don't
10 know if these particular calls were in the
11 alerts or not.  But otherwise if they
12 weren't in the alert, then we would have
13 no way of -- we would not necessarily --
14 to my knowledge.  Now, I'm not saying we
15 didn't, but I'm saying to the best of my
16 knowledge, we did not communicate
17 otherwise directly to Spring other than
18 providing them with the call data, which
19 based on what we've seen would've said no
20 sale because they don't want sales that
21 are improper.
22 Q   Sure.  Does AnswerNet use any do
23 not contact lists before making
24 verification calls?
25 A   No.

Page 116

1  G. Pudles
6  Q   Okay.  Did AnswerNet ever alert
7  defendants to these calls, or would they
8  have alerted defendants to the content of
9  these calls?
10 MR. MURDZA:  Objection, form.
11 A   We provided reports on these
12 calls and their dispositions, and the --
13 the stuff that you already saw on the
14 reports you've already shown to the -- to
15 the client.
16 Q   Okay.  So, but --
17 THE REPORTER:  I'm sorry, Counsel.
18 Sorry, Counsel.  Counsel Hallak, did you
19 join on -- in on -- in on the objection?
20 I think you're muted.  I saw you -- your
21 lips moving?
22 MR. HALLAK:  Yes, I did.  Sorry.
23 THE REPORTER:  Sorry about that,
24 Counsel.  Sorry, Counsel.  Thank you
25 everybody.

Page 115

1  G. Pudles
2  Q   Okay.  Do AnswerNet verifiers
3  get instructions on recognizing or
4  addressing cognitive decline in elderly
5  adults.
6  A   I have no idea what you are --
7  what you are asking.  And besides that,
8  are you suggesting that that was something
9  that an -- that a verifier should have
10 seen during that period for one of your
11 class members?
12 Q   No, it's just literally --
13 A   -- there's something specific,
14 then by all means speak up, but -- but,
15 you know, asking me if --
16 Q   No, no.  It's just a question
17 I'm --
18 A   -- read minds, no, they don't
19 read minds.
20 MR. PRESTON:  Okay.  I think that's
21 it.  I don't know if I have any other questions.  I
22 don't know if Mr. Murdza or Mr. Hallak do.
23 MR. HALLAK:  No questions from the
24 defendants.
25 THE REPORTER:  Okay.  We'll go -- all

Page 117

30 (Pages 114 - 117)

G. Pudles

1
2    right.  Since this is federal, we'll do
3    orders on the record before we go off the
4    record.  So Counsel Hallak, will you --
5    will you be ordering today?
6        MR. HALLAK:  Yes, please.  I just
7    need an electronic copy for now.  Thank
8    you.
9        THE REPORTER:  Okay.  E-copy,
10    standard ten day?
11        MR. HALLAK:  Sure.
12        THE REPORTER:  Okay.  And -- and
13    Counsel Murdza, will we be ordering a -- a
14    copy of the transcript today?
15        MR. MURDZA:  No, we won't.
16        THE REPORTER:  All right.  Thank you
17    so much.  The time is 12:42 p.m.  Off the
18    record.
19        (Signature reserved.)
20        (Whereupon, at 12:42 p.m., the
21        proceeding was concluded.)
22
23
24
25

Page 118

CERTIFICATE OF TRANSCRIBER

1
2        I, PATRICIA EDMONDS, do hereby certify that this
3    transcript was prepared from the digital audio recording of
4    the foregoing proceeding, that said transcript is a true
5    and accurate record of the proceedings to the best of my
6    knowledge, skills, and ability; that I am neither counsel
7    for, related to, nor employed by any of the parties to the
8    action in which this was taken; and, further, that I am not
9    a relative or employee of any counsel or attorney employed
10    by the parties hereto, nor financially or otherwise
11    interested in the outcome of this action.
12    September 3, 2024
13
14        *Patricia Edmonds*
                PATRICIA EDMONDS
15
16
17
18
19
20
21
22
23
24
25

Page 120

CERTIFICATE OF DEPOSITION OFFICER

1
2        I, JAMES BEKMAN, the officer before whom the
3    foregoing proceedings were taken, do hereby certify that
4    any witness(es) in the foregoing proceedings, prior to
5    testifying, were duly sworn; that the proceedings were
6    recorded by me and thereafter reduced to typewriting by a
7    qualified transcriptionist; that said digital audio
8    recording of said proceedings are a true and accurate
9    record to the best of my knowledge, skills, and ability;
10    that I am neither counsel for, related to, nor employed by
11    any of the parties to the action in which this was taken;
12    and, further, that I am not a relative or employee of any
13    counsel or attorney empl                    or
14    financially or otherwise i                  this
15    action.  September 3, 20
16
17                JAMES BEKMAN
18            Notary Public in and for the
19                State of New York
20
21    [X] Review of the transcript was requested.
22
23
24
25

Page 119

1    David.Murdza
2    david.murdza@answernet.com
3        September 3, 2024
4    RE:   Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
5    8/26/2024, Gary Pudles (#6872872)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10    any changes, the witness should note those with the
11    reason, on the attached Errata Sheet.
12        The witness should sign the Acknowledgment of
13    Deponent and Errata and return to the deposing attorney.
14    Copies should be sent to all counsel, and to Veritext at
15    (division email).
16    Return completed errata within 30 days from
17    receipt of testimony.
18    If the witness fails to do so within the time
19    allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 121

31 (Pages 118 - 121)

Nock App'x 47

```
 1  Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
 2  Gary Pudles (#6872872)
 3           E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Gary Pudles              Date
25
                                    Page 122
```

```
 1  Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
 2  Gary Pudles (#6872872)
 3        ACKNOWLEDGEMENT OF DEPONENT
 4     I, Gary Pudles, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____  _____
12  Gary Pudles              Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25
                                    Page 123
```

Veritext Legal Solutions
800-336-4000

Nock App'x 48

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT NOCK, | |
| *Petitioner,* | |
| v. | No. 25-mc-26 |
| ANSWERNET, INC., *doing business as* TPV.COM, | |
| *Respondent.* | |

## <u>ORDER</u>

**AND NOW**, this 1st day of July 2025, upon consideration of petitioner Robert

Nock's unopposed Motion to Compel pursuant to Federal Rule of Civil Procedure 37,

(ECF No. 1), it is **ORDERED** that the Motion is **GRANTED**.[1]  AnswerNet, Inc. is

---

[1]     Robert Nock is the named plaintiff in a Telephone Consumer Protection Act class action pending in the United States District Court for the District of Maryland.  (Mot. at 1, ECF No. 1-1.) Nock properly served non-party respondent AnswerNet, Inc. with a subpoena on March 26, 2025. (ECF No. 1-5.)  AnswerNet failed to timely object or respond to the subpoena by April 15, 2025.  *See* Fed. R. Civ. P. 45(d)(2)(B).  Nock moved to compel AnswerNet to respond and the parties stipulated that AnswerNet had until June 20, 2025 to respond to the motion.  (ECF No. 4.)  But AnswerNet again failed to respond.  *See* Loc. R. Civ. P. 7.1(c) ("In the absence of a timely response, the motion may be granted as uncontested . . . ."); *Kerlin v. Howard*, No. 18-481, 2020 WL 263011, at *2 (M.D. Pa. Jan. 17, 2020) ("A nonparty's failure to make timely objections to a subpoena generally constitutes waiver of objections to the validity of the subpoena.").

In any event, Nock's Motion succeeds on the merits.  Nock's subpoena was properly issued by the District of Maryland, where the underlying action against Defendant Indra is pending.  *See* Fed. R. Civ. P. 45(a)(2); (Subpoena at 2, ECF No. 1-4).  The subpoena commands production of documents at AnswerNet's headquarters in Willow Grove, Pennsylvania, in compliance with Rule 45(c)(2)(A). Finally, this Court is the proper forum to compel discovery, *see* Fed. R. Civ. P. 37(a)(2) ("A motion for an order to a nonparty must be made in the court where the discovery is or will be taken."), and Nock has satisfied his burden of attempting to confer with AnswerNet in good faith, *see* Fed. R. Civ. P. 37(a)(1); (E-Mail Exchanges, ECF Nos. 5-2, 1-10).

Nock seeks several relevant records from AnswerNet, all limited to the relevant class period. (Subpoena at 9–10.)  These include (1) "[a]ll agreements and contracts between TPV.com and Defendants," (2) "communications between TPV.com and Defendants," (3) "documents concerning any policy, plan, procedure, or practice under which TPV.com provides services" to Indra, (4) documents identifying relevant employees involved in providing those services, (5) documents "containing data collected by TPV.com . . . while the Sales Agents enrolled consumers," (6) communications with relevant Indra representatives, (7) documents relating to information

ordered to comply with the subpoena issued by the United States District Court for the District of Maryland within fourteen days of this Order.

It is further **ORDERED** that Nock's Motion for Entry of Default is **DENIED AS MOOT**.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.

---

system(s) used by or made available to Indra for the purpose of enrolling consumers, and (8) documents outlining the loss or destruction of otherwise responsive documents.

These records are relevant to Nock's claims that Indra used AnswerNet's services "to collect GPS data – as well as IP addresses and other enrollment data – and make the recorded post-enrollment verification calls to consumers." (Mot. at 2.) The District of Maryland acknowledged as much when it ordered Indra to produce "all TPV.com data for all attempted and successful enrollments between April and July of 2021." (ECF No. 1-8.) Indra produced an incomplete set of TPV.com data in its possession and told Nock it "would not object to the service of a subpoena by Plaintiff on TPV.com" to acquire the remainder of the documents. (ECF No. 1-9.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHONY LAWSON,<br><br>                    Petitioner,<br><br>    v.<br><br>TWILIO, INC.,<br><br>                    Respondent. | Case No.  24-mc-80129-PHK<br><br>**ORDER ON MOTION TO ENFORCE THIRD-PARTY SUBPOENA**<br><br>Re: Dkt. 1 |

This matter arises out of a putative class action brought by Petitioner Anthony Lawson ("Lawson") that is currently pending in the United States District Court for the Middle District of Florida, styled *Lawson v. Visionworks of America, Inc.*, No. 6:23-cv-01566-WWB-EJK.  Before the Court is Lawson's motion to compel a nonparty, Respondent Twilio, Inc. ("Twilio"), to produce documents responsive to a subpoena issued from this District in connection with that case.  [Dkt. 1].  Twilio opposes the motion and asks the Court to transfer this miscellaneous action to the Middle District of Florida.  [Dkt. 7].  Lawson does not unequivocally oppose transfer.  *See* Dkt. 12 at 10 ("[I]f this Court is not inclined to grant Petitioner's Motion, then Petitioner does not oppose a transfer of this matter to the Middle District of Florida.").  The Court finds the motion suitable for resolution without oral argument.  *See* Civil L.R. 7-1(b).

## BACKGROUND

The underlying Florida action is brought on behalf of a putative class of individuals who allege Visionworks of America, Inc. ("Visionworks") violated the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 *et seq.*, by sending spam telemarketing text messages to consumers even though consumers requested to opt out of receiving such messages and even

though consumers' telephone numbers were listed on the National Do Not Call registry. Twilio, a Delaware corporation headquartered in San Francisco, California, is a cloud communications company that provides programmable communication tools for making and receiving phone calls, text messages, and performing other communication functions using its web service. Lawson, the named plaintiff in the underlying Florida action and Petitioner here, issued a third-party subpoena to Twilio in the underlying action on March 4, 2024, which commanded Twilio to produce certain records and documents by April 3, 2024, and to appear for a remote deposition on May 3, 2024. The subpoena was served on Twilio's registered agent in Florida on March 5, 2024.

On March 19, 2024, Twilio's counsel served written objections to the subpoena, asserting that the materials sought were subject to the attorney-client privilege, proprietary in nature, and/or irrelevant to the underlying action, and claiming that the subpoena as written was overly broad, unduly burdensome, and vague and ambiguous. Counsel for Lawson and Twilio met and conferred on multiple occasions thereafter regarding the contents of the subpoena but were unable to reach any agreement. On May 24, 2024, Lawson filed the instant motion in this Court, in accordance with Federal Rule of Civil Procedure 45. *See* Fed. R. Civ. P. 45(d)(2)(B)(i) ("At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.").

## LEGAL STANDARD

Federal Rule of Civil Procedure 45 authorizes the issuance of a subpoena commanding a nonparty to, among other things, appear for deposition and produce documents within the nonparty's possession, custody, or control. Fed. R. Civ. P. 41(a)(1)(A)(iii). The scope of discovery allowed under a Rule 45 subpoena is generally the same as the scope of discovery permitted under Rule 26(b). *In re Subpoena to Apple, Inc.*, No. 5:14-cv-80139-LHK, PSG, 2014 WL 2798863, at *2 (N.D. Cal. June 19, 2014); *see* Fed. R. Civ. P. 45 advisory committee's note to 1970 amendment ("[T]he scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules."); Fed. R. Civ. P. 34(a) ("A party may serve on any other party a request within the scope of Rule 26(b).").

A nonparty commanded to produce documents pursuant to a Rule 45 subpoena may

<u>**VIA CM/ECF**</u>

December 23, 2015

The Honorable Jon S. Tigar
San Francisco Courthouse
Courtroom 9 - 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:    *Lathrop et al. v. Uber Technologies, Inc.*, Case No. 3:14-cv-05678-JST

Dear Judge Tigar:

The parties disagree about whether Uber must produce: (1) logs of text messages sent to putative class members; and (2) additional screen flows from its mobile application and mobile and desktop websites. The parties further disagree about whether the Court should require Uber to appear for at least two 7-hour Rule 30(b)(6) depositions.

### 1. Text Logs (Request Nos. 13, 14, 15, and 23)

<u>Plaintiffs' Position</u>:  Contrary to Uber's misstatements (*see* Dkt. 78-1 at 18), Plaintiffs have *not* requested all text messages ever sent by Uber. Instead, Plaintiffs requested logs for the following universe: messages sent by Uber (during the Class Period) to all mobile-terminating cellular telephone numbers related to: (1) recruiting Uber drivers and/or the process of applying to become a driver and (2) referring new drivers and/or Uber's "refer a friend" program. These logs would also capture messages sent even after the recipients revoked any purported consent.

The requested text logs are narrowly tailored to Plaintiffs' claims[1] and are directly relevant to, amongst other things, class certification, Uber's use of an automated telephone dialing system ("ATDS") and damages. Production of text logs is a standard part of discovery in TCPA litigation. They can be used to (a) calculate the number of Class members, (b) identify the Class members, (c) ascertain the number of TCPA violations, (d) determine which Class members asked Uber to stop texting them, but still received more texts from Uber, and (e) show that Uber used an ATDS to send its text messages. Uber does not argue that the requested logs are irrelevant, nor does it dispute that production of such logs is commonplace in TCPA cases. Uber's citation to non-TCPA case *Dziennik*, *infra*, is inapposite: Plaintiffs are not seeking the logs to recruit more class representatives. Uber's blanket argument that the logs are not relevant to class certification is non-sensical and the 37-year old non-TCPA case it cites, *Oppenheimer Fund*, includes no such holding. Even if, as Uber claims, the logs do not identify individuals by name, the logs can be used in concert with other sources to bridge any gap.

Although Uber has claimed, for months, that it was working to carve out these text logs, it recently informed Plaintiffs that it is *impossible* to do so. Yet, nowhere in Uber's submission (including the Declaration of Michael Kadin) does Uber actually state that this task is

---

[1] Uber does not explain or support its contention that the requests are "far from narrowly tailored."

impossible. Uber admits that the log files are searchable (just not "easily") and there are only 100 topics that need to be searched. The thrust of Uber's new burden (rather than impossibility) argument is that the volume of data is enormous—yet, running queries or scripts across large amounts of data only increases the time it takes to get results, not any added burden. Uber's claims of burden are especially dubious considering that it is one of the foremost technology companies in the world—named by MIT as one of the 50 Smartest Companies in 2015 and called "A Paragon of Operational Innovation" by Wharton Magazine. Further, Uber has used Twilio, Inc.—a leading company that allows software developers to rapidly and programmatically send and receive thousands of text messages—to send the "overwhelming majority" of the messages at issue, and Uber could obtain the logs from Twilio. According to Plaintiffs' expert,[2] who has been involved in over a hundred TCPA cases, Twilio regularly produces the types of text logs sought by Plaintiffs.[3] Uber should be ordered to produce (or obtain from Twilio) the specific logs requested by Plaintiffs. Alternatively, Uber should be ordered to produce all of its logs to Plaintiffs or a third-party vendor to perform the work that Uber refuses to do.

    <u>Defendant's Response</u>: This is not a "standard" TCPA case. Uber does not send text messages to random or purchased lists of recipients. Instead, Uber sends text messages in a variety of contexts, many of which have nothing to do with Plaintiffs' claims. *See* Declaration of Michael Kadin ¶ 2.[4] Plaintiffs insist that their request for logs is "narrowly tailored." However, the categories requested by Plaintiffs are far from "narrowly tailored" and such messages are simply not separately identifiable. As Uber has repeatedly explained to Plaintiffs' counsel, it is not possible to automatically retrieve lists of all text messages Plaintiffs are seeking. *Id.* ¶ 17-18; *see also* Dkt. No. 78 at 4. Text messages that flow through Uber's servers are logged together with other server events and each month Uber logs over a petabyte of data. Kadin Decl. ¶ 3, 9. Log file entries reflecting text messages relevant to this lawsuit are intermingled with log file entries reflecting myriad other irrelevant events. *Id.* ¶ 4-5. The only way to retrieve the information requested by Plaintiffs with accuracy is a <u>manual</u> search of these log files to locate a subset of potentially relevant log files relating to text messages. This subset, estimated to exceed over ten terabytes of data in the aggregate, would then also need to be manually reviewed—a practical impossibility. *Id* ¶ 17.[5]

    The enormous burden associated with producing logs to Plaintiffs far outweighs any marginal relevance to Plaintiffs' claims. Plaintiffs are not entitled to the logs merely to "identify the class members" prior to certification. *See Dziennik v. Sealift, Inc.*, No. 05-CV-4659 (DLI)(MDG), 2006 WL 1455464, at *1 (E.D.N.Y. May 23, 2006) (collecting cases). And the logs are not relevant to issues of class certification under Rule 23. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 354 (1978) (lists of putative class members not "within the scope of

---

[2] Should the Court find it appropriate, Plaintiffs can submit a declaration of their expert on these issues. However, Plaintiffs did not receive a draft of Uber's Declaration of Michael Kadin until 2:22 AM EST this morning and did not have time to prepare a declaration in response.

[3] Plaintiffs have subpoenaed Twilio, but Twilio has currently refused to produce the information on the basis that Uber *can* produce it and, as such, Twilio, as a non-party, should not be required to.

[4] The contents of the declaration should be of no surprise to Plaintiffs as it merely reiterates what Uber has previously tried to explain to Plaintiffs with no avail. Plaintiffs were apprised of the fact that Uber would be filing the declaration no later than around 9 a.m. PST on Monday.

[5] *See also Megabytes, Gigabytes, Terabytes… What Are They?*, http://www.whatsabyte.com/ ("Ten Terabytes could hold the printed collection of the Library of Congress.").

1   Mark S. Eisen (SBN 289009)
    meisen@edelson.com
2   EDELSON PC
    555 West Fifth Street, 31st Floor
3   Los Angeles, California 92688
    Tel: 213.533.4100
4   Fax: 213.947.4251

5   Jay Edelson (*Pro Hac Vice*)
    jedelson@edelson.com
6   Rafey S. Balabanian (*Pro Hac Vice*)
    rbalabanian@edelson.com
7   Benjamin H. Richman (*Pro Hac Vice*)
    brichman@edelson.com
8   Christopher L. Dore (*Pro Hac Vice*)
    cdore@edelson.com
9   EDELSON PC
    350 North LaSalle Street, Suite 1300
10  Chicago, Illinois 60654
    Tel: 312.589.6370
11  Fax: 312.589.6378

12  *Attorneys for Plaintiff and the putative class*

13

14                  **UNITED STATES DISTRICT COURT**

15                 **NORTHERN DISTRICT OF CALIFORNIA**

16                         **OAKLAND DIVISION**

17  BRIAN GLAUSER, individually and on       Case No. 4:11-cv-02584-PJH
    behalf of all others similarly situated,
18                                            **PLAINTIFF'S RULE 56(d)**
                   *Plaintiff,*               **MOTION FOR STAY OF BRIEFING ON**
19                                            **OR DENIAL, WITHOUT PREJUDICE,**
    *v.*                                      **OF GROUPME'S MOTION FOR**
20                                            **SUMMARY JUDGMENT**
    GROUPME, INC., a Delaware corporation,
21
                   *Defendant.*
22

23

24

25

26

27

28

Nock App'x 55

1                      **INTRODUCTION**

2       This case challenges Defendant GroupMe, Inc.'s ("GroupMe") practice of sending

3  unsolicited text messages promoting its group messaging service to consumers nationwide in

4  violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). (Dkt. 1.) On

5  April 28, 2014, GroupMe filed its motion for summary judgment (the "Motion" or "Motion for

6  Summary Judgment"), arguing that judgment should be entered in its favor because it did not, as

7  Glauser alleges, use an Automatic Telephone Dialing System ("ATDS")—as that term is defined

8  under the TCPA[1]—to send the messages at issue. In particular, GroupMe argues that the

9  undisputed facts show that the equipment it used to send the messages (i) did not have the

10  *present* capacity (at the time the messages were sent) to randomly or sequentially generate

11  telephone numbers, (ii) did not and could not predictively dial numbers, and (iii) required human

12  intervention to function. (*See generally* Dkt. 107-1.)

13       Glauser disputes GroupMe's positions in this regard—both factually and legally—and

14  has attempted to explore their factual bases in discovery throughout this case. Particularly

15  relevant here are Glauser's efforts to obtain discovery from third parties Twilio, Inc. ("Twilio")

16  and Bandwidth.com, Inc. ("Bandwidth") (collectively, the "Third Parties") with respect to their

17  involvement in the transmission of the messages, which GroupMe has now actively and

18  improperly thwarted.

19       With respect to Twilio, as a condition of Glauser's dismissal (without prejudice) of his

20  ―――――――――――――――

21  [1]     The TCPA defines an ATDS as "equipment which has the capacity . . . (A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers." *See* 47 U.S.C. § 227(a)(1); *see also Sterk v. Path, Inc.*, --- F. Supp. 2d ----,

22  2014 WL 2443785, at *3 (N.D. Ill. May 30, 2014). The FCC and courts have further clarified "that an ATDS may include equipment that automatically dials numbers from a stored list

23  without human intervention, even when the equipment lacks the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." *Sterk*, 2014

24  WL 2443785, at *3 (collecting cases); *see also In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C.R. 15391, 15392 n.5 (2012) ("The [FCC]

25  has emphasized that th[e] definition [of ATDS] covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether

26  the numbers called are randomly or sequentially generated or come from calling lists.") (citation omitted).

27

28

---

Nock App'x 56

1   claims against it in this matter, Twilio agreed (through its former counsel) to informally produce

2   certain information relevant to its role in the transmission of the GroupMe messages.

3   Notwithstanding, Twilio later reneged and demanded that Glauser serve it with a formal third-

4   party subpoena. When all attempts to persuade Twilio to reconsider its position fell short, on

5   June 26, 2014, Glauser in fact served a subpoena duces tecum on Twilio pursuant to Federal

6   Rule of Civil Procedure 45. (*See* Subpoena to Twilio, Inc., attached as Exhibit 2.) Rather than

7   attempt in good faith to substantively respond, however, Twilio instead retained GroupMe's

8   attorneys at White & Case LLP, who asserted numerous blanket and unsupported objections on

9   its behalf and simply refused to provide any substantive responses whatsoever. (*See* Twilio,

10  Inc.'s Response to Subpoena, attached as Exhibit 3.)

11          Glauser's subpoena to Bandwidth met a similar fate. (*See* Subpoena to Bandwidth.com,

12  Inc., attached as Exhibit 4.) That is, despite Bandwidth's in-house compliance department having

13  contacted Glauser's counsel to discuss the most efficient way for it to produce the information

14  Glauser sought in his subpoena, (*see* Declaration of Benjamin H. Richman ¶ 13, attached as

15  Exhibit 1), Bandwidth also ultimately retained GroupMe's attorneys, who asserted the same

16  blanket objections as Twilio and refused to provide any substantive responses. (*See*

17  Bandwidth.com, Inc.'s Response to Subpoena, attached as Exhibit 5.)

18          Setting aside the fact that GroupMe's and its counsel's interference with Glauser's third-

19  party discovery efforts is wholly improper (as explained further below), that conduct has also left

20  Glauser at a serious disadvantage in responding to GroupMe's Motion for Summary Judgment.

21  Indeed, despite actively attempting to discover the limited information necessary for him to

22  adequately and timely respond to the Motion, GroupMe has sought to ensure that Glauser

23  obtained nothing. As a result, Glauser is left with no choice but to request that the Court defer

24  ruling on or deny, without prejudice, GroupMe's Motion until Twilio and Bandwidth agree to

25  provide the information necessary for him to adequately oppose the Motion or they are ordered

26

27

28

**VIA ELECTRONIC FILING**

The Honorable Jacqueline Scott Corley
United States Magistrate Judge
United States District Court for the Northern District of California
450 Golden Gate Avenue, Courtroom F, 15th Floor
San Francisco, California 94102

Re:     *Jeremy Bauman, et al. v. V Theater Group, LLC, et al.*, Case No. 3:15-mc-80102-JSC

Dear Judge Corley:

Counsel for Plaintiffs and non-party Twilio, Inc. (collectively, the "Parties") submit this joint
letter brief pursuant to the Court's Order of April 17, 2015, Dkt. #9. As permitted by the Court's
Order, the Parties agreed to extend briefing deadlines by one week.

## PLAINTIFFS' BRIEF OF APRIL 29, 2015

Twilio obstructs the litigation of Plaintiffs' class action claims by refusing to produce highly
relevant documents that (a) Plaintiffs have subpoenaed for production and (b) Twilio agreed to
produce. Plaintiffs respectfully ask for the Court's assistance to overcome Twilio's obstructions.

**A.      Background to the Discovery Dispute**

In a pair of consolidated federal class action lawsuits pending in Nevada, Plaintiffs allege that
Defendants violated the Telephone Consumer Protection Act ("TCPA") by sending text
messages to consumers. *See* Dkt. #2-1; Dkt. #2-2. The TCPA states, "It shall be unlawful for any
person … to make any call … using any automatic telephone dialing system … to any telephone
number assigned to a … cellular telephone service …." 47 U.S.C. § 227(b)(1)(A)(iii); *cf. Thomas
v. Taco Bell Corp.*, 582 F. App'x 678, 678 (9th Cir. 2014). "A text message is a call under the
TCPA." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).

Plaintiffs learned that Twilio helped facilitate Defendants' transmissions of text messages to the
class of consumers who Plaintiffs seek to represent. *See* Dkt. #2 ¶¶ 5-6; Dkt. 2-3 at 3; *cf.* Dkt. 6-
1, p. 5 ("Twilio facilitated the transmission of text messages …."). Plaintiffs also learned that
Twilio—not Defendants—has possession, custody, and control of all records pertaining to the
transmission of the text messages at issue in Plaintiffs' two class action lawsuits. *See* Dkt. #2 ¶ 6;
*cf.* Dkt. 6-1, p. 6 ("**The defendants did not maintain copies or records of any transmissions
to Twilio nor did defendants maintain copies of any particular text message. Twilio does
maintain certain information regarding the defendants' account; however, this information
is gathered and electronically maintained by Twilio, not the defendants.**") (emphasis in
original). Twilio's own website markets how these transmission records are extensive, including
information such as acknowledgement of text message receipt by cellular telephone carriers in
the United States at a rate of 99%. *See Affidavit of Albert H. Kirby* ("*Aff. Kirby*"), ¶ 10, Ex. 7.

In this context, Plaintiffs propounded a subpoena upon Twilio which asks for seven categories of
documents related to the text message transmissions at issue in Plaintiffs' two complaints. *See*
Dkt. #2-4. This subpoena was served upon Twilio at its corporate headquarters on February 12,
2015. *See* Dkt. #2-5; *cf.* Dkt. #2 ¶ 9. Twilio's Customer Operations Manager states that she did

The Honorable Jacqueline Scott Corley
Page 2

not become aware of the subpoena until March 31, 2015. *See* Dkt. #4-1 ¶¶ 1-2; *cf.* Dkt. #1 at 6. But at the Order to Show Cause hearing, Twilio's counsel conceded that Twilio was in actual receipt of the subpoena. Accordingly, the Court instructed the Parties to meet and confer regarding Twilio's compliance with the subpoena. *See* Dkt. #9 at 1.

Immediately after the hearing on Thursday, April 16, 2015, the Parties' counsel reached a proposed compromise as to what documents should be produced in lieu of further motion practice. The Parties' counsel discussed narrowing the requests to "1) all transmittal records from Defendants' accounts, 2) any STOP messages or reply communications from message recipients, 3) a copy of Defendants' customer profiles (including account information, services provided, *et cetera*), 4) billing records – reflecting Twilio's charges." *See Aff. Kirby*, ¶ 3, Ex. 2; *cf. id.*, ¶ 2, Ex. 1 at p. 2. On Monday, April 20, 2015, Twilio assented to the compromise. *See id.*

In an email sent on Tuesday, April 21, 2015, Twilio's counsel served 50 pages of PDF documents and 2 Excel files with data responsive to Plaintiffs' subpoena. *See Aff Kirby*, ¶¶ 4-5, Ex. 3 at p. 10. However, a quick review of the Excel files made clear that not "all transmission records" had been produced. *See id.*, ¶ 5. And within fifteen minutes of the email transmittal, Plaintiff Bauman's counsel responded seeking the additional, responsive discovery. *See id.*, Ex. 3 at pp. 9-10. Upon further review, additional deficiencies became very apparent. *E.g.*, *see id.*, Ex. 3 at pp. 2-3. But attempts to meet and confer ended after Twilio's counsel advised, "Twilio intends to seek its attorneys' fees and costs associated with any additional meet and confer efforts." *See id.*, Ex. 3 at p. 1. Plaintiffs believe that further meeting and conferring would be futile. Therefore, Plaintiffs respectfully request the assistance of the Court to enforce Twilio's obligations to comply with the subpoena.

**B.       Twilio Refuses to Produce "All" Transmittal Records Despite its Promise to Do So**

Plaintiffs made quite clear during the meet and confer process that they considered all data associated with a text message transmission to be a transmittal record. *See id.*, ¶ 6. *E.g.*, "transmittal records" necessarily include the contents of the text message transmitted, acknowledgments from cellular telephone carriers of receipt of a transmittal, the caller and recipient telephone numbers, the times and dates of the transmittals, and any other data collected with regard to a transmittal. *Id.* And there is no genuine dispute that Twilio agreed to produce "all" records of transmittals made from Defendants' Twilio accounts. *See, e.g., Aff. Kirby*, Ex. 1, p. 2. "All" simply means everything. But Twilio refuses to produce "all" transmittal records.

Instead of "all" transmittal records, Twilio produced only records of each calling telephone number, each called telephone number, and the date and time of each transmittal. *See Aff. Kirby*, ¶ 9, Ex. 6. Twilio does not dispute that additional transmittal records exist. *See id.*, Ex. 3 at pp. 1-2. Rather, Twilio argues that (a) the additional records are not available in a reasonable time, (b) the records are not relevant, and (c) Twilio would incur expense to comply. *See id.* Even ignoring that Twilio agreed to produce "all transmittal records", these arguments have no merit. The only evidence presented to date suggests that "all" transmittal records are easily available to Twilio. For example, Twilio touts the easy access of transmission receipt acknowledgments as a reason why businesses should send their text messages through Twilio's infrastructure. *See Aff. Kirby*, Ex. 7. Other records produced by Twilio substantiate that it collects records identifying which text messages were sent to cellular telephone carriers. *See id.*, ¶ 7, Ex. 4 at p. TWILIO40. And within 24 hours of agreeing to do so, Twilio demonstrated that it had easy access to the

The Honorable Jacqueline Scott Corley
Page 3

contents of transmittals by producing a set of reply communications that included the contents of text messages received. *See Aff. Kirby*, ¶ 8, Ex. 5; *also see id.*, Ex. 1 at p. 2; *cf. id.*, Ex. 3 at p. 10. Thus, the only apparent delay or expense involved in Twilio providing "all" transmittal records is the delay and expense of Twilio having to redo what it agreed to do in the first place.

Moreover, the transmittal records which Twilio refuses to produce are highly relevant to certifying and ultimately adjudicating the claims being prosecuted against the Defendants. For example, the records of the contents of the text messages transmitted will help confirm the numerosity of the class by demonstrating how many of the text messages were part of the telemarketing scheme that resulted in Plaintiffs receiving unsolicited commercial text messages. This is relevant because, "[b]efore a class can be certified, a court must determine that it is 'so numerous that joinder of all members is impracticable.'" *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 566-67 (W.D. Wash. 2012), *citing* Fed. R.Civ. P. 23(a)(1). Also, Plaintiffs and Defendants will be mediating the case soon. *See* Dkt. #6-2 at 2:27-28. Being able to quantify the size of the class and the damages at issue is necessary to resolve the class's damage claims.

Additionally, the data which Twilio refuses to produce should help Plaintiffs substantiate the manageability of the class's claims as required by Rule 23(b)(3). TCPA defendants commonly oppose class certification by arguing that it might be hard to tell who received a text message on their cellular telephones. *See, e.g., Agne*, 286 F.R.D. at 570 (noting that a defendant argued that questions of who actually received text messages overwhelm common issues). But Twilio has in hand transmittal records which are acknowledgments from cellular telephone carriers that text messages were received. Records such as these can only help demonstrate to the Nevada District Court how easy it can be to adjudicate the class's claims as part of a certified class action.

Twilio has no good cause to refuse to produce "all" transmittal records. Plaintiffs served a lawful subpoena requesting these records. Twilio subsequently promised to produce them. Therefore, Plaintiffs respectfully request that Twilio be ordered to produce "all" transmittal records.

**C.      Twilio Refuses to Produce All of Defendants' Account Profile Information**

Twilio agreed to produce Defendants' customer profiles, including account information, services provided, *et cetera. See, e.g., Aff. Kirby*, Ex. 1, p. 2. However, documents produced by Twilio illustrate that its production is incomplete. Twilio produced a number of documents whose headers state that they are Accounting History details. *See id.*, ¶ 7, Ex. 4. These headers indicate that these documents are just a subset of documents that are part of Twilio's V Theater Box Office's Account. *See id.*, ¶ 7. Yet, Twilio produced no other account documents. *See id.*, ¶ 7. Plaintiffs subpoenaed all of those documents, and Twilio agreed to produce them. Twilio offers no genuine reason why it cannot produce all account documents. Knowing the full scope and context of Defendants' business with Twilio is highly relevant to Plaintiffs' case. Therefore, Plaintiffs respectfully asks the Court to compel Twilio's full production of account documents.

**D.      Plaintiffs Respectfully Ask the Court to Help Them Obtain Discovery from Twilio**

Twilio "must show that [it] took every reasonable step to comply with the subpoena and to articulate reasons why compliance was not possible." *See Martinez v. City of Pittsburg*, No. C 11-01017 SBA LB, 2012 WL 699462, at *3 (N.D. Cal. Mar. 1, 2012) (citation omitted). And, "[a] court may consider a history of noncompliance and a failure to comply despite the

The Honorable Jacqueline Scott Corley
Page 4

pendency of a contempt motion." *Id.* (citation omitted). Despite these standards, Twilio continues to obstruct Plaintiffs' access to necessary and reasonable discovery.

"Discovery—a process intended to facilitate the free flow of information between parties—is now too often mired in obstructionism. Today's 'litigators' are quick to dispute discovery requests, slow to produce information, and all-too-eager to object at every stage of the process." *Sec. Nat. Bank of Sioux City, Iowa v. Abbott Labs.*, 299 F.R.D. 595, 596 (N.D. Iowa 2014). "This conduct fuels the astronomically costly litigation industry at the expense of 'the just, speedy, and inexpensive determination of every action and proceeding.'" *Id.*, at 597, *quoting* Fed.R.Civ.P. 1. Though a non-party in the present case, Twilio lends truth to these observations by refusing to produce highly relevant documents that (a) Plaintiffs have subpoenaed for production and (b) Twilio agreed to produce. Plaintiffs respectfully ask for the Court's assistance to obtain discovery materials which Plaintiffs properly subpoenaed, Twilio possesses, and Plaintiffs need.

## TWILIO'S RESPONSE OF MAY 4, 2015

Twilio is not a party to this dispute. As such, Twilio has no vested interest in impeding the litigation or prejudicing either party. After receiving plaintiff's subpoena in late March, Twilio worked assiduously to respond to plaintiff's broad requests, and did so promptly given the urgency expressed by plaintiff about their discovery needs. To avoid further legal expense associated with motion practice, Twilio directed its engineers *to write code* to access information that is not used or accessed in the ordinary course of business. Twilio produced all of the information it was able to create through this process and provided the information within business days of the court-directed meet and confer among counsel. Twilio produced information responsive to all of the categories of narrowed requests and complied fully with its commitment to provide information. *See generally* Affidavit of Emily Emery in Opposition to Plaintiff's Motion to Compel ("Emery Aff.") at ¶¶ 1-18. Despite this, plaintiff continues to press for additional information. Twilio offers the following points for consideration:

1) Twilio has produced the information that it could to respond to the narrowed requests. Twilio maintains that it has fully complied with its commitment to produce the readily available information in each of the four categories per its agreement. Emery Aff. at ¶ 11. Twilio did not commit to produce additional information. In the contempt application, plaintiff represented that it wanted information about the number of messages transmitted, the numbers of the intended recipients and the services defendants' obtained from Twilio. Twilio agreed to provide that information and did so. Twilio never intended to produce every datum of information about defendants' accounts because it could never deliver. Emery Aff. at ¶ 14.

2) Plaintiffs seek to require Twilio to write software queries to access information that Twilio does not use in the ordinary course of its business. That is well beyond the scope of responsive required by the federal rules. *See Robinson v. Adams*, No. 1:08-CV-01380-AWI, 2011 WL 2118753, at *9-15 (E.D. Cal. May 27, 2011) (ruling that defendants do not have to create responsive documents); *Zysman v. Zanett Inc.*, No. C-13-02813 YGR (DMR), 2014 WL 1320805, at *3 (N.D. Cal. Mar. 31, 2014) (denying plaintiff's motion to compel defendants to produce documents in a manner that they were not kept in the usual course of business) ("Under Rule 34, Defendants are only required to produce documents as they are

The Honorable Jacqueline Scott Corley
Page 5

kept in the ordinary course of business, not to alter the documents or explain information contained therein.").

3) The burden plaintiff seeks to impose is particularly oppressive for a non-party. *See Bickoff v. Wells Fargo Bank, N.A.*, No. 14-CV-1065-BEN WVG, 2015 WL 1256360, at *2 (S.D. Cal. Mar. 18, 2015) (granting plaintiff's ex parte application for an order to quash the deposition subpoena as to nonparties) ("Pursuant to Rule 45, a party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.").

4) Twilio's responses were complete. Twilio did not redact the information provided. In the past, Twilio has produced a broader data set of information that was limited to a limited volume of data. Plaintiff seeks a huge amount, involving hundreds of thousands of transmissions without narrow time parameters. Twilio does not have the manpower or bandwidth to process that request. Emery Aff. at ¶ 13.

5) Twilio does not provide this information in the ordinary course of business. Twilio is a communications platform API, not a record retention API. Twilio is not a consulting service, so Twilio does not have a platform with retained data, reporting or other documentation. Twilio does not use historic data in its ordinary course of business. Consequently, Twilio does not have tools to obtain access to such information. Emery Aff. at ¶ 14.

6) Because this is not information Twilio would provide in the ordinary course of business, Twilio's customers would have no expectation that Twilio could provide the information as requested by plaintiff. If a customer requested this information, Twilio would instruct the customer to write its own query, using its own software developers, at its own cost. Emery Aff. at ¶ 17.

7) Requiring Twilio to provide additional information would impose an undue burden in two different respects. First, Twilio would have to deploy engineering resources to write code to develop information to provide additional information. Twilio estimates that it would take an additional 30 hours of engineering time to develop queries to create responsive information. Emery Aff. at ¶ 15. Second, Twilio does not have the engineering bandwidth to respond to the broader set of requests. Its engineers are fully engaged with regular business projects. To satisfy plaintiffs' demands, Twilio would have to hire new engineering staff, or divert resources from its business operations. Emery Aff. at ¶ 16.

8) Before requiring a third party to incur the burden of creating access to information that Twilio does not use in the ordinary course, the court should require plaintiff to seek responsive information from defendants who can access the requested information or give plaintiffs direct access. A Twilio customer could obtain access to the underlying data with little effort. A user can log into its Twilio account or use the Twilio API to run a query to obtain the records, avoiding the size limitation by limiting the queries by time ranges. Plaintiff could request user access to defendant's account from defendant. Plaintiff or defendant could then develop software queries to produce the records without any additional burden on Twilio. However, Twilio does not have the authority to give plaintiff access to defendant's user credentials, or access to defendant's account. Defendant could easily create

The Honorable Jacqueline Scott Corley
Page 6

add an additional user on its account if the defendant so desired. The information about how to do that is available on Twilio's FAQs. Emery Aff. at ¶ 18. Defendants have quick and direct access to the data that Twilio does not because of how its systems are configured. The court should require plaintiff to exhaust its pursuit of additional information from defendants before imposing additional burdens on a third party to create code to access the additional information plaintiff seeks.

9) Plaintiff has not attempted to obtain relevant information through less expensive or less burdensome means. When asked during meet and confer whether plaintiff's counsel had requested the user credentials of defendants, counsel refused to answer the question. When asked whether plaintiff's counsel had attempted to access the user's account using the user's credentials, counsel refused to answer the question. Given defendants are parties to the litigation, plaintiff should at least be required to attempt to access the information through a less expensive and less onerous means than to require a third party to write code creating queries to access information that may or may not be relevant to the dispute.

10) The court should consider the remote relevance of the requested information. Plaintiffs claimed that they needed to know how many messages were transmitted and the numbers of the recipients of those messages to demonstrate ascertainability and numerosity. Twilio has produced the relevant information plaintiffs claimed they needed for class certification. The transmittal records Twilio produced identify the recipients of the messages and the number of messages transmitted.

11) The additional information plaintiffs seek is beyond the scope of their earlier requests. Plaintiffs now seek information related to the content of the text messages that were transmitted, claiming they need to review the contents of every text, and the identities of the carriers who terminated each particular call. First, Twilio cannot readily access that information. Second, plaintiffs have not suggested that these issues are even in dispute. Plaintiffs allege that defendants had a uniform practice of transmitting unsolicited messages to the putative class. There is no suggestion that defendants have asserted any differentiation in their messaging, or otherwise challenged plaintiffs' contention. Presumably, if defendants were to make that assertion, they would have to produce evidence to support it. No evidence or argument has been introduced to suggest that this is the case. As to the identity of the carrier, plaintiffs have not offered any explanation as to the relevance of that information.

12) The court should impose sanctions. Twilio met and conferred, and agreed to a compromise to avoid the legal expense of responding to an overbroad subpoena, and a motion to compel. Twilio agreed to produce information responsive to a narrowed scope of subpoena based on its capabilities, its understanding of the issues in controversy, and the court's encouragement to resolve the dispute. Plaintiff moved to compel even though Twilio advised that it had produced all the information that it had agreed to provide, that Twilio would have to write code to access additional information, and that providing the information would be time consuming and expensive. Despite that, plaintiff moved to compel anyway. Plaintiff has required Twilio to bear substantial additional expense to respond to a motion to compel that is overreaching by seeking to impose burdens on a non-party without any good faith basis. Accordingly, the court should impose sanctions. *Legal Voice v. Stormans Inc.,* 738 F.3d 1178, 1185 (9th Cir. 2013) ("A court may, however, impose sanctions when a party issues a

The Honorable Jacqueline Scott Corley
Page 7

subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law."). Twilio submits that the court should award attorneys' fees and costs associated with the meet and confer process and responding to this motion based on a lodestar of hours expended and the regular hourly billing rate of Twilio's counsel.

### PLAINTIFFS' REPLY OF MAY 6, 2015

Uncontroverted evidence establishes that Plaintiffs served Twilio with a subpoena on February 12, 2015. *See* Dkt. #2-5 at 2; *cf.* Dkt. #5, pp. 2:12 – 3:6. Twilio offered no timely objections. *See* Dkt. #2, p. 2 ¶ 10; *cf.* Fed.R.Civ.P. 45(d)(2)(B) (requiring objections no later than "14 days after the subpoena is served"). Thus, Twilio waived its objections. *See Scruggs v. Vance*, No. 2:06-CV-0633 KJM KJN, 2011 WL 6368297, at *11 (E.D. Cal. Dec. 19, 2011) ("Generally, failure to serve timely objections waives all grounds for objection."). In this context, after the hearing on the Court's order to show cause why Twilio should not be held in contempt, the Court ruled, "As stated on the record, the parties are ordered to meet and confer in person regarding Twilio's compliance with the subpoena." Dkt. #9 at 2. The Court rightly put the emphasis on Twilio's compliance because it was too late for Twilio to raise new objections. Nevertheless, Twilio raises new objections in its letter brief response by which it attempts to resist production of documents required by the subpoena and by Twilio's subsequent agreements. Plaintiffs respectfully ask the Court to ignore these very late objections and, instead, focus on the evidence which substantiates Twilio's failure to produce required discovery without good cause. *See Martinez*, 2012 WL 699462, at *3 (to avoid contempt, a person "must show that [it] took every reasonable step to comply with the subpoena and to articulate reasons why compliance was not possible.").

### A.    Twilio's Response Establishes its Intent to Defraud Plaintiffs of Discovery

Twilio does not dispute that it agreed on Monday, April 20, to produce (a) all transmission records from Defendants' accounts and (b) a copy of Defendants' customer profiles (including account information, services provided, *et cetera*). *See Aff. Kirby*, Ex. 1 at p. 2. Twilio does not dispute that Plaintiffs made clear that these production categories included an expansive array of documents and data. *See id.*, ¶ 6. Plaintiffs consistently have sought all such documents and data with their subpoena and application to enforce it. *See* Dkt. #2-4 at 9-10, Requests #1 – #6; *cf.* Dkt. #1. However, prior to agreeing to produce all of these documents and data, Twilio admits that it decided that it would not comply fully with these requests. *See Twilio's Response*, ¶ 1 ("Twilio never intended to produce every datum of information"); *cf. Aff. Emery*, ¶¶ 3-5, 7, 13. But Twilio failed to bring these objections and their reasons to Plaintiffs' attention. Instead, Twilio agreed to produce all of the requested documents and data without disclosing Twilio's limitations. *See Aff. Kirby*, Ex. 1 at p. 2. Twilio then falsely stated that it had complied fully with these requests. *See id.*, Ex. 3 at p. 10. Thus, Twilio tried to defraud Plaintiffs of discovery.

Discovery is not a game. Rule 45 does not permit Twilio to present objections after pretending it had none. *See Scruggs*, 2011 WL 6368297, at *11 (Rule 45 "require[s] the recipient of a subpoena to raise all objections at once, rather than in staggered batches, so that discovery does not become a 'game.'"), *quoting In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998). And Rule 45 does not permit Twilio to trick Plaintiffs into accepting less discovery than they are due. *See* Fed.R.Civ.P. 45. Twilio's objections should be rejected and it should be compelled to honor its agreement to produce **all** transmission records and **all** of Defendants' customer profile documents (including account information, services provided, *et cetera*).

The Honorable Jacqueline Scott Corley
Page 8

**B.      Twilio's Response Confirms that it is Withholding Defendants' Account Data**

Twilio argues that it has no reason to impede Plaintiffs. This is false. Plaintiffs stated repeatedly that one purpose of the subpoena is to help determine if Twilio is responsible for sending illegal text messages. *See* Dkt. #1 at 4:17-19; Dkt. #5 at 4:24-26. Indeed, Plaintiffs allege the existence of unnamed defendants. *See* Dkt. #2-1, ¶ 9. Other discovery indicates that Twilio may be responsible. *See* Dkt. #6-1, pp. 5-6 (Defendants' statement that Twilio facilitated transmissions of the text messages at issue). Thus, Twilio has ample reason to obstruct Plaintiffs.

Twilio promised to provide a copy of Defendants' customer profiles (including account information, services provided, *et cetera*). This is exactly the type of data that could help determine if Twilio shares in Defendants' responsibility for sending illegal text messages. Yet, Twilio offers no excuse for failing to produce all account information associated with the V Theater account. *See*, *e.g.*, *Aff. Kirby*, ¶ 7. Also, Twilio for the first time reveals in its response that there is a second account for which it has provided no data. *Aff. Emery*, ¶ 6. There is no valid reason for Twilio to withhold any information from either account. Therefore, Plaintiffs respectfully request that Twilio be compelled to produce **all** of Defendants' account data.

**C.      Twilio's Response Confirms that it is Withholding Requested Transmission Records**

Twilio promised to produce all transmission records. Twilio now refuses. But each of the records could make it easier to certify and represent the putative class. Contents of text messages would make it easier to determine which text messages were sent to class members. Since it is a TCPA violation to send text messages "to any telephone number assigned to a … cellular telephone service" (*see* 47 U.S.C. § 227(b)(1)(A)(iii)), Twilio's details of delivery and receipt by cellular telephone carriers would help identity and quantify class members with TCPA claims. Even Defendants stipulate, "Materials sought by Plaintiffs [in these proceedings] may assist the Parties to reach a settlement or otherwise resolve the case." *See Aff. Kirby*, Ex. 8 at ¶ 4.

Plaintiffs respectfully request that Twilio be ordered to produce **all** transmission records. Compelling Twilio to search its electronic data is proper with production requests. *See*, *e.g.*, *In re CV Therapeutics, Inc. Sec. Litig.*, C03-3709EMC, 2006 WL 2458720, *2 (N.D.Cal. Aug. 22, 2006) ("Employment of search terms is a reasonable means of narrowing the production…."); *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003) (noting that electronic evidence is frequently cheaper and easier to produce than paper evidence because it can be searched automatically). Twilio demonstrated the ease of these data searches by retrieving the contents of all text messages received by Defendants' account. *See Aff. Kirby*, Ex. 5. Even if Twilio had not agreed to undertake these searches, the time and expense of complying with these production requests would not be reasons to deny them. *See Jackson v. Montgomery Ward & Co., Inc.*, 173 F.R.D. 524, 529 (D.Nev. 1997). ("[J]ust because complying with a discovery request will involve expense or may be time consuming does not make it unduly burdensome.").

**D.      Twilio's Request for Sanctions is Frivolous**

Plaintiffs simply seek data requested by a lawful subpoena and promised by Twilio. Twilio's gamesmanship caused avoidable expenses and twice caused the Nevada District Court to delay case deadlines. *See* Dkt. #6-2; *Aff. Kirby*, Ex. 8. It is not the Plaintiffs who deserve sanctions.

The Honorable Jacqueline Scott Corley
Page 9

*/s/ Patrick S. Thompson*
Patrick S. Thompson (SBN 160804)
*pthompson@goodwinprocter.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center, 24th Floor
San Francisco, California 94111
Telephone: (415) 733-6000
Facsimile: (415) 677-9041

Attorney for non-party Twilio, Inc.

*/s/ Albert H. Kirby*
Albert H. Kirby (SBN 204266)
*ahkirby@soundjustice.com*
**SOUND JUSTICE LAW GROUP, PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 489-3210
Facsimile: (866) 845-6302

Attorney for Plaintiff Jeremy Bauman

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Maryland

| | | |
|---|---|---|
| Robert Nock | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:24-cv-00662 |
| Palmco Administration, LLC d/b/a Indra Energy, et al | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:       Twilio Inc., 101 Spear Street, Suite 500, San Francisco, California 94105
c/o CSC, 2710 Gateway Oaks Drive, Sacramento, California 95833

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters: See attached schedule

| Place: 2233 Shore Line Drive, Alameda, California 94501, or elsewhere or remotely consistent with the attached schedule | Date and Time: 10/06/2025 1:00 pm |
|---|---|

The deposition will be recorded by this method:   Stenographic and/or video recording

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See attached schedule

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   09/08/2025

*CLERK OF COURT*
                                                                    OR

_____                         s/Ethan Preston
*Signature of Clerk or Deputy Clerk*                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Plaintiff, Robert Nock                                                           , who issues or requests this subpoena, are:
Ethan Preston, Preston/Law Offices, 4054 McKinney Avenue, Suite 310, Dallas, Texas 75204, (972) 564-8340,

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Nock App'x 67

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:24-cv-00662

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc.:

Nock App'x 68

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBERT NOCK, *on behalf of himself and others similarly situated*<br><br>*Plaintiff,*<br><br>v.<br><br>PALMCO ADMINISTRATION, LLC, d/b/a Indra Energy; and PALMCO POWER MD, LLC, d/b/a Indra Energy<br><br>*Defendants.* | No. 1:24-cv-00662-RBD<br><br>**PRESERVATION INSTRUCTIONS, PRODUCTION SCHEDULE, AND NOTICE OF DEPOSITION FOR SUBPOENAS TO TWILIO INC.** |

## PRESERVATION AND PRODUCTION INSTRUCTIONS

The attached subpoena places Twilio Inc. (together, "Twilio") on notice that it has a duty to preserve evidence relevant to the above-captioned case, including in particular call records for the following numbers for calls during 2021 ((844) 275-4742, (888) 200-0961, (844) 416-1174 (844) 275-4742, (833) 513-7075, and (844) 943-2767), records identifying the owner of the accounts using such numbers, and communications with such owners, and communications with AnswerNet, Inc., TPV LLC, Sales Verification LLC, and/or Cerida Investment Corp. (collectively, "TPV.com"). Failure to obey a subpoena could render Twilio liable to sanctions for contempt of court. *See* Fed. R. Civ. P. 45(e). Federal law provides criminal penalties for any person who "corruptly ... obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice[.]" 18 U.S.C. § 1503(a). *See also* 18 U.S.C. § 401(3) (court may punish "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command" by "fine or imprisonment, or both, at its discretion"). Contact the counsel identified above if there are any questions about the subpoena or your obligations thereto.

The duty to preserve created by a subpoena extends to documents and other evidence

Nock App'x 70

within Twilio's "possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(iii). Twilio has "control" over evidence or documents where it has the right to obtain the documents upon demand.

It is likely that most of the documents requested in this subpoena are electronic. Effective preservation of documents requires you to identify and inventory the physical media where requested electronic documents may be found. Such physical media can take any number of forms, and the following list is provided for illustrative purposes: (1) hard drives attached to personal computers, laptops, and servers; (2) external, networked or detached drives; (3) archive or backup tapes; (4) portable drives (Flash USB drives and external hard drives connected via USB or FireWire); (5) optical media (i.e., CDs and DVDs); (6) floppy discs; (7) portable devices including wireless devices and other PDAs; and (8) volatile memory (i.e., RAM) of the foregoing devices. Document custodians should be alerted that relevant documents may be found in any of the foregoing media, and that a single item of computer media may contain multiple file systems.

## INSTRUCTIONS AND PRODUCTION SCHEDULE

**Instructions:**

Twilio is required to respond to the attached subpoena in a manner that is consistent with Federal Rule 45. The following instructions do not limit the scope of Twilio's obligations under the Rule 45, but are merely meant to remind or inform it of these duties and to provide examples of compliance those duties.

### A.    Definitions

With respect to this Subpoena,

1.    The term "Plaintiff" means Robert Nock.

2.      The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make requests inclusive rather than exclusive.

3.      The term "Twilio" means Twilio Inc. and its principals, partners, officers, directors, attorneys, managers, members, servants, employees, assignees, affiliates, and/or anyone acting for or on behalf of it, and/or any predecessor, successor, affiliate, subsidiary, parent or related corporation, partnership or entity, and/or anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

4.      The term "TPV.com" means AnswerNet, Inc., TPV, LLC, Sales Verification LLC, and/or Cerida Investment Corp., their principals, partners, officers, directors, attorneys, managers, members, servants, employees, assignees, affiliates, and/or anyone acting for or on behalf of them, and/or any predecessor, successor, affiliate, subsidiary, parent or related corporation, partnership or entity, and/or anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

5.      The term "affiliate" has the same meaning as it does under 12 C.F.R. § 225.2(a).

6.      The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

7.      The term "call record" means all documents, including call detail records, audio recordings, and/or text messages, concerning telephone calls and text messages sent during the class period to the present. Call records should include each and every category and/or field of data or metadata which are linked to the responsive call and which are stored by and/or accessible to Defendants, including by way of example but without limitation the following:

     a.      The database id number or designator for the call record;

     b.      The identity of the Telesales Channel that placed the call;

     c.      The originating party (i.e., the telephone number of the party originating the call);

     d.      The terminating party (i.e., the telephone number of the party receiving the call);

     e.      The dialed number (i.e., the number that the originating party dialed);

     f.      The designation or identification of the dialer used to make the call;

g.    The designation or identification of the campaign in which the call was made;

h.    The disposition of the call;

i.    The date the call was initiated (i.e., month, day, year);

j.    The time the call was initiated (i.e., hour, minute, second);

k.    The duration of the call (i.e., hours, minutes, seconds);

l.    Any call features and/or feature codes applied to the call (e.g., pre-recorded voice, click-to-dial, call-forwarding, call-forwarding to voicemail, forward-to number, call-waiting, three-way calling, interactive voice response, etc.);

m.    Original originating number (i.e., the number that originated the call before call forwarding was invoked);

n.    Carrier Identification Code ("CIC") for interexchange carrier calls;

o.    Telephone switch identification originating the call; and

p.    Telephone switch identification terminating the call.

8.    The term "class period" means March 5, 2020 through the present and to date of the Court's class certification ruling in this case.

9.    The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) in any document, and/or via oral, written, and/or electronic means.

10.    The term "complaint" means any and all versions of the complaint filed in action.

11.    The term "consumer" means past, current, potential, and/or prospective customers for Defendants' residential electric generation and/or natural gas supply services.

12.    The term "Defendants" means PalmCo Administration, LLC, PalmCo Power MD, LLC, and Palmco Energy MD LLC.

13.    The term "document" includes any communication, data, information, or expression that is fixed in a tangible form and that is stored in a medium from which it can be retrieved and examined. This definition expressly includes, but is not limited to, emails, computer files in every kind and format (which includes

Nock App'x 73

every sort of entry or other information stored in a database), as well as writings of every kind, any correspondence, books, records, logs, reports, memoranda, abstracts, advertisements, agreements, appointment records, audio recordings (whether transcribed or not), balance sheets, bills, books of account, certificates, communications, checks, compilations, papers, transcriptions or summaries of conversations, diaries, drafts, drafts of documents, disks, notes, notations, plans and specifications, graphs, tapes, slides, computer programs, computer print-outs, entries, estimates, expense records, financial analyses, financial statements, forms, handbooks, telegrams, income statements, indices, intra-office and inter-office communications, invoices, itemizations, journals, letters, meeting reports, minutes, notes, payroll records, photocopies, photographs, press releases, prospectuses, publications, receipts, records of account, reports, resolutions, statements, statistical records, studies, summaries, system analyses, and time records.

14.    The term "Indra Admin" means PalmCo Administration, LLC as well as its principals, partners, officers, Twilios, attorneys, managers, members, servants, employees, assignees, affiliates, and/or anyone acting for or on behalf of it, and/or any predecessor, successor, affiliate, subsidiary, parent or related corporation, partnership or entity, and/or anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

15.    The term "Indra MD" means PalmCo Power MD, LLC and/or Palmco Energy MD LLC as well as their principals, partners, officers, Twilios, attorneys, managers, members, servants, employees, assignees, affiliates, and/or anyone acting for or on behalf of them, and/or any predecessor, successor, affiliate, subsidiary, parent or related corporation, partnership or entity, and/or anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

16.    The term "Indra" means Indra Admin and Indra MD, as well as any combination of PALMco Power, CA, LLC, PALMco Power CT, LLC, PALMco Energy CT, LLC, PALMco, Power DC, LLC, PALMco Energy DC, LLC, PALMco Power DE, LLC, PALMco Power IL, LLC, PALMco Energy IL, LLC, PALMco Power MA, LLC, PALMco Energy MA, LLC, PALMco, Power MD, LLC, PALMco Energy MD, LLC, PALMco Power NJ, LLC, PALMco Energy NJ, LLC, Columbia Utilities, LLC, Columbia Utilities Power, LLC, PALMco Power NY, LLC, PALMco Energy NY, LLC, PALMco Power OH, LLC, PALMco Energy OH, LLC, PALMco, Power PA, LLC, PALMco Energy PA, LLC and PALMco Energy VA, LLC, individually or collectively, or any other affiliate owned by Robert Palmese, or operated by Indra Admin.

17.    The term "insider" includes employees, officers, owners, stockholders, or board members of Indra, persons in control of Indra, or relative of any such person, and/or a partnership in which Indra is a general partner, and/or a general partner in such partnership.

Nock App'x 74

18.    The term "instrument numbers" means MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber lntegrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and/or International Mobile Equipment Identity ("IMEI").

19.    The term "person(s)" means any natural person or any business, legal or governmental entity or association.

20.    The term "Sales Agent(s)" means Endurance Sales & Marketing LLC, Energy Group Consultants, JBW Energy Enterprises, LLC, NSL Marketing, LLC, NU Life Marketing, Reignite Marketing Corporation, and/or Rock Your Sales, as well as their principals, partners, officers, attorneys, managers, members, servants, employees, assignees, affiliates, and/or anyone acting for or on behalf of them, and/or any predecessor, successor, affiliate, subsidiary, parent or related corporation, partnership or entity, and/or anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

21.    The term "TCPA" means the federal Telecommunication Consumer Protection Act and as well as implementing regulations and related Federal Trade Commission and Federal Communications Commission regulations, rules, and orders.

**B.    Scope**

In its response to the Subpoena, Twilio shall produce (in addition to all documents in its possession or custody) all documents which it has a right to demand or to which it has access. By way of example, but without limitation, he shall produce all responsive documents found in the possession or custody of his agents, partners, attorneys, servants, employees, assignees, affiliates, and/or anyone acting for or on behalf of him, and/or any predecessor, successor, affiliate, subsidiary, parent or related corporation, partnership or entity, and/or anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

**C.    Production of Electronic Documents**

Twilio shall produce any electronic documents requested herein in "native format,"

Twilio Inc. Subpoena                    6                    No. 1:24-00662

meaning the format in which they are ordinarily used or accessed by it outside of litigation.
Native format explicitly includes application-specific metadata (like File Properties for Word
.doc files) and file system metadata (like the date of creation and modification and file
permissions stored in an NTFS-formatted file system). In particular, Twilio shall produce
electronic documents with their original filepath.

File system metadata can be preserved by archiving responsive electronic documents in a
.tar or .zip file. These archival formats simplify preservation of time-related metadata. These
archival formats can also be used to simplify preservation of file systems' overall Twilioy
structure (and thereby responsive documents' filepath) by initially including the file systems'
root Twilioy in the archive, and then manually excluding all non-responsive Twilioies and files.
If it prefers, Twilio may use a .tar or .zip or similar archival file format to produce all responsive
documents on a particular file system. (The documents contained within the archive file should
still be produced in their native format.)

However, if responsive electronic documents are in a file format that is not accessible by
mass-market software, Twilio shall translate the file to a format accessible by mass-market
software. If possible, the documents should be translated in manner that preserves the original
documents' metadata. Typically, data in databases should be produced in plain text (i.e., ASCII or
Unicode) format, with appropriate delimiters to preserve differentiation between different data
fields (which may include tabs or commas), and clear identification of such data fields. Please
coordinate with Plaintiffs' counsel early on so that the logistics of translating such electronic
documents can be worked out in advance of the production deadline. If possible, the documents
should be translated in manner that preserves the original documents' metadata. Conversion of
documents from other formats to a .tiff or .pdf format is not acceptable for a number of reasons.

Nock App'x 76

**<u>DO NOT CONVERT DATA STORED IN A DATABASE TO PDF FORMAT OR WE</u>**

**<u>WILL REQUIRE YOU TO REPRODUCE THAT DATA.</u>**

There are a variety of ways to authenticate electronic documents. For instance, Twilio

may wish to assign a Bates number or calculate a hash value for each electronic document

produced, or each archival file, or even each CD or hard drive. A hash is a mathematical or

cryptographic "signature" of a file, and can be used to authenticate documents with only minimal

time and resources. In either event, Twilio can ensure the integrity of the electronic documents it

produces by including a cryptographic hash value for each document (or each archive). These

hash values can be used to label particular productions, and to ensure that the productions are not

altered. To the extent Twilio requires Bates designations on its production, it should provide an

index with the file name, hash value, and Bates designation of each document produced.

     **D.**     **Manner of Production**

Twilio shall organize the requested documents either "as they are kept in the ordinary

course of business or must organize and label them to correspond to the categories in the

demand." Fed. R. Civ. P. 45(d)(1)(A). If Twilio does not organize and label produced documents,

it must demonstrate that it produced the documents as they are kept in the usual course of

business. Twilio may be obliged to substantiate that the documents it produces are produced as

they are kept in the ordinary course of business.

Twilio should produce documents via a file share, on optical media (CDs or DVDs), or

on a portable hard drive. If Twilio has paper documents without any electronic originals, those

documents should be scanned into a .pdf format in a manner that ensures that they are legible and

searchable. Please coordinate with Plaintiff's counsel early on, so that the logistics of scanning

such paper documents in can be worked out in advance of the production deadline. For

Nock App'x 77

environmental and logistical reasons, documents that cannot be scanned should be produced on paper only as a last resort.

Email is the preferred manner of conveying the documents, and can be sent to jginsburg@creditlaw.com, teamkimmel@creditlaw.com, and ep@eplaw.us.

### E.    Objections

Any objections to the Subpoena must conform to Rule 45(c)(2)(B). Any grounds for objection that is not stated in a timely objection are waived. If documents are withheld under a claim of privilege or protection as trial-preparation material, Twilio shall make the claim expressly and shall describe the nature of the withheld documents (and, if applicable, the external circumstances which it claims support the application of such privilege) in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the applicability of the privilege or protection. *Cf.* Fed. R. Civ. P. 45(e)(2). A privilege log or equivalent should be prepared with your response to the Subpoena, or an extension should negotiated beforehand.

Defendants or other third parties may serve you with objections to your production in response to this subpoena. These objections do not require or permit Twilio to delay its production in response to this subpoena. Defendants and other third parties must file a motion for protective order or a motion to quash the subpoena if they wish to prevent your production, and they have limited standing to do so. *Cf.* Fed. R. Civ. P. 26(c); Fed. R. Civ. P. 45(d)(3).

### Schedule of Documents to be Produced by Twilio Inc.

1.    All documents concerning the Twilio account(s) which used these telephone numbers during the class period: (844) 275-4742, (888) 200-0961, (844) 416-1174 (844) 275-4742, (833) 513-7075, and (844) 943-2767, including account, registration, session records (including records of IP addresses used to register such account or to access such account at different times, and records of the devices used to access such account (including hardware model, operating system

Nock App'x 78

versions), records of recovery email addresses or telephone numbers, records of unique device identifiers, and records of mobile network information and or other records identifying any other Twilio account used by the person(s) using the Twilio account associated with such telephone numbers.

2.   All call records for calls between

   a.   any of these telephone numbers: (844) 275-4742, (888) 200-0961, (844) 416-1174 (844) 275-4742, (833) 513-7075, and (844) 943-2767; and

   b.   any of these telephone numbers: (215) 914-9702, (347) 383-5493, (929) 408-8985, and (917) 291-6675;

   during the class period.

3.   All call records for calls or text messages to or from any of the following telephone numbers in 2021: (844) 275-4742, (888) 200-0961, (844) 416-1174 (844) 275-4742, (833) 513-7075, and (844) 943-2767.

4.   To the extent not already produced in response to prior Requests, all documents sufficient to identify every telephone number beginning with a 800, 833, 844, 855, 866, 877, or 888 area code, which number TPV.com used, reserved, or paid for during the class period.

5.   To the extent not already produced in response to prior Requests, all documents sufficient to identify every telephone number beginning with a 800, 833, 844, 855, 866, 877, or 888 area code, which number was used, reserved, or paid for by any of the Twilio account(s) identified in your response to Request 1 above during the class period.

6.   All documents concerning the Twilio account(s) which used these telephone numbers during the class period: (407) 449-8340, (407) 553-2150, (410) 346-0089, (410) 781-1325, and (410) 784-4536, including account, registration, session records (including records of IP addresses used to register such account or to access such account at different times, and records of the devices used to access such account (including hardware model, operating system versions), records of recovery email addresses or telephone numbers, records of unique device identifiers, and records of mobile network information and or other records identifying any other Twilio account used by the person(s) using the Twilio account associated with such telephone numbers.

7.   All call records for calls or text messages to or from any of the following telephone numbers during the class period: (407) 449-8340, (407) 553-2150, (410) 346-0089, (410) 781-1325, and (410) 784-4536.

8.   All documents concerning any communication between Twilio and any other

person (besides Plaintiff and his counsel) regarding the case captioned above, *Nock v. PalmCo Administration, LLC*, No. 1:24-00662, pending in the United States District Court for the District of Maryland (including, by way of example but without limitation, communications concerning this subpoena, Twilio's response thereto, and the retention and/or production of documents relevant to the case captioned above, as well as documents evidencing such communications). This category does not include Comcast's internal communications.

9.    All documents concerning any incident under which any document which would be responsive to this subpoena was purportedly lost, destroyed, delinked, dereferenced, deleted, and/or access to such document was lost.

10.   To the extent that you intend to charge Plaintiff any cost or expense for complying with this subpoena, all documents on which you may rely to support such cost or expense.

11.   To the extent that you object to this subpoena, every document on which you may rely to support such objection in any dispute regarding this subpoena.

## NOTICE OF DEPOSITION OF TWILIO INC.

PLEASE TAKE NOTICE that Plaintiff Robert Nock ("Plaintiff"), through the undersigned counsel, will take the oral deposition of third-party Twilio Inc. under Federal Rules of Civil Procedure 30 and 45 before a qualified court reporter remotely via audio-visual signal transmitted via the Uniform Resource Locator (URL) provided by the court reporter October 6, 2025 beginning at 10:30 a.m. Eastern Time (or at another time and place which may agreed upon by the parties) under Federal Rules of Civil Procedure 30 and 45. The deposition will be recorded stenographically, and may be viewed and/or recorded via audio-video signal, including the instant visual display and recording of the testimony, by Zoom, Skype, and/or other comparable application. The deposition may be videotaped, recorded and transmitted using LiveNote or other comparable instant transcription service, and may continue from day to day or to a mutually agreed upon date, with weekends and holidays excluded, until it is complete. The record prepared by the court reporter is the official record of the deposition, but Plaintiff may make an independent recording of the deposition's video and/or audio signal.

The place of the deposition shall be 2233 Shore Line Drive, Alameda, California 94501. Absent valid and timely objection, however, the deposition will proceed remotely. Plaintiff's consent to a remote deposition is subject to the condition that the deponent is responsible for ensuring adequate facilities for an orderly, full, complete, transparent, and unimpeded deposition. These facilities specifically include: (1) a desktop or laptop computer with a physical keyboard (not a mobile device); (2) which can download deposition exhibits from a Google Drive folder, open and view webpages, Word, Excel, and csv, and listen to audio files; and (3) an Internet connection capable of transmitting and receiving a clear, continuous, and uninterrupted audio-visual signal via the court reporter's URL, including both viewing other participants' screens and sharing their own; (4) a deposition location with a closed room which is free from ambient noise and any other disruptions. While the deposition is on record, the deponent will remain alone in the closed room. Direct or indirect *ex parte* communications (or attempted communications) with the deponent are prohibited from the start of the deposition until its close. Plaintiff reserves the right to move to re-depose the deponent if anyone impedes, delays or frustrates an orderly, full, complete, transparent, and unimpeded examination of the deponent (at that person's cost), including by failing to ensure such facilities. The deponent and other parties are responsible for ensuring that their own facilities are adequate prior to the deposition and *Plaintiff strongly encourages the deponent and all other parties properly attending the deposition to use any training URL provided by the court reporter to test their facilities prior to the deposition*.

### **Topics for Rule 30(b)(6) Deposition**

Under Rule 30(b)(6) of the Federal Rules of Civil Procedure, Twilio is required to designate one or more officers, directors, managing agents, employees or other persons who consent to testify on its behalf regarding the matters described below, and to produce them for

Nock App'x 81

deposition consistent with the attached subpoena and this schedule:

1.    The foundation for the deponents' testimony at their deposition, including their personal knowledge, and the basis for (including accuracy and reliability of) their personal knowledge, and the basis for Twilio's designations of the deponents as its representatives.

2.    Twilio's identification, search for, location, collection, and production of documents of documents responsive to this subpoena.

3.    The nature of Twilio's relationship with TPV.com, the nature and manner of the the services Twilio provides TPV.com, and the Twilio personnel with personal knowledge of the services Twilio provides TPV.com.

4.    Any incident under which any document which would be responsive to this subpoena was purportedly lost, destroyed, delinked, dereferenced, deleted, and/or access to such document was lost.

5.    To the extent that you intend to charge Plaintiff any cost or expense for complying with this subpoena, the basis and nature of such costs or expenses.

Dated: September 8, 2025        By:   s/Ethan Preston
                                      Ethan Preston
                                      ep@eplaw.us
                                      PRESTON LAW OFFICES
                                      4054 McKinney Avenue, Suite 310
                                      Dallas, Texas 75204
                                      Telephone: (972) 564-8340
                                      Facsimile: (866) 509-1197

                                      Jacob U. Ginsburg, Esq. (*pro hac vice*)
                                      KIMMEL & SILVERMAN, P.C.
                                      30 East Butler Ave.
                                      Ambler, PA 19002
                                      Phone: (267) 468-5374
                                      Facsimile: (877) 788-2864
                                      Email: jginsburg@creditlaw.com
                                      teamkimmel@creditlaw.com

*Attorneys for Plaintiff Robert Nock, on his own
behalf, and behalf of all others similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, a true and correct copy of the foregoing was

served via CM/ECF upon all counsel of record.

Dated: September 8, 2025          By:   s/Ethan Preston
                                        Ethan Preston

Nock App'x 83

Preston Law Offices
Ethan Preston SBN 263295
4054 McKinney, Suite 310
Dallas, TX  75204
(972)564-8340


Representing: Plaintiff                                        File No.


UNITED STATES DISTRICT COURT


|  |  |
|---|---|
| Robert Nock | ) |
| **Plaintiff/Petitioner** | ) |
|  | ) |
| vs. | ) |
|  | ) |
| Palmco Administration, LLC, et al | ) |
| **Defendant/Respondent** | ) |
|  | ) |
|  | ) |
|  | ) |

Case No. 1:24-cv-00662

Proof of Service of:
Subpoena to Testify at a Deposition in a Civil Action;
Preservation and Production Instructions

Service on:
Twilio Inc.


Hearing Date:    2025-10-06


Hearing Time:    1:00 pm


Div/Dept:    2233 Shore Line Drive, Alameda, CA
94501


PROOF OF SERVICE

Order # 26249508

Nock App'x 84

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | | FOR COURT USE ONLY |
|---|---|---|
| Preston Law Offices<br>Ethan Preston SBN 263295<br>4054 McKinney Suite 310<br>Dallas, TX 75204 | | |
| TELEPHONE NO:  (972)564-8340          FAX NO *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:  onelegal@eplaw.us<br>ATTORNEY FOR *(Name)*:  Plaintiff | | |
| ***Insert name of court, judicial district or branch court, if any:***<br>United States District Court, District of Maryland<br>101 West Lombard Street<br>Baltimore, MD 21201 | | |
| PLAINTIFF / PETITIONER:   Robert Nock<br>DEFENDANT / RESPONDENT:   Palmco Administration, LLC, et al | | CASE NUMBER:<br>1:24-cv-00662 |
| HEARING DATE:<br>2025-10-06 | HEARING TIME:<br>1:00 pm | HEARING LOCATION:<br>2233 Shore Line Drive, Alameda, CA 94501 |
| **PROOF OF SERVICE** | | Ref. No. or File No.:<br>14100926 (26249508) |

1. At the time of service I was a citizen of the United States, over 18 years of age and not a party to this action, and I served copies of:
Subpoena to Testify at a Deposition in a Civil Action; Preservation and Production Instructions

2. Party Served:                              Twilio Inc. by serving Rebecca Vang - Authorized Agent - Person Most Knowledgeable

3. Date & Time of Delivery:              September 9, 2025 at 1:25 pm PDT

4. Address, City and State:              2710 Gateway Oaks Dr Suite 150N Sacramento, CA, 95833

5. I received the above document(s) for service on:     September 8, 2025

6. Witness Fees:                              Witness Fee and mileage both ways, if applicable, were offered or demanded and paid. Amount $40.00.

Fee for service: $91.00

Registered California process server.
Brandon Ortiz
County: Sacramento
Registration No.: 2012-037

InfoTrack US, Inc. - P000634
1400 North McDowell Blvd Suite 300,
Petaluma, CA  94954
800-938-8815

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

_____
Brandon Ortiz

Date: September 9, 2025

---

**PROOF OF SERVICE**

Page 1 of 1
Order #26249508

Nock App'x 85

From:   "Ethan Preston" <ep@eplaw.us>
To:     "Emily Park" <epark@twilio.com>
CC:    "Olesia Schoenstein" <oschoenstein@twilio.com>
        "Matt Gainer" <mgainer@twilio.com>
        "Jacob Ginsburg" <jginsburg@creditlaw.com>
        "Tyson Mott" <tyson.mott@answernet.com>
Date:   10/7/2025 4:07:32 PM
Subject:  Re: Fwd: Subpoena request- Robert Nock vs. Palmco Administration, LLC d/b/a Indra Energy

---

Thanks, Emily. Without waiving any other objection to your email below, its not entirely clear whether motion practice is premature or not. It seems to me that the scope and timing of Twilio's production may be in flux, and with them any waiver of the deadlines under Rule 45. Certainly, we have not seen Twilio's responses, and a commitment to timely produce responsive documents would at least narrow any dispute over the subpoena. That said, we view waiver of Rule 45 deadlines as an endpoint in the meet and confer process, not its starting point.

We're of course mindful of the SCA. We may seek content from Twilio after obtaining consent from TPV.com. *Cf.*, *e.g.*, *Juror No. One v. Superior Ct.*, 206 Cal.App.4th 854 (2012).

Jake, its good to see you again. Perhaps it makes sense to have a call next week, after Twilio's response?

Thanks again,

Ethan

On 10/7/25 2:55 PM, Emily Park wrote:

> Ethan,
>
> Thank you for our call earlier today and for your follow-up.
>
> Initially we note that the subpoena you served is a deposition subpoena, and you had reached out while I was out on maternity leave to suggest that the deposition may not be necessary. Upon my return, I confirmed that we agreed the deposition is not necessary and requested an extension of time to provide our objections and responses to the subpoena given my recent return. I also requested that we meet and confer, noting that we "may be limited in what we can provide." Given this, I'm not sure it was reasonable to expect our written response by yesterday—particularly in advance of any meet and confer. In any event, I believe the correspondence below speaks for itself, and we will be providing our written response by the end of this week.
>
> Additionally, during our meet and confer today, I learned for the first time about a sworn declaration submitted by AnswerNet/TPV in connection with Plaintiff's motion to compel. As I explained during our call, our customers likely possess the data you are seeking and are in the best position to assess the relevance of the requests and produce responsive records. Further, Twilio is restricted from producing content of messages under the Stored Communications Act.
>
> During our call, you expressed concerns—without providing details—as to the accuracy of the declaration and suggested it may contain false or misleading information about the existence of certain text or call logs. I requested a copy of the declaration so we can review and evaluate it ourselves. Based on your message below, it appears we should expect to hear directly from AnswerNet regarding that document. In the meantime, and absent further information, our position remains that AnswerNet is the appropriate party to produce this information.

While you've indicated an intent to pursue motion practice, we believe any such action would be premature—particularly given the lack of clarity around what has been said or produced by AnswerNet, whether efforts are being duplicated, or whether a meet and confer has been adequately completed.  Please also copy Twilio's outside counsel, Jake Sommer, on all future correspondence. Thank you.

Emily

On Tue, Oct 7, 2025 at 2:23 PM Ethan Preston <ep@eplaw.us> wrote:
> Emily, thanks for your time today.
>
> I think at the start of the call, we misunderstood each other's positions. I expected to discuss what documents Twilio would produce when (hence my October 1 email "Let's include a production schedule in the agenda"), and you expected to discuss an extension on Twilio's time to object to the subpoena under Rule 45. In fact, during the call, I learned Twilio's position is that it will not commit to producing any responsive documents. Conversely, I clarified Nock's position that Twilio's objections to the subpoena are not timely. All that said, Twilio plans to serve a written response at the end of the week.
>
> We also discussed a declaration signed by Gary Pudles and dated July 15. As we discussed, I do not think that declaration reflects TPV.com's current position on matters directly relevant to the subpoena. Please ask my contact at TPV.com (Tyson Motts, cc'd on this email) to provide you with that declaration if you think it will facilitate our meet and confer process. But otherwise I do not think it is appropriate or productive for *Nock* to provide that declaration (and certainly not without involving TPV.com first).
>
> Please let me know if I misstated or omitted anything material above, or if there are any further questions about Nock's positions.
>
> Thanks again,
>
> Ethan
>
> On 10/7/25 10:25 AM, Ethan Preston wrote:
>> Emily, I'm assuming you plan to call me at 415 842 4666 in a few minutes. If you have other plans, please let me know. Thanks, Ethan
>>
>> On 10/4/25 9:06 AM, Ethan Preston wrote:
>>> Thanks for the email, Emily. This is very helpful and sets us up for a productive call on Tuesday.
>>>
>>> On 10/3/25 5:57 PM, Emily Park wrote:
>>>> Hi Ethan,
>>>>
>>>> Thanks for the breakdown -- I will review before our call.  Regarding your inquiry about preservation, it's unclear which entities you're requesting a litigation hold for, or how this matter relates to the *Anthony* matter.
>>>
>>> You might know TPV.com as AnswerNet. Anyways, we're also looking to identify the

customer using the (844) 275-4742, (888) 200-0961, (844) 416-1174 (844) 275-4742, (833) 513-7075, and (844) 943-2767 numbers, which we expect is AnswerNet /TPV.com.

To the extent you are seeking preservation of certain records, please note that Twilio's customers control, via the Twilio Console, whether data in their accounts is retained or deleted. Twilio does not delete data from active accounts unless instructed to do so by the customer.  Accordingly, any preservation request should be directed to the relevant customers, as they are the parties with access to and control over potentially relevant data.

To provide some additional background, we have already served TPV.com with subpoenas but haven't yet been able to get some of the documents we're seeking. Please see attached.

Emily

On Wed, Oct 1, 2025 at 8:48 PM Ethan Preston <ep@eplaw.us> wrote:

Hi Emily,

Tuesday, October 7 at 8:30am PT/12:30pm CT is great. ==Let's include a production schedule in the agenda as well.==

I think its helpful to break down the documents covered by the subpoena before the call.

(1) seeks to identify the accountholder for certain numbers we think are used by TPV.com ((844) 275-4742, (888) 200-0961, (844) 416-1174 (844) 275-4742, (833) 513-7075, and (844) 943-2767).

(2) and (3) seek call records for calls and texts sent between (a) TPV.com and (b) four telephone numbers of interest.

(4) and (5) seeks documents showing the 800 numbers that TPV.com has used

(6) seeks to identify the accountholder(s) for (407) 449-8340, (407) 553-2150, (410) 346-0089, (410) 781-1325, and (410) 784-4536.

(7) seeks call records for (6).

(8) to (11) seek documents relevant to potential disputes.

With respect to preservation, please confirm Twilio has kept a litigation hold on its call records and text messages in light of the pending *Anthony* case (see attached).

Thanks,

Ethan

On 10/1/25 2:56 PM, Emily Park wrote:

> I am unavailable at the proposed time.  Are you available Tuesday 10/7 at
> 8:30am PT? ==As for the written response to the subpoena, I will plan for us
> to discuss and agree on a date for same.==  Thanks.

> On Wed, Oct 1, 2025 at 1:24 PM Ethan Preston <ep@eplaw.us> wrote:
>> Emily, let's prioritize the documents and take the deposition off calendar
>> until further notice. I'm available on Monday from 8:30am to 10:30am
>> PT. Let me know what works. Thanks, Ethan

>> On 10/1/25 12:18 PM, Emily Park wrote:

>>> Hi Ethan,

>>> My name is Emily Park, and I serve as Senior Counsel on Twilio's
>>> litigation team. ==I am writing to request an extension of the time to
>>> respond to the subpoena== served in connection with the Nock v.
>>> Palmco matter as I just returned from parental leave and require
>>> additional time to review the subpoena.  Additionally, our team has
>>> a scheduled offsite next week and will be unavailable on the noticed
>>> date.

>>> I agree that the deposition may not be necessary but we may be
>>> limited in what we can provide. It would be helpful to have a call to
>>> discuss what you are seeking. Please let me know your availability
>>> for a call next week. Thank you.

>>> Emily Park

>>> ---------- Forwarded message ---------
>>> From: **Ethan Preston** <ep@eplaw.us>
>>> Date: Wed, Oct 1, 2025 at 12:35 PM
>>> Subject: Re: Subpoena request- Robert Nock vs. Palmco
>>> Administration, LLC d/b/a Indra Energy
>>> To: Olesia Schoenstein <oschoenstein@twilio.com>
>>> Cc: Matt Gainer <mgainer@twilio.com>

>>> Hi Olesia and Matt, I hadn't heard back from you all. I think we'd all
>>> be best served if we got enough documents from Twilio to defer or
>>> avoid the deposition presently set for next week. Of course, I
>>> understand Twilio could see things differently, so please let me
>>> know if that's the case. (Please also confirm Twilio will make its
>>> deponent available on Monday, and please let me know who it is
>>> and where I can email the Zoom link.) Thanks, Ethan

On 9/19/25 11:00 AM, Ethan Preston wrote:

Thanks for reaching out, Olesia. Please find the requested documents attached.

On 9/19/25 9:43 AM, Olesia Schoenstein wrote:

Mr. Preston,

This is to confirm receipt of the subpoena request for the matter referenced above. As we look into your request and prepare our response, we'd like to confirm if there is a protective order in place. If so, will you kindly send a copy for our records? Also, could you please provide a copy of the Complaint in this matter. Thank you.

Sincerely,
Olesia Schoenstein
Paralegal Litigation, Employment & Litigation Technology

EMAIL    oschoenstein@twilio.com

View Our Privacy Policy  |  Unsubscribe

--
Emily Park
Senior Counsel I, Litigation



--
Emily Park
Senior Counsel I, Litigation



--
Emily Park
Senior Counsel I, Litigation



--
Emily Park
Senior Counsel I, Litigation



October 10, 2025

Ethan Preston
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, TX 75204
**VIA EMAIL (ep@eplaw.us)**

Re: Non-Party Twilio Inc.'s Objections and Response to Subpoena Served in Connection with *Robert Nock, on behalf of himself and others similarly situated v. Palmco Administration, LLC, d/b/a Indra Energy; and Palmco Power MD, LLC, d/b/a Indra Energy*, Civil Action No. 1:24-cv-00662, United States District Court, District of Maryland (the "Action")

Dear Mr. Preston:

Non-party Twilio Inc. ("Twilio") hereby objects and responds to the subpoena dated September 8, 2025 served on it in connection with the above-referenced Action (the "Subpoena").

## PRELIMINARY STATEMENT

Nothing contained in Twilio's objections and responses to the Subpoena is intended as a waiver of any privilege, protection, or immunity, including without limitation, the attorney-client privilege, the work-product doctrine, the joint-defense privilege, the common-interest privilege, or any other applicable privilege, protection, or immunity afforded by law. Twilio's responses and objections are conditioned specifically on the understanding that inadvertent disclosure of privileged or otherwise protected information is not intended to be, and may not be construed as, a waiver of any such privilege, protection, immunity, or any other ground for objecting to discovery with respect to such request, or the subject matter thereof, or the response thereto.

Twilio also preserves the following rights in objecting and responding to the Subpoena: (1) Twilio's right to object on any grounds at any time to the use of any documents or information provided by these objections and responses for any purpose in any subsequent proceeding in this Action or any other action; (2) Twilio's right to further object on any grounds at any time to further discovery arising out or relating to the Subpoena; and (3) Twilio's right to revise, correct, supplement, and/or clarify these objections or responses.

To the extent that Twilio agrees to respond and/or produce documents in response to the Subpoena, Twilio is not admitting any fact or agreeing with any legal or factual characterization in any request. Any documents that Twilio agrees to produce will be

produced at a reasonable time and in a reasonable manner.

## GENERALLY APPLICABLE OBJECTIONS TO THE SUBPOENA

1.      Twilio objects to the Subpoena to the extent that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or any other privilege, protection or immunity. Any inadvertent disclosure of such information is not intended and shall not be construed or deemed to constitute a waiver, either generally or specifically, in whole or in part, with respect to such information, or the subject matter thereof.  As a non-party to the Action, Twilio objects to the creation of a privilege log as that would impose an undue burden and to the extent not required under the Federal Rules of Civil Procedure.

2.      Twilio objects to the Subpoena to the extent that it seeks information that constitutes or contains trade secrets or other confidential, research, development, proprietary, or sensitive commercial or private information the disclosure of which would frustrate the rights of Twilio or any other person. Twilio will not disclose such information unless subject to an appropriate protective order in this Action.

3.      Twilio objects to the Subpoena to the extent that it calls for the disclosure of information protected by federal and/or state law, including, but not limited to the Electronic Communications Privacy Act. Further, Twilio will not disclose such information unless subject to an appropriate protective order in this Action.

4.      Twilio objects to the Subpoena as unduly burdensome and oppressive to the extent that it requests the production of documents from a non-party that would appear to be within Defendant's possession, custody, or control and thus subject to appropriate party discovery.

5.      Twilio objects to the Subpoena to the extent that it demands "any and all" or "all" documents relating to a topic or topics on the grounds that the use of such terms would render the request facially overbroad, unduly burdensome, and disproportionate to the needs of the case. Similarly, Twilio objects to the Subpoena to the extent that no specific timeframe for responsiveness is specified. If Twilio agrees to produce documents in response to a request, Twilio may provide exemplars or documents sufficient.

6.      Twilio objects to the Subpoena to the extent that it attempts to impose obligations upon Twilio beyond those required by the Federal Rules of Civil Procedure, the Local Rules, or an applicable standing order.

7.      Twilio objects to the Subpoena to the extent it seeks documents that are not reasonably calculated to lead to the discovery of admissible evidence or proportionate to the needs of the case as required by Fed. R. Civ. P. 26(b), or the burden and expense in obtaining the proposed discovery outweighs its likely benefit. To the extent that Twilio responds to any request, it does not concede any aspect of this objection. And because Twilio is not a

party to the Action, it cannot accurately determine what is relevant and what is not, and objects to the Subpoena on those grounds as well.

8.    Twilio objects to the Subpoena to the extent that its requests assume disputed facts or call for an improper legal conclusion. By responding to the Subpoena, Twilio does not admit or agree with any of the matters contained in the Subpoena, or that any purported fact is true or exists.

9.    Twilio objects to the Subpoena to the extent it fails to provide a place of compliance within 100 miles of San Francisco, California. The applicable rule provides that a subpoena may command a person to produce documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person. Twilio is headquartered in San Francisco, California and the records requested in the Subpoena issued to Twilio, to the extent they existed, would be accessible from Twilio's headquarters to custodians of records who are employed at that location. As such, the Subpoena specifies an improper place for production.

## SPECIFIC RESPONSES TO DOCUMENTS REQUESTED

**Request No. 1:** All documents concerning the Twilio account(s) which used these telephone numbers during the class period: (844) 275-4742, (888) 200-0961, (844) 416-1174 (844) 275-4742, (833) 513-7075, and (844) 943-2767, including account, registration, session records (including records of IP addresses used to register such account or to access such account at different times, and records of the devices used to access such account (including hardware model, operating system versions), records of recovery email addresses or telephone numbers, records of unique device identifiers, and records of mobile network information and or other records identifying any other Twilio account used by the person(s) using the Twilio account associated with such telephone numbers.

**Objections and Responses to Request No. 1:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request to the extent that it seeks to impose an undue and disproportionate burden on non-party Twilio and prematurely seeks information from Twilio before first seeking such information from the Defendant and/or the relevant Twilio customer with more direct knowledge of the relevant party's involvement. It would be improper, and duplicative, to compel Twilio to respond when an actual party to this matter and/or the customer identified below can fully satisfy this Request.

Twilio further objects to this Request because it is overly broad and unduly burdensome in that it seeks "All documents" concerning numerous categories of information such as registration, IP addresses, recovery email addresses, and hardware models. Further, the Request is vague and ambiguous because it contains numerous undefined terms, such as "session records," "unique device identifiers," and "mobile network information." Twilio also notes that the Request fundamentally misunderstands the nature of Twilio's services to ask

about "records of devices," "operating system versions," and "hardware model[s]." Twilio does not have records of that nature for any customer.

Twilio additionally objects to this Request to the extent it seeks information not relevant to the underlying litigation and/or seeks information not proportional to the needs of the case. Twilio further objects to this Request to the extent it seeks information not within its possession, custody or control. Twilio also objects to this Request to the extent that it seeks information that constitutes or contains confidential and sensitive commercial information, the disclosure of which would frustrate the expectation of privacy held by Twilio or any other person.

Subject to and without waiving the foregoing objections, Twilio states phone numbers (844) 275-4742, (888) 200-0961, (844) 416-1174, (833) 513-7075 and (844) 943-2767 belong to customer(s) of Twilio's services. The customer(s) details associated with the phone numbers are as follows:

AnswerNet
www.answernet.com
3930 Commerce Avenue
Willow Grove, Pennsylvania 19090

(844) 275-4742 Utilization period: May 7, 2019 to present
(888) 200-0961 Utilization period: August 12, 2018 to present
(844) 416-1174 Utilization period: May 23, 2019 to present
(833) 513-7075 Utilization period: May 22, 2019 to present
(844) 943-2767 Utilization period: November 27, 2020 to present.

**Request No. 2:** All call records for calls between:

> a. any of these telephone numbers: (844) 275-4742, (888) 200-0961, (844) 416-1174, (844) 275-4742, (833) 513-7075, and (844) 943-2767; and

> b. any of these telephone numbers: (215) 914-9702, (347) 383-5493, (929) 408-8985, and (917)291-6675; during the class period.

**Objections and Responses to Request No. 2:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request to the extent that it seeks to impose an undue and disproportionate burden on non-party Twilio and prematurely seeks information from Twilio before first seeking such information from the Defendant and/or the relevant Twilio customer with more direct knowledge of the relevant party's involvement. It would be improper and duplicative to compel Twilio to respond when an actual party to this matter and/or the customer identified below can fully satisfy this Request.  Twilio further objects to this Request as overly broad and unduly burdensome, including because it seeks call records "between" ten (10) phone numbers without specifying timeframes or limiting context, and to the extent it seeks the creation of documents or compilations that do not currently exist in the ordinary course of Twilio's

business. Twilio also objects to this Request to the extent it seeks information not relevant to the underlying litigation and/or seeks information not proportional to the needs of the case.

Subject to and without waiving the foregoing objections, Twilio states phone numbers (347) 383-5493, (929) 408-8985 and (917) 291-6675 and (215) 914-9702 do not belong to customers of Twilio's services. Twilio states phone numbers (844) 275-4742, (888) 200-0961, (844) 416-1174, (833) 513-7075 and (844) 943-2767 belong to a customer of Twilio's services. The customer details have been provided in response to Request No. 1 and that customer should be able to provide any responsive records to you. See Objections and Responses to Request No.1 above.

**Request No. 3:** All call records for calls or text messages to or from any of the following telephone numbers in 2021: (844) 275-4742, (888) 200-0961, (844) 416-1174, (833) 513-7075, and (844) 943-2767.

**Objections and Responses to Request No. 3:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request to the extent that it seeks to impose an undue and disproportionate burden on non-party Twilio and prematurely seeks information from Twilio before first seeking such information from the Defendant and/or the relevant Twilio customer with more direct knowledge of the relevant party's involvement.  It would be improper, and duplicative, to compel Twilio to respond when an actual party to this matter and/or the customer identified below can fully satisfy this Request.

Twilio also objects to this Request to the extent it seeks information not relevant to the underlying litigation and/or seeks information not proportional to the needs of the case. Twilio further objects to this Request to the extent it seeks the content of communications, which Twilio by law cannot produce in a civil litigation. See, e.g., 18 U.S.C. § 2702. Twilio further objects to the extent it seeks the creation of documents or compilations that do not currently exist in the ordinary course of Twilio's business. Twilio also objects to this Request to the extent it seeks information not within its possession, custody or control.

Subject to and without waiving the foregoing objections, Twilio states phone numbers (844) 275-4742, (888) 200-0961, (844) 416-1174, (833) 513-7075 and (844) 943-2767 belong to a customer of Twilio's services. The customer details have been provided in response to Request No. 1. See Objections and Responses to Request No.1 above.

**Request No. 4:** To the extent not already produced in response to prior Requests, all documents sufficient to identify every telephone number beginning with 800, 833, 844, 855, 866, 877, or 888 area code, which number TPV.com used, reserved, or paid during the class period.

**Objections and Responses to Request No. 4:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request to the extent that it seeks to impose an undue and disproportionate burden on non-party Twilio and prematurely seeks information from Twilio before first seeking such information

from the Defendant and/or the relevant Twilio customer with more direct knowledge of the relevant party's involvement. It would be improper, and duplicative, to compel Twilio to respond when an actual party to this matter and/or the customer identified below can fully satisfy this Request.

Twilio further objects to this Request as overly broad and unduly burdensome, including because it seeks identification of "every telephone number beginning with 800, 833, 844, 855, 866, 877, or 888" allegedly used, reserved, or paid for by TPV.com during the class period, which is not reasonably tailored in scope, time, or subject matter. Further, Twilio cannot accurately search its databases based on an entity name alone. Twilio further objects to the extent that this Request seeks protected information, potentially including the content of communications, that Twilio by law cannot produce in a civil litigation. See, e.g., 18 U.S.C. § 2702. Twilio also objects to this Request to the extent it seeks information not within its possession, custody or control. Subject to and without waiving the foregoing objections, see Objections and Responses to Request No.1 above.

**Request No. 5:** To the extent not already produced in response to prior Requests, all documents sufficient to identify every telephone number beginning with 800, 833, 844, 855, 866, 877, or 888 area code, which number was used, reserved, or paid for by any of Twilio account(s) identified in your response to Request 1 above during the class period.

**Objections and Responses to Request No. 5:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request to the extent that it seeks to impose an undue and disproportionate burden on non-party Twilio and prematurely seeks information from Twilio before first seeking such information from the Defendant and/or the relevant Twilio customer with more direct knowledge of the relevant party's involvement.  It would be improper, and duplicative, to compel Twilio to respond when an actual party to this matter and/or the customer identified below can fully satisfy this Request.

This Request is further overly broad on its face as it seeks "*all documents* sufficient to identify every telephone number beginning with 800, 833, 844, 855, 866, 877, or 888" allegedly used, reserved, or paid for." The Request is not sufficiently tailored and does not even identify the accounts for which it seeks documents for. Twilio also objects to this Request to the extent it seeks information not relevant to the underlying litigation and/or seeks information not proportional to the needs of the case. Twilio further objects to the extent that this Request seeks protected information, potentially including the content of communications, that Twilio by law cannot produce in a civil litigation. See, e.g., 18 U.S.C. § 2702. Twilio also objects to this Request to the extent it seeks information not within its possession, custody or control. Subject to and without waiving the foregoing objections, see Objections and Responses to Request No.1 above.

**Request No. 6:** All documents concerning the Twilio account(s) which used these telephone numbers during the class period: (407) 449-8340, (407) 553-2150, (410) 346-0089, (410) 781-1325, and (410) 784-4536, including account, registration, session records (including records of IP addresses used to register such account or to access such account at different

times, and records of the devices used to access such account (including hardware model, operating system versions), records of recovery email addresses or telephone numbers, records of unique device identifiers, and records of mobile network information and or other records identifying any other Twilio account used by the person(s) using the Twilio account associated with such telephone numbers.

**Objections and Responses to Request No. 6:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request to the extent that it seeks to impose an undue and disproportionate burden on non-party Twilio and prematurely seeks information from Twilio before first seeking such information from the Defendant and/or the relevant Twilio customer with more direct knowledge of the relevant party's involvement.  It would be improper, and duplicative, to compel Twilio to respond when an actual party to this matter and/or the customer(s) identified below can fully satisfy this Request.

Twilio further objects to this Request because it is overly broad and unduly burdensome in that it seeks "All documents" concerning numerous categories of information such as registration, IP addresses, recovery email addresses, and hardware models. Further, the Request is vague and ambiguous because it contains numerous undefined terms, such as "session records," "unique device identifiers," and "mobile network information." Twilio also notes that the Request fundamentally misunderstands the nature of Twilio's services to ask about "records of devices," "operating system versions," and "hardware model[s]." Twilio does not have records of that nature for any customer.

Twilio additionally objects to this Request because it seeks information not relevant to the underlying litigation and/or seeks information not proportional to the needs of the case. Twilio further objects to this Request to the extent it seeks information not within its possession, custody or control. Twilio also objects to this Request to the extent that it seeks information that constitutes or contains confidential and sensitive commercial information, the disclosure of which would frustrate the expectation of privacy held by Twilio or any other person.

Subject to and without waiving the foregoing objections, Twilio states phone numbers (407) 449-8340, (407) 553-2150, (410) 346-0089, (410) 781-1325, and (410) 784-4536 belong to customers of Twilio's services. The customer details associated with phone numbers are as follows:

**(407) 449-8340**

Callrail.com
100 Peachtree St. NW Suite #2700
Atlanta, Georgia 30303
Utilization period: December 7, 2023 to present
Utilization period: May 2, 2021 to May 17, 2023

Zillow, Inc.

www.zillowgroup.com
1301 2nd Ave
Seattle, Washington 98101
Utilization period: September 13, 2023 to September 18, 2023
Utilization period: November 13, 2023 to November 20, 2023

CodeRagon Infotech
AHMEDABAD
India
Utilization period: August 6, 2020 to March 18, 2021

Batch Service
https://batchservice.com
4625 South Wendler Drive
Tempe, Arizona 85282
Utilization period: March 10, 2020 to July 1, 2020

**(407) 553-2150**

Real Estate Webmasters
www.realestatewebmasters.com
223 Commercial St
Nanaimo, British Columbia V9R 5G8
Canada
Utilization period: July 18, 2023 to present

Callrail.com
100 Peachtree St. NW Suite #2700
Atlanta, Georgia 30303
Utilization period: September 26 to May 21, 2023

Apop LLC
www.apopmedia.com
941 E 2nd. St. Unit 108
Los Angeles, California 90012
Utilization period: August 27, 2020 to August 27, 2020

**(410) 346- 0089**

Podium
https://www.podium.com
1650 Digital Drive
Lehi, Utah 84043
Utilization period: March 28, 2023 to July 6, 2020

xanadumarketing.com

www.xanadumarketing.com
14200 Ironwood Dr Nw Ste B
Grand Rapids, Michigan 49534
Utilization period: July 23, 2020 to September 24, 2020

LightfootGlobal
www.lightfootglobal.com
9921 Carmel Mountain Rd #425
San Diego, California 92128
Utilization period: October 25, 2020 to November 23, 2020

Credit Saint
http://www.acqualify.com
PO Box 110
Ringwood, New Jersey 07430
Utilization period:  January 8, 2021 to January 29, 2021

Crowdskout
http://www.crowdskout.com
1101 K St NW FL 8
Washington, District of Columbia 20005
Utilization period: March 15, 2021 to March 29, 2021

ChaseData Corp.
http://www.chasedatacorp.com
8201 Peters Rd
Plantation, Florida 33324
Utilization period: May 14, 2021 to June 18, 2021

Ghost Management Group, LLC
www.weedmaps.com
41 Discovery
Irvine, California 92618
Utilization period: August 4, 2021 to November 3, 2022

Auto Dominate Marketing LTD
http://www.autodominate.com
111 West Main Street Suite A
Salisbury, Maryland 21801
Utilization period: January 25, 2023 to present

**(410) 781-1325**

Callrail.com
100 Peachtree St. NW Suite #2700
Atlanta, Georgia 30303

Utilization period: December 14, 2020 to July 6, 2021
Utilization period: January 23, 2023 to May 19, 2023

Ghost Management Group, LLC
www.weedmaps.com
41 Discovery
Irvine, California 92618
Utilization period: August 21, 2021 to November 2, 2022

Speed to Contact, LLC
https://www.ricochet360.com/
840 Apollo St Ste 100
El Segundo, California 90245
Utilization period: July 20, 2023 to October 8, 2024

**(410) 784-4536**

ResponseTREE
https://responsetree.com/
16755 Von Karman Ave
Irvine, California 92606
Utilization period: December 20, 2020 to March 23, 2021

ChaseData Corp.
http://www.chasedatacorp.com
8201 Peters Rd
Plantation, Florida 33324
Utilization period: May 13, 2021 to September 14, 2021

Scale to Win
https://www.scaletowin.com/
455 Market St Ste 1940
PMB 546116
San Francisco, CA 94105-2448 US
Utilization period: October 29, 2021 to March 29, 2022

Callrail.com
100 Peachtree St. NW Suite #2700
Atlanta, Georgia 30303
Utilization period: May 19, 2022 to June 26, 2023

CallTrackingMetrics
https://www.calltrackingmetrics.com
231 Najoles Road Suite #500
Millersville, Maryland 21108
Utilization period:June 26, 2023 to November 8, 2023

ANGI Homeservices Inc
www.angi.com
3601 Walnut St, Suite 700,
Denver, Colorado 80205
Utilization period: January 10, 2024 to February 7, 2024

CoStar
https://www.costar.com/
1331 L St NW Ste 2
Washington, District of Columbia 20005
Utilization period: March 23, 2024 to present

**Request No. 7:** All call records for calls or text messages to or from any of the following telephone numbers during the class period: (407) 449-8340, (407) 553-2150, (410) 346-0089, (410) 781-1325, and (410) 784-4536.

**Objections and Responses to Request No. 7:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request to the extent that it seeks to impose an undue and disproportionate burden on non-party Twilio and prematurely seeks information from Twilio before first seeking such information from the Defendant and/or the relevant Twilio customer with more direct knowledge of the relevant party's involvement. It would be improper, and duplicative, to compel Twilio to respond when an actual party to this matter and/or the customer(s) identified below can fully satisfy this Request.

Twilio further objects to this Request because it is overly broad and unduly burdensome in that it seeks "All records" concerning five separate phone numbers and is not reasonably tailored in scope or subject matter. Twilio additionally objects to this Request because it seeks information not relevant to the underlying litigation and/or seeks information not proportional to the needs of the case. Twilio further objects because this Request seeks protected information, potentially including the content of communications, that Twilio by law cannot produce in a civil litigation. See, e.g., 18 U.S.C. § 2702. Twilio also objects to this Request to the extent it seeks information not within its possession, custody or control.

Subject to and without waiving the foregoing objections, Twilio states phone numbers (407) 449-8340, (407) 553-2150, (410) 346-0089, (410) 781-1325, and (410) 784-4536 belong to customers of Twilio's services. The customer details have been provided in response to Request No. 6. See Objections and Responses to Request No. 6 above.

**Request No. 8:** All documents concerning any communication between Twilio and any other person (besides Plaintiff and his counsel) regarding the case captioned above, Nock v. Palm Co Administration, LLC, No. 1:24-00662, pending in the United States District Court for the District of Maryland (including, by way of example but without limitation, communications concerning this subpoena, Twilio's response thereto, and the retention and/or production of

==documents relevant to the case captioned above, as well as documents evidencing such communications). This category does not include Comcast's internal communications.==

==**Objections and Responses to Request No. 8:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request because it seeks information not relevant or proportional to the needs of the underlying Action. Additionally, the Request is overly broad because it seeks "all documents" concerning "any communications," and because it fails to identify specific individuals or entities, timeframes, or subject matter limitations. Twilio also objects to this Request to the extent the Request seeks privileged communications, including those protected by attorney-client privilege or work product doctrine. Subject to and without waiving these objections, Respondent will produce non-privileged documents, if any.==

**Request No. 9:** All documents concerning any incident under which any document which would be responsive to this subpoena was purportedly lost, destroyed, delinked, dereferenced, deleted, and/or access to such document was lost.

**Objections and Responses to Request No. 9:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request on the grounds that it is vague, overly broad, and unduly burdensome. The Request fails to identify any specific time period, custodians, or categories of documents, and uses ambiguous terminology such as "delinked" and "dereferenced," which are not defined and may be interpreted in multiple ways. To the extent the Request seeks information protected by the attorney-client privilege, work product doctrine, or other applicable protections, Twilio objects and will withhold such documents. Subject to and without waiving the foregoing objections, Twilio directs Plaintiff to certain publicly-accessible documentation regarding Twilio's retention policies:

https://help.twilio.com/articles/4410585868443-Data-Retention-and-Deletion-in-Twilio-Products
https://help.twilio.com/articles/223181008-Twilio-SMS-message-and-traffic-storage

**Request No. 10:** To the extent that you intend to charge Plaintiff any cost or expense for complying with this subpoena, all documents on which you may rely to support such cost or expense.

**Objections and Responses to Request No. 10:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Subject to and without waiving those objections, Twilio states that, at this time, it does not intend to charge Plaintiff any costs or expenses in connection with compliance with this subpoena. Twilio reserves all rights to seek reimbursement of reasonable costs as permitted under applicable law.

**Request No. 11:** To the extent that you object to this subpoena, every document on which you may rely to support such objection in any dispute regarding this subpoena.

**Objections and Responses to Request No. 11:** Twilio incorporates herein by reference its Preliminary Statement and Generally Applicable Objections. Twilio objects to this Request

on the grounds that it is improper, premature, and not a proper request under Rule 45. This Request purports to require the identification or production of documents supporting legal objections, which are typically based on legal principles, case law, and proportionality—not necessarily on specific documents in Twilio's possession. Twilio further objects to this Request to the extent it calls for the disclosure of attorney-client communications, documents protected by the work product doctrine, and/or other applicable protections. Twilio will withhold all privileged materials.  Twilio also objects to the Request as vague, overly broad, and unduly burdensome, particularly to the extent it seeks "every document" that may hypothetically be relied upon in any potential future dispute, without limitation or specificity.

Subject to and without waiving the foregoing objections, Twilio states that its objections are set forth herein and are based on applicable legal standards under Rule 45, including, but not limited to, undue burden, lack of proportionality, and the limitations on discovery from non-parties. Twilio expressly reserves all rights.

In closing, please note that Twilio allows developers to programmatically send and receive text messages and perform other communication functions using its web service API but Twilio does not conduct such tasks on its customers' behalf except to provide technical support for use of its platform. Twilio customers have access to their own records by way of the Twilio account console and/or Twilio's APIs and are best positioned to obtain and produce documents responsive to these requests to the extent they exist (see, e.g., the BulkExportAPI method outlined at https://www.twilio.com/legal/civil-requests).

Please email me at the address below if you have any questions regarding Twilio's objections and responses.

Sincerely,

Jacob Sommer
Shareholder
ZwillGen PLLC
jake@zwillgen.com
*Counsel to Twilio*

From: "Ethan Preston" <ep@eplaw.us>
To: "Jake Sommer" <Jake@zwillgen.com>
CC: "Jacob Ginsburg" <jginsburg@creditlaw.com>
Date: 10/10/2025 11:06:58 AM
Subject: Re: Twilio Subpoena Response

Thanks. Can we set up a call next week?

On 10/10/25 11:40 AM, Jake Sommer wrote:

> That should say "an ISV."   Not "and ISV."
>
> Jacob Sommer
> Shareholder
> ZwillGen PLLC
> 202-706-5205
>
> **From:** Ethan Preston <ep@eplaw.us>
> **Sent:** Friday, October 10, 2025 11:47 AM
> **To:** Jake Sommer <Jake@zwillgen.com>
> **Cc:** Jacob Ginsburg <jginsburg@creditlaw.com>
> **Subject:** Re: Twilio Subpoena Response
>
> Thanks, Jake. Twilio's response appreciably narrows the open items in subpoena, but I'm a little confused by your email. I don't see ISV referenced in Twilio's response. Twilio's response seems to focus on the prospect of getting relevant documents from TPV.com/AnswerNet. To help fill out the record, I wanted to provide the court's orders from our ancillary case with TPV.com. Can we set up a call next week?
>
> Thanks,
>
> Ethan
>
>
> On 10/10/25 9:25 AM, Jake Sommer wrote:
>
>> Ethan -
>>
>> As you know, Twilio has asked me to assist with its response to your subpoena. Attached are the company's objections and responses to your subpoena.
>>
>> We have also connected with AnswerNet, and ISV, who we have identified in response to Request No. 1 and is the proper party from which to seek these documents.  Twilio is ready to support AnswerNet to resolve any issues it may have in pulling records responsive to requests you serve on them.  This should obviate the need for a deposition or to seek additional documents from Twilio.
>>
>> Jake
>>
>> Jacob Sommer
>> Shareholder
>> ZwillGen PLLC